## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AUSTAR INTERNATIONAL LIMITED, directly against and derivatively on behalf of AustarPharma LLC<br><br>                Plaintiff,<br><br>v.<br><br>AUSTARPHARMA LLC<br>                Defendant/Nominal Defendant,<br><br>RONG LIU and GUANGZHOU BRISTOL DRUG DELIVERY CO., LTD.,<br><br>                Defendants. | **COMPLAINT**<br><br>Civil Action No. _____<br><br>*Document Electronically Filed*<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Plaintiff Austar International Limited ("Austar"), a company located in Hong Kong that specializes in investing in drug research and development, brings this suit in a derivative and direct capacity against Rong Liu ("Liu"), a New Jersey-based scientist with whom Austar partnered to launch a pharmaceutical drug technology company in 2004, and Guangzhou Bristol Drug Delivery Co., Ltd. (the "Guangzhou Company"), a pharmaceutical company controlled by Liu, which he formed in July 2013 in the People's Republic of China ("PRC").

2.     In 2004, Austar and Liu signed a joint venture agreement (the "Joint Venture Agreement"), agreeing to "co-operate in the establishment and management" of a new company that would engage in "the business of pharmaceutical research and development, [and] manufacturing and distribution of finished drug products worldwide."[1]  Austar agreed to supply

---

[1] Joint Venture Agreement dated July 1, 2004, Recital (A).  A true and correct copy of the July 1, 2004 Joint Venture Agreement is attached hereto as Exhibit A.

the start-up capital – pledging $8 million by the end of 2006 – as well as "well-established social connections, reputation and goodwill in the Chinese pharmaceutical industry."[2]  Liu agreed to contribute his experience and scientific knowledge of drug research and development, as well as his personal connections in the U.S. pharmaceuticals industry.[3]   Both parties covenanted to "take all actions necessary" for the creation and success of the Company, while Liu was given the primary responsibilities of setting up the Company (i.e., filing articles of incorporation), launching special projects, and overseeing the venture's daily operations as president and chief executive officer.[4]

3.      Shortly thereafter in 2004, the contemplated joint venture – named AustarPharma LLC ("AustarPharma" or the "Company") – was incorporated in the State of New Jersey, with headquarters in Edison.  From its inception through this day, AustarPharma's core business has been to "engage in pharmaceutical research and development, manufacturing, and distribution of finished drug products in China & USA."[5]

4.      In 2008, De Fortune Holding Limited ("DFH"), a party based in the Cayman Islands, agreed to invest in AustarPharma through a capital contribution of $2 million.  The parties signed an Amended and Restatement Operating Agreement on August 8, 2008 ("Operating Agreement"),[6] under which Austar, Liu, and DFH were each made "Members" of the LLC with certain rights and responsibilities, and Liu continued to serve as president and CEO.

5.      As its founding business partner, co-venturer and fiduciary, Austar placed its trust in Liu.  Austar entrusted Liu not only with its investment capital and good name, but also with its commercial strategies, sophisticated understanding of national and international drug markets,

---

[2] *Id.,* Arts. 7.2, 9.3.

[3] *Id.*, Art. 9.4.

[4] *Id.*, Arts. 4.1, 9.4, 9.6.

[5] *Id.*, Art. 9.1.

[6] A true and correct copy of the August 8, 2008 Operating Agreement is attached hereto as Exhibit B.

and client relationships.  Austar put its faith in Liu that he would manage AustarPharma in the parties' joint interest, maximize the Company's returns, and safeguard its intellectual property. Liu has done the opposite.  He has used his position of authority at AustarPharma to engage in a multi-year campaign of self-dealing, theft, and usurpation of corporate opportunities.

6.     Rather than work to expand AustarPharma's business opportunities abroad, Liu secretly founded a number of competitive companies in the PRC and has been steadily working to capture the PRC and U.S. markets for himself.  Using AustarPharma's intellectual property, personnel and trade name, Liu has been raising capital in China, developing and commercializing medical technologies and products similar, if not identical, to those developed by AustarPharma, and trying to claim the PRC market for himself.  He also has taken steps – which have accelerated in recent months – to spread his illicit business activities to the United States.  For example, a number of current or former AustarPharma employees who are now also affiliated with Liu's competitor entities have filed patent applications in the PRC in the name of those competitor entities, including several patent applications in the name of the Guangzhou Company.  Some of these patent applications involve technology that is very similar to what AustarPharma has developed, reflecting a clear intent to compete directly with AustarPharma. Liu's self-serving actions violate basic tenants of New Jersey corporate law, agency law, and tort law, as well as the federal Defense of Trade Secrets Act of 2016.  Austar only learned of at least some of these actions in recent years, including as recently as 2018.

7.     Liu's conduct also runs afoul of the parties' original Joint Venture Agreement and subsequent Operating Agreement. Within both contracts, the parties mutually promised that Members of AustarPharma during the term of their membership, as well as for any two-year period following their separation, would not compete with AustarPharma in the United States by

engaging in a similar business or by selling similar drug products. *See* Exhibit B (Operating Agreement), Art. 12.1 ("The Members shall not engage in any business or other activities which directly or indirectly competes with specific generic drug products developed by the Company for the market in the USA"); *see also* Exhibit A (Joint Venture Agreement), Art. 13.1. Liu further agreed within both contracts not to compete with AustarPharma in the PRC. *See* Exhibit B (Operating Agreement), Art. 12.2; Exhibit A (Joint Venture Agreement), Art. 13.1. Liu flagrantly breached his contractual duties.

8.    Accordingly, Austar brings this lawsuit both in a derivative capacity, advancing claims belonging to AustarPharma and all of its shareholders, and in a direct capacity, advancing claims belonging to Austar specifically. As set forth below, the derivative claims are for breach of fiduciary duty owed by a CEO to his shareholders, conversion of property, misappropriation of trade secrets under federal law and New Jersey law, tortious interference with prospective economic advantage, and judicial expulsion of Liu as a Member of AustarPharma. The direct claims are for breach of fiduciary duty owed by a joint-venturer to his business partner, breach of contract, and conversion of property.

## **PARTIES**

9.    Plaintiff Austar International Limited is a company organized under Hong Kong law with its principal place of business in Hong Kong.

10.    Defendant Rong Liu is an individual who, on information and belief, resides in Warren, New Jersey.

11.    Defendant Guangzhou Bristol Drug Delivery Co., Ltd. is a company headquartered in the city of Guangzhou in the PRC.

12.     Nominal defendant AustarPharma LLC is a company incorporated in Delaware and headquartered in Edison, New Jersey, where it maintains a research and development facility dedicated to drug delivery technology innovation and product development. AustarPharma is the corporation in whose name many of the derivative actions are being brought. However, because AustarPharma's management opposes this suit, AustarPharma is listed as a nominal defendant, consistent with New Jersey law and practice. Austar is confident that AustarPharma's management opposes this suit because as described below, Liu currently controls over 50% of AustarPharma's LLC interests. This means that pursuant to the Operating Agreement, Austar would not be able to obtain the 60% approval of the total LLC interests necessary to initiate litigation, and the Company's management would oppose the suit. *See* Exhibit B (Operating Agreement), Art. 6.1(d).

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because one of Plaintiff's claims arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836. This Court has supplemental jurisdiction over the other claims asserted herein under 28 U.S.C. § 1367.

14.      Venue is proper in this Court with respect to Defendant Liu because he resides in the State of New Jersey and because a large amount of the business conduct at issue occurred in New Jersey.

15.     Venue is also proper in this Court with respect to Defendant Guangzhou Company because it committed the intentional tort of misappropriating AustarPharma's trade secrets, AustarPharma was harmed in New Jersey by the Guangzhou Company's conduct, and the Guangzhou Company acquired AustarPharma's trade secrets through its founder Liu's relationship with AustarPharma in New Jersey. Liu acquired knowledge of the trade secrets as a

5

member of AustarPharma, while he was residing in New Jersey, and subsequently founded Guangzhou Company in the PRC, where he has filed patent applications in Guangzhou Company's name that involve the improper use of AustarPharma's trade secrets.

16.     All of the conduct which forms the basis for the claims set forth in this Complaint took place within the applicable statutes of limitation.

## FACTUAL ALLEGATIONS

### I.     AUSTARPHARMA'S BUSINESS AND PRODUCTS

17.     Since its incorporation, AustarPharma has focused on the research, development, manufacture, and commercialization of finished generic drug products and drug-delivery technology products, as well as on providing research and development services to pharmaceutical companies worldwide.

18.     From the very beginning, the strategic goal of AustarPharma was to serve markets in the United States, the People's Republic of China, and worldwide.  Article 9.1 of the Joint Venture Agreement, signed by Liu and Austar in 2004, provides that "[t]he principal business of the Company is to engage in pharmaceutical research and development, manufacturing and distribution of finished drug products *in China & USA.*" (emphasis added).  Article 1.5 of the Operating Agreement, signed in 2008, likewise describes the "Business of the Company" as follows:  "The Company shall continue to engage in pharmaceutical research and development, manufacturing and distribution of finished drug products in the People's Republic of China . . . and the United States of America and in other activities reasonably incidental thereto."  AustarPharma's June 3, 2010 Business Plan also states that "[t]he business scope of

AustarPharma is development, manufacturing and commercialization of generic and drug delivery technology-based products for the US and world markets."[7]

19.     AustarPharma's business today can be broken into two categories: (1) generic drug development, including conventional generic drugs, modified-release drugs, and niche generic drugs, and (2) development of drug delivery technology-based products, including proprietary drug delivery technologies and conventional drug delivery technologies.

20.     One of AustarPharma's specialties is the development of water-insoluble drug delivery technologies.  Specifically, AustarPharma has combined controlled-release and water-insoluble drug delivery technologies to complete several platform technologies that allow AustarPharma to become a leader in the development of modified-release generic drug products in both U.S. and global markets. These platform technologies include an osmotic pump system, a diffusion controlled film system, and a matrix system with both erosion and diffusion mechanisms.[8]

21.     AustarPharma also uses its water-insoluble drug delivery technologies to improve water-insoluble drugs to meet underserved market needs. [9] These technologies include pharmaceutical salts and pH adjustment, cosolvents, conventional micelles with surfactants, self-emulsifying systems, emulsions and microemulsions, semisolid systems, particle size reduction (*e.g.* nanocrystals), solid dispersions, process improvement, softgel technology, lipid based systems, complexations, liposomes, polymeric micelles, fast absorption techniques,

---

[7] *See* AustarPharma June 3, 2010 Business Plan at 8.  A true and correct copy of the AustarPharma June 3, 2010 Buisness Plan is attached hereto as Exhibit C.
[8] *See id.* at 4.
[9] *Id.* at 20.

Bioavailability enhancement techniques, bio-variation reduction techniques, and pain and irritation reduction on injection sites.[10]

22.     AustarPharma has also developed other drug delivery technologies including implantable technologies, parenteral drug delivery technologies, pulmonary and intranasal delivery technologies, enhanced absorption/transport technologies.

23.     To date, AustarPharma has received at least two Abbreviated New Drug Application ("ANDA") approvals from the FDA for generic drug products.  They are for methocarbamol tablets, granted in 2011, and for sertraline hydrochloride tablets, granted in 2009. Both products are currently sold in the United States in prescription drug form.  Methocarbamol is used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries, and sertraline hydrochloride is a selective serotonin reuptake inhibitor that treats depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and anxiety.

24.     AustarPharma has entered co-development agreements with numerous pharmaceutical companies based primarily in the U.S. and China, pursuant to which AustarPharma conducts the necessary research and development to prepare generic drugs for launch worldwide – including all necessary preparations for applying for FDA approval – in exchange for some combination of a development service fee, marketing rights and a share in the profits from the sale of those drugs in certain specified regions (often the U.S.) or worldwide. Under these contracts, AustarPharma's co-development partners are also entitled to market and sell the products in certain specified regions (often PRC) or worldwide.  AustarPharma receives millions of dollars in revenues from these co-development partnerships which involve a variety of generic drugs, including but not limited to: febofibrate (a cholesterol drug), valstaran (a blood

---

[10] *Id.* at 20-21.

pressure drug), nifedipine extended release tablets (a blood pressure drug), tedalafil (a blood pressure drug), esomeprazole DR Capsules (helps with acid reflux), naloxone (an opioid drug), aripiprazole (an antipsychotic drug), alendronate sodium tables (an osteoporosis drug), and paliperidone (a schizophrenia drug). To the best of Austar's knowledge, AustarPharma has earned millions of dollars in revenues from its development and commercialization of these FDA-approved drugs.

25.     AustarPharma established a wholly-owned subsidiary in Beijing (the "Beijing Subsidiary") in March 2005 to cultivate and expand AustarPharma's co-development partnerships with Chinese pharmaceutical companies, as well as to provide additional research and testing services in support of U.S. product development.[11] The Beijing Subsidiary also assists AustarPharma's Chinese co-development partners to ensure that their facilities are in compliance with manufacturing regulations enforced by the FDA.[12] Taking advantage of cost-effective manufacturing in China through these co-development partnerships is an important competitive advantage for AustarPharma's generic drug sales in U.S. and global markets.[13]

## II.     AUSTARPHARMA'S FORMATION AND STRUCTURE

26.     AustarPharma is a joint venture and its members are co-joint venturers.

27.     The LLC was formed on July 14, 2004, through filing a certificate of formation with the New Jersey Secretary of State pursuant to the New Jersey Limited Liability Company Act.

28.     The operative governing charter for AustarPharma is an August 8, 2008 Amended and Restated Operating Agreement, executed by Austar, Liu, and DFH. That agreement

---

[11] *See id.* at 8.
[12] *Id.*
[13] *Id.*

9

superseded the 2004 Joint Venture Agreement, as well as other interim agreements Liu and Austar had signed.[14]

### A.  **Members of AustarPharma**

29.    Under the Operating Agreement, the "Members" of AustarPharma are Austar, Liu, and DFH (the "Members").

30.    Article 6.6 of the Operating Agreement contains the covenants of the Members to one another.  Specifically, it provides that the Members agree to "perform and observe or, so far as such Member is able to do, to procure that the Company shall at all times act in accordance with, the provisions of this Agreement," Art. 6.6(b), and to "vote such Member's Membership Units in all matters so as to give full force and effect to the provisions of this Agreement," Art. 6.6(d).

31.    Pursuant to Article 6.1 of the Operating Agreement, "the approval or consent of Members owning an aggregate of more than 60% of the total LLC Interests shall be required" in order for AustarPharma to take certain actions set forth therein.  These include decisions to "cause the Company to participate in any capacity . . . in any business organization or enterprise," to "own, improve, develop, operate, manage and lease real estate," to "borrow money from any Member, bank, lending institution or other lender for any purpose of the Company," and to "enter into, terminate or amend any Related Party Transaction."  Art. 6.1(a)-(n).

32.    Meanwhile, Article 6.2 sets forth actions that AustarPharma cannot take without the "approval or consent of Members owning an aggregate of more than 80% of the total LLC Interests."  These include actions to "consolidate or merge with any Person or with any other business," to "effectuate any reorganization of the Company," and to "incur indebtedness or

---

[14] *See* Exhibit B (Operating Agreement), Annex II.

create liability . . .   the effect of which . . . will result in a total debt to equity ratio of the Company at any time exceeding 50%."  Art. 6.2(a)-(j).

33.    Article 2.1 sets forth the capital contributions of the Members and the percentage interest ("LLC Interests") each Member will hold in AustarPharma. As of the Effective Date, Austar held 275,000 membership units, a 43.87 percent equitable interest, and made $4,019,401 in capital contributions.  Liu held 225,000 membership units, a 35.89 percent interest, and did not make any capital contribution. DFH held 1,250,000 membership units, a 19.94 percent interest, and made $2,000,000 in capital contributions.

34.    Article 11 of the Operating Agreement provides restrictions on transfers of LLC Interests.  It states: "[N]o Member shall have the right to transfer any or all of its, his or her LLC Interest, and any purported transfer or assignment thereof shall be void and of no force or effect, and may be ignored by the Company and the other Members."  Art. 11.1.  Further, if "all Members other than the Member proposing to transfer any LLC Interest (the 'Transferring Member') do not unanimously approve the proposed transfer, the transferee of such Transferring Member's LLC Interest shall have no right to become a Member or participate in any manner in the management or conduct of the Business of the Company.  In that event, the transferee shall only be entitled to Distributions of the Distributive Share of the profits of the Company . . . to which the Transferring Member otherwise would be entitled." *Id.*

35.    On or around December 12, 2017, Austar learned from Liu that Liu had acquired De Fortune Holding Limited, meaning that Liu became the beneficial owner of DFH's membership and LLC Interests in AustarPharma, and that Liu obtained the capability of voting all of DFH's voting rights.  Accordingly, the current voting rights arrangement at AustarPharma is that Austar holds 43.87% of the company's voting rights, and Liu effectively controls 55.83%

of the company's voting rights.  The remaining 0.30% is held by Landmark – a consultant who was introduced by Liu and then retained by AustarPharma at the direction of Liu – which received this percentage as consideration to help AustarPharma find investors.

**B.  Managers and Directors of AustarPharma**

36.     Pursuant to Article 5.1 of the Operating Agreement, AustarPharma also has Managers who are appointed annually by unanimous approval of the Members.  As of the Effective Date, and as set forth in Article 5.3(b), AustarPharma had two Managers:  (i) Mars Ho Kwok Keung ("Mr. Ho"), the Chairman of Austar, who is based in Hong Kong; and (ii) Liu, the President and Chief Executive Officer of AustarPharma, who is based in New Jersey.

37.     Article 5.2 of the Operating Agreement defines the authority of the Managers, who are tasked with managing and controlling day-to-day operations of AustarPharma "for the benefit of all of the Members." The signature of any Manager is generally sufficient to bind AustarPharma and the Managers generally "have the full and entire right, power and authority to manage and conduct the Business of the Company."

38.     Meanwhile, Article 10 of the Operating Agreement provides that AustarPharma shall have a Board of Directors (the "Board") consisting of four directors ("Directors"), the number of which may be increased or decreased by unanimous consent of the Members. Austar is entitled to designate two Directors and to designate the Chairman of the Board, and Liu and DFH are each entitled to designate one Director.

39.     Austar designated Mr. Ho as Chairman of the Board and also designated Ms. Gu Xun to serve on the Board. Liu designated himself to serve on the Board, and DFH designated Ms. Tsui Kwan Amelia. Art. 10.3.

## C. Rong Liu's Duties as CEO and President

40.      Article 9 of the Operating Agreement sets forth the obligations of the CEO and President of AustarPharma, Liu. Article 9.1 states: "The Chief Executive Officer and President of the Company shall perform and observe, and/or, so far as he or she is otherwise able to do, to procure that the Company shall at all times act in accordance with, the provisions of this Agreement."

41.      Article 9.2 lists the "Special Responsibilities" of the CEO and President as follows:

> In addition to responsibility for leadership and executive duties in directing the Business and operations of the Company, Mr. Liu in his capacity of Chief Executive Officer and President shall:  (a) contribute his experience, know-how and general knowledge in pharmaceutical research and development, drug delivery technologies, strong connections and excellent reputation in the pharmaceutical industry in the USA to develop and operate the Company; and  (b) introduce and develop special projects ("Special Projects"), which mean any project under development by the Company whose ideas originate with Mr. Liu and which have been approved by the Board as Special  Project for purposes of this Agreement prior to implementation thereof by the Company.

42.      As CEO, Liu is also required to prepare and deliver certain financial reports to the Members. Article 7.1 of the Operating Agreement requires that "[n]o later than 60 days prior to the end of each Fiscal Year, the Chief Executive Officer shall prepare and deliver to the Members . . . reports for the next Fiscal Year" including an Investment Plan, Budget authorization, Forecast authorization, Project purchasing budget, Rented property requirements, Authorization for personnel, and more.

43.      The reports due from the CEO and President must be approved by the Members owning an aggregate of more than 60% of the total interests in AustarPharma within 30 days. Art. 7.1.

44.     The Operating Agreement also states that "[n]o spending which is the subject of any of the foregoing reports shall be made until the report related to such spending shall have been approved as set forth herein." Art. 7.1.

**D.  Covenant on Non-Competition**

45.     Article 12.1 of the Operating Agreement clearly and unambiguously precludes Members from competing with AustarPharma's business:

> The Members shall not engage in any business or other activities which directly or indirectly competes with specific generic drug products developed by the Company for the market in the USA so long as Austar and DFH are Members and Mr. Liu is an Employee and a Member and in each case for a period of two years after any of them ceases to be a Member, which activities shall include, without limitation, the following:
>
> (a) employment of any Person who has, at any time within the one year period preceding the date such Member ceased to be a Member or Mr. Liu ceased to be a Member and Employee ("Disassociation Date"), been a Director, officer, employee or consultant to the Company and also, by reason thereof is or may be likely to be in possession of confidential information of the Company; and
>
> (b) any action to interfere directly with the goodwill of the Company or tamper with or induce or attempt to tamper with or induce, any Person who is, or who had, at any time within the two-year period preceding the Disassociation Date, been an employee, agent, sales person, contractor, supplier, manufacturer, distributor or dealer of the Company to stop selling to the Company or otherwise to abandon the Company.

46.     Article 12.2 is entitled "Exceptions Applicable in the PRC," and it states: "The restrictions in Section 12.1 shall not be deemed to prohibit *Austar or DFH* from engaging, directly or indirectly, in any business similar to the Company's Business involving customers in the PRC, provided that the nature of such business does not conflict with the Company's Business."  Art. 12.2 (emphasis added). There is no similar exception permitting Liu to conduct similar business in the PRC.

14

47.     The text of Article 12.1, the Operating Agreement as a whole, and the parties' understanding when the Operating Agreement was signed, all demonstrate that Article 12 is intended to encompass (and ban) competitive activities by Liu with respect to AustarPharma's products, technologies and business interests in the PRC.   That is, Articles 12.1 and 12.2, together, prevent Liu from seeking to develop and to sell in the United States *or* in the PRC generic drug products or delivery technologies that are equivalent to those being developed by AustarPharma for initial launch in the United States.   Article 12.2 makes this especially clear, because while it provides that "[t]he restrictions in Section 12.1 shall *not* be deemed to prohibit *Austar* or *DFH* from engaging . . . in any business similar to the Company's Business involving customers in the PRC" (emphasis added), it does not provide a similar exception to Article 12.1's restrictions as to Liu. Thus, Article 12's restrictions on anti-competitive activities restrict Liu from "engaging in business similar to the Company's Business" in both the United States and in the PRC.

## IV.   LIU'S ACTS OF SEL-DEALING, USURPATION OF CORPORATE OPPORTUNITIES, AND THEFT OF TRADE SECRETS

48.     Despite his clear duties under AustarPharma's operating documents and New Jersey law, Liu established separate competing companies to trade on, and profit from, AustarPharma's technology, funding, human capital and good reputation, with a focus on AustarPharma's primary markets of the U.S. and China.

### A.   Launching Companies that Compete With AustarPharma

49.     In July 2013, Liu formed Guangzhou Bristol Drug Delivery Co., Ltd., which engages in the same business, and covers the same markets, as AustarPharma.[15]   Based on publicly available information, including company profiles published on Chinese websites, the

---

[15] The Guangzhou Company sometimes refers to itself publicly as Guangzhou Bosiyi Controlled Release Pharmaceutical Co., Ltd., or simply as Bristol.

Guangzhou Company holds itself out as a high-tech pharmaceutical company specializing in the research and development of new drug delivery systems. It is located in the city of Guangzhou, which is widely known in PRC as "Guangzhou Science City" and as "the Silicon Valley of South China." Liu gave himself the roles of Chairman of the Board, Manager and Legal Representative of the Guangzhou Company.[16]

50.     Liu's experience with AustarPharma is portrayed in the Chinese media as being highly relevant to the value that he brings to Guangzhou Company, providing further evidence of the significantly overlapping business of the two entities and Liu's intent to wrongfully benefit from the good will and reputation of AustarPharma.

51.     For instance, public profiles of Guangzhou Company circulated in the PRC note that Liu and his team members "have rich experience in the development and industrialization of innovative pharmaceutical preparations and new drug delivery system drugs."

52.     Online profiles of the Guangzhou Company refer directly to Liu's work with AustarPharma in the United States. For example, one such profile dated November 12, 2017 states:

> In 2004, Dr. LIU RONG and his team founded AustarPharma. LLC in the United States (located in Edison City, New Jersey, United States), to provide research and development services of pharmaceutical preparations for global pharmaceutical enterprises, and the company has cooperated with many global well-known pharmaceutical companies on development of many drugs. Dr. LIU RONG and his team have developed more than 20 preparation products that have been listed in the United States or are passing the FDA certification, including many different technologies and dosage forms, and solubilization technology, oral sustained and controlled release preparation technology, oral quick-release preparation technology of insoluble drugs.

---

[16] *See* January 16, 2017 Capital Increase Agreement at 66 and 88. A true and correct copy of the January 16, 2017 Capital Increase Agreement for the Guangzhou Company is attached hereto as Exhibit D; *see also* August 29, 2017 Guangzhou Bristol Drug Delivery Co., Ltd. Board Resolution at 5. A true and correct copy of the August 29, 2017 Guangzhou Bristol Drug Delivery Co., Ltd. Board Resolution is attached hereto as Exhibit E.

53.     There is a significant and undeniable overlap between the business focus of AustarPharma and of Guangzhou Company, as it has been described in publicly available materials.  For example, a January 16, 2017 Capital Increase Agreement obtained by Austar— related to Guangzhou Company and entered into between Liu, two investors, and Bristol Holdings Limited (another company controlled by Liu)—describes the core technology and businesses of Guangzhou Company to include: (1) developing controlled-release pharmaceutical products that involve osmotic pump technology;  (2) developing pharmaceutical products that involve nano-solubilization technology, pellets-sustained released technology, heat melt extrusion, and liposome formulation technology; and (3) using the American FDA and ANDA product development system to conduct domestic consistency evaluation on the chemistry, manufacturing, and quality control for drugs that are already on the market.[17]   The pharmaceutical products and technologies included in the description of Guangzhou Company's core technology and business are virtually (if not entirely) identical to those already developed and being developed by AustarPharma, which Liu and Guangzhou now intend to introduce in both the United States and PRC markets.  Further, the Guangzhou Company appears to be marketing its FDA expertise to Chinese pharmaceutical companies, just as AustarPharma has done resulting in numerous co-development agreements with Chinese partners.

54.     The Guangzhou Company's August 29, 2017 board resolution states that its business will be to produce new drug delivery mechanisms and new products that use sustained release, controlled release, targeting, transdermal absorption, and other new technology.[18]   Again, that business mission is virtually identical to AustarPharma's business mission.

---

[17] Exhibit D (Capital Increase Agreement) at 67.
[18] Exhibit E (Guangzhou Company Board Resolution) at 4.

55.     The Guangzhou Company has also invested in several companies listed in the below chart, either as the sole shareholder or in conjunction with Liu or other companies incorporated by Liu.   These companies are focused on researching and developing similar technologies to AustarPharma.   The information contained in the chart below is based on publicly available sources.

| No. | Name of Company (in English) | Date of Incorporation | Liu's Role | Scope of Business |
|---|---|---|---|---|
| 1 | Guangzhou Zhiping Pharmaceutical Technology Co., Ltd. | 28-Jul-16 | Executive Director, Manager and Legal Representative | Medical research and experimental development; biomedical technology research; drug research and development; food science and technology research services; biotechnology extension services; biotechnology development services; biotechnology consultation and communication services; biotechnology transfer services; transfer of human scientific research results; transfer of research results of Health Science projects; life engineering projects development; and popularization of research achievements in health science projects. |
| 2 | Shanghai Yiping Pharmaceutical Technology Co., Ltd. | 31-Jul-17 | Specific role undisclosed (indirect owner) | To engage in the development, transfer, consultation and service of technology in the fields of medical technology and biotechnology. |

| 3 | Sichuan Keside Drug Delivery Co., Ltd. | 27-Nov-17 | Chairman of Board, Manager and Legal Representative | Pharmaceutical research and development, production, chemical preparation production; import and export of goods and technology; medical research and experimental development; biotechnology transfer services; biotechnology development services; and biotechnology consultation and communication services. |
| 4 | Guangzhou Bosiya Biotechnology Co., Ltd. | 7-Jun-18 | Chairman of Board, Manager and Legal Representative | Medical research and experimental development; biomedical technology research; drug research and development; biotechnology transfer services; biotechnology development services; biotechnology consultation and communication services; anthropology transfer service of research results; transfer of research results of health science projects; promotion of research results of health science projects; commodity trade; manufacture of chemical raw materials; manufacture of chemical preparations; development and production of new anticancer drugs, new cardio-cerebrovascular drugs and new nervous system drugs. |

| 5 | Guangzhou Auwecare Pharmaceutical Company Ltd. (PRC) | 10-August-2016 | Executive Director and Manager | Enterprise management services; scientific and technological information consulting services; medical research and experimental development; biomedical technology research; drug research and development; food science and technology research services; biotechnology extension services; biotechnology development services; biotechnology consultation and communication services; biotechnology transfer services; anthropology transfer service of research results; transfer of research results of health science projects; promotion of research results of health science projects; import and export of technology; import and export of goods. |
|---|---|---|---|---|
| 6 | Sichuan Xiaotong Biotechnology Co., Ltd. (PRC) | 13-October-2017 | Executive Director and Manager | Biotechnology extension services, pharmaceutical research and experimental development; science and technology intermediary services; biotechnology development, transfer, consulting services; and product development and manufacturing. |
| 7 | Guangzhou Xiaotong Pharmaceutical Clinical Research Co., Ltd. (PRC) | 23-June-2017 | Executive Director and Manager | Biomedical technology research; drug research and development; medical research and experimental development; science and technology intermediary services; science and technology information consultation services; transfer of research results of health science projects; and laboratory testing. |

| 8 | Beijing Xiaotong Pharmaceutical Technology Co., Ltd. (PRC) | 18-July-2018 | Executive Director and Manager | Technology promotion; technology service; technology development; technology transfer; technology consultation; medical research; and product design. |
|---|---|---|---|---|

56.     All in all, while serving as CEO, Director, and Member of AustarPharma, Liu created the Guangzhou Company and the entities described above to compete with the generic drug products and the medical technologies that AustarPharma intended to, and still intends to, develop, commercialize, and/or sell in the United States and the PRC.

**B.  Use of AustarPharma Personnel**

57.     Based on publicly available information—including patents in the PRC and information about grants the Guangzhou Company has applied for and received in connection with its employment of international employees—Liu has employed individuals at the Guangzhou Company while they were simultaneously employed by AustarPharma.

58.     Public profiles of Guangzhou Company specifically state that Liu formed the company using members of the AustarPharma team.  Moreover, the Capital Increase Agreement lists the Guangzhou Company's core team which includes a number of individuals currently or formerly employed by AustarPharma, including Qiang ("Dillon") Gao, Junjie Peng, Yan Liu, Yuehan Hou, and Xiaoling Zhang.[19]  The individuals that Liu recruited to work at the Guangzhou Company were also apparently told that they could be trained at a "U.S headquarter," presumably at AustarPharma's Edison, New Jersey plant.

59.     Specifically, the employees numbered one through four below are individuals who, based on publicly available information, have simultaneously held positions at both companies.  The remaining individuals are known to have held positions at both companies close

---

[19] Exhibit D (Capital Increase Agreement) at Appendix 2.

in time, and Austar anticipates, on information and belief, that discovery will reveal more of these individuals were employed by both companies simultaneously.

| No. | Name | Position at Guangzhou Company | Position at AustarPharma |
|---|---|---|---|
| 1 | Dillon Gao | Core staff; Director, Vice President of Business and Strategic Development | Vice President |
| 2 | Zhanguo Yue | Core staff; Patent Inventor | Formulation |
| 3 | Na Zhang | Core Staff | Strategic and Business Development Consultant |
| 4 | Tiffany Wu | Director until 2014 | HR & Admin Manager |
| 5 | Wei Li | Vice President of Preparation Department; Patent Inventor | Formulation |
| 6 | Yan Liu | Registration Supervisor | Formulation Team Junior Scientist |
| 7 | Yuehan Hou | Pharmaceutical Preparation Supervisor | Formulation Team Junior Scientist |
| 8 | Xiaoling Zhang | Registration Supervisor | Formulation Team Junior Scientist |
| 9 | Junjie Peng | Pharmaceutical Preparation Supervisor; Patent inventor of subsidiary of Bristol | Scientist |
| 10 | Wu Xueming | Core employee | Employee |
| 11 | Tong (Tony) Weiqin | Chief Science Officer; Patent inventor | President |
| 12 | Zhihong Zhang | Patent inventor | Formulation |
| 13 | Yuanjian Wang | Deputy Director of Analysis | Formulation |

C. <u>Similar Technology Platform and Competition with AustarPharma Products</u>

60.    There is significant overlap between the products developed by AustarPharma and those developed by Liu's competitive businesses, especially the Guangzhou Company, based on the descriptions of the Guangzhou Company in publicly available materials.

61.    Among AustarPharma's "core competences" are its water-insoluble drug delivery technologies, including liposomes, softgel technology (lipid based systems, which are similar to the Guangzhou Company's soft capsules), and particle size reduction (e.g. nanocrystals, which are the same as the Guangzhou Company's nano–solubilization technology).   Also among AustarPharma's core competences are its controlled-release drug delivery technologies, which include matrix systems, diffusion controlled systems, and osmotic pump systems.

62.    Meanwhile, an online Guangzhou Company profile says that it is developing "solubilization techniques for poorly soluble drugs" – nearly identical to AustarPharma's water-insoluble drug delivery technology.   And among its core products and technologies, the Guangzhou Company's Capital Increase Agreement – like AustarPharma's "core competences" – also lists osmotic pump controlled-release technology, nano-solubilization technology, and liposomal formulation technology.[20]

63.    Liu has purportedly prepared a host of drug products for launch by his Guangzhou Company, a number of which AustarPharma has already developed and sold, including but not limited to: oxybutynin, paliperidone, nifedipine, celecoxib, valsartan tablets, olmesartan, omeprazole, esomeprazole, simvastatin, metformin, diclofenac sodium and aripiprazole.[21]

64.    Like AustarPharma, which was established to focus on U.S. and Chinese markets, the Guangzhou Company was predicted in a November 2016 public report to "become a Chinese

---

[20] Exhibit D (Capital Increase Agreement) at 67.
[21] *See id.* at 106-108; *see also supra* ¶ 24.

pharmaceutical company that develops and produces prescription drugs for China, the United States, Europe and other regulated international markets."

65.     In fact, the Guangzhou Company has recently taken a number of steps to begin selling its products in the United States.  These include:

a.     The Guangzhou Company acquired the rights to an FDA-approved product (valsartan tablets) and a product still in the FDA approval process (valsartan hydrochlorothiazide compound tablets) in 2017 from Qingdao Huaren Pharmaceutical Co., Ltd., ("Huaren") a public company listed in China Capital Market.  These two products were developed by AustarPharma under two Consignment Agreements entered into between Huaren and AustarPharma on the same date of December 25, 2010, pursuant to which Huaren obtained worldwide sales and manufacturing rights and AustarPharma received a development service fee (for helping prepare the products for launch in the U.S.) and half of the profits from products manufactured in the U.S.  The Guangzhou Company subsequently purchased Huaren's rights under these agreements, which include the right to half of the profits from products sold in the U.S., illustrating the Guangzhou Company's interest in U.S. markets.

b.     On August 3, 2017, the Guangzhou Company announced in its WeChat public account a project to build a microsphere sustained release preparation technology platform for injection, noting that the products would be registered in the PRC and U.S. and would obtain economic returns through sales in both markets.

c.     An online profile of the Guangzhou Company dated November 12, 2017 states that Guangzhou Company has a platform for the development and production of Chinese and American one-stop drugs, and that it would develop and produce drugs for PRC, U.S., Europe and other international markets.

d.      On May 13, 2018, the Guangzhou Company announced in its WeChat public account that it had passed an FDA site inspection on its Production Workshop and Analytical laboratory, making it the first company in the City of Guangzhou to pass FDA inspection. The same online post stated that passing the FDA inspection provided the Company a solid foundation for its international strategic layout.

### D.  <u>Diversion of Corporate Opportunities from AustarPharma to Himself</u>

66.     Both as to the specific generic drugs developed and being developed by AustarPharma, and as to the drug delivery system technology being created by AustarPharma to serve as a platform upon which AustarPharma will develop other products (i.e., controlled-release technologies, such as osmotic pump systems), Liu has unfairly pursued market opportunities at his own companies in the PRC and prospectively worldwide that should belong to AustarPharma. Liu has done so through the Guangzhou Company, and other entities he controls, which (as noted above) have taken AustarPharma's business model, personnel and products, and put them to use for Liu's personal gain.

67.     Liu has pursued business opportunities, sales, and scientific partnerships that AustarPharma always intended to pursue itself—and that in his role as CEO, Liu *knew* AustarPharma intended to pursue.

68.     For instance, the Guangzhou Company publicly purports to have forged a number of cooperative partnerships and entered into projects with well-known pharmaceutical companies in China, and abroad, in order to develop and commercialize drugs for sale in the PRC, U.S., European and international markets.  As noted above, such co-development partnerships are a critical component of AustarPharma's business.  Liu never offered these opportunities to

AustarPharma, nor was AustarPharma informed that the Guangzhou Company was pursuing them.

69.     Liu has also been using AustarPharma's image in the PRC to raise capital for his competitive entities, as well as visibility, a positive trade reputation, and cooperation agreements with government authorities in high-tech zones in the PRC.  This underscores that Liu is diverting corporate opportunities that would otherwise belong to AustarPharma for his own benefit.  For example, online postings in PRC (including for recruitment) pertaining to the Guangzhou Company tout the success Liu and his team with AustarPharma.

70.     By way of further example, the Guangzhou Company recently announced an investment of 400 million RMB in building a 25,000 square meter factory to develop drugs that will compete with AustarPharma's business.  According to publicly available information, this factory located in the Guangzhou Hunagpu Hi-Tech Development Zone is scheduled to be completed and put into use in April 2019 and will focus on research and development of new sustained-released drugs, to be sold internationally. Liu never offered this business opportunity to AustarPharma.

71.     Liu has also usurped opportunities he knew AustarPharma was pursuing in Deyang, a city in Sichuan province.  On July 26, 2017, Liu entered into an agreement with Deyang High Tech Zone Management Committee, purportedly on behalf of AustarPharma, pursuant to which AustarPharma would invest in Deyang for a newly built BE project and pharmaceutical project ("the Deyang Project").[22]  However, Liu failed to reveal this deal to the other principals and managers of AustarPharma and ultimately diverted the benefits of this deal

---

[22]  The public announcement of this deal referenced several agreements to be entered into, including: (a) the BE project investment agreement and pharmaceutical company investment agreement between AustarPharma and the Deyang Government; (b) Three Parties Cooperation Agreement between Deyang Government, Guangan Industrial Centralized Development Zone and AustarPharma; and (c) a cooperation agreement between Deyang People's Hospital and AustarPharma.

to his Guangzhou Company instead of AustarPharma.  The public announcement of the Deyang Project made clear that Liu had traded on AustarPharma's name and good will to garner favor and secure a substantial business deal for the benefit of his Guangzhou Company.  The announcement touted *AustarPharma* as one of the "designated suppliers of the U.S. government" with experience in research, development and production of release preparations and insoluble medicines.  It also stated that *AustarPharma* has seven FDA-approved preparations and medicines on the market in the United States, and has close cooperation with "the main channel[s] of American medicines" such as CVS and Walgreens. The same announcement introduced Liu as the chairman of both AustarPharma and Guangzhou Company. Austar later found that Liu and his companies invested in two other companies in Deyang – namely, Sichuan Keside Drug Delivery Co., Ltd. on Nov. 27, 2017, through the Guangzhou Company, and Sichuan Xiaotong Biotechnology Co., Ltd. on Oct. 13, 2017, through yet another one of Liu's companies – and proceeded with the Deyang Project through those companies and the Guangzhou Company instead of through AustarPharma.

  **E. Theft of AustarPharma's Trade Secrets**

  72. AustarPharma has devoted extensive time, money, and other resources to the design, development, and testing of certain drugs, delivery technologies, research processes, quality assurance and regulatory compliance processes, manufacturing processes, and other methodologies relating and contributing to the preparation of drugs for launch in the U.S. AustarPharma's unique formulas, methodologies, and processes for developing drugs and drug delivery technologies constitute confidential trade secrets ("AustarPharma's Trade Secrets").

  73. AustarPharma has taken numerous precautions to keep this type of proprietary information confidential, including, but not limited to, requiring its scientists to sign invention

and non-disclosure agreements, requiring potential and actual vendors, suppliers, and other business partners to sign confidentiality agreements, advising all employees that such information must be held confidential, protecting electronically stored information with passwords, and reasonably restricting access to AustarPharma's facilities and locations within those facilities where particularly confidential information is stored.

74.     Liu has formed entities designed to compete directly with AustarPharma, which employ individuals currently or recently employed by AustarPharma.  Liu and the current or former AustarPharma personnel he now employs have applied for patents in the name of the Guangzhou Company and other entities Liu created for products that involve the same drug delivery technology that is described in AustarPharma's 2010 business plan and has been researched and developed for years by AustarPharma, including water-insoluble drug delivery technologies (*e.g.* self-emulsifying systems, lipid based systems, liposomes) and controlled-release technologies (*e.g.* osmotic pump systems).  According to its Capital Increase Agreement, the Guangzhou Company has applied for patents for its independent osmotic pump core technology, matrix tablets and liposomal technology.[23]  The following patent applications have been filed in the Guangzhou Company's name and list as inventors individuals employed by AustarPharma either at the time of the patent application or at some time prior to that date.

| Patent No. | Name in English | Inventors Employed by AustarPharma | Date |
|---|---|---|---|
| 2016101774009 | A liposome-microspheres preparation of local anesthetic and its preparation method | Zhanguo Yue, Ron Liu | 2016-03-25 |
| 2016101403992 | A self-emulsifying agent of entecavir | Ron Liu | 2016-03-11 |
| 201610140556X | Preparation and application of naboin hydrochloride gel matrix sustained-release tablets | Ron Liu | 2016-03-11 |

---

[23] Exhibit D (Capital Increase Agreement) at 71.

28

| 2014106633099 | An enteric-coated sustained-release tablet of 5-hydroxytryptamine reuptake inhibitor and its preparation method | Ron Liu, Wei Li | 2014-11-19 |
| 2014103553266 | Paroxetine Sustained Release Composition and Its Preparation Method | Ron Liu, Wei Li | 2014-07-22 |
| 2018106353310 | Osmotic pump controlled release preparation | Ron Liu,Wei Li | 2018-06-20 |
| 2017114956349 | A solid dispersion of posaconazole and its preparation method and enteric-coated preparation of posaconazole | Tong (Tony) Weiqin | 2017-12-28 |
| 201711497855X | A Poxaconazole Solid Dispersion Compound Inhibiting Crystallization and Its Preparation Method | Tong (Tony) Weiqin | 2017-12-28 |
| 2017101456528[24] | A solid dispersion of insoluble active ingredients of traditional Chinese medicine and its preparation method | Ron Liu, Wei Lei, Junjie Peng | 2017-03-10 |

75.     Thus, with the assistance of AustarPharma personnel, Liu has used AustarPharma's Trade Secrets to develop competing products and technologies for the Guangzhou Company and his other entities, establishing patents for Guangzhou Company that should rightfully belong to AustarPharma.

## **DEMAND FUTILITY**

76.     Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert certain causes of action as derivative claims because a pre-suit demand on the Members would be futile.

a.     Such a demand would be futile because Article 6.1(d) of the Operating Agreement requires the "approval or consent of Members owning an aggregate of more than 60% of the total LLC Interests" in order to commence litigation, and Austar has under 44% of

---

[24] This patent application was made in the name of Guangzhou Zhiping Pharmaceutical Technology Co., Ltd., another one of Liu's competitor entities.

the LLC Interests with the remainder held by Liu both directly and as the beneficial owner of DFH's interests.[25] Liu would oppose AustarPharma bringing a lawsuit against himself and has a sufficient percentage of the LLC Interests to block such an action.

b.   It would likewise be futile for Plaintiff to seek consent to bring a lawsuit on behalf of AustarPharma from a majority of the LLC's managers because AustarPharma has only two managers – Liu and Mr. Ho – and Liu therefore constituted 50% of the management.[26]

c.   Finally, AustarPharma has four Directors:  Mars (Austar), Ms. Gu Xun (Austar), Liu, and Miss Kwan Amelia (DFH).[27]  It would be futile to seek approval for a lawsuit from a majority of the Board of Directors, because two of the four Directors are controlled or effectively controlled by Liu, and would disapprove.[28]

## COUNT I

### Breach of Fiduciary Duty
### (Derivative and Direct Claim Against Liu)

77.   Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 76.

78.   As the CEO, President and a founding partner of the AustarPharma joint venture, Liu owes fiduciary duties to AustarPharma, as well as all of its shareholders and Members (including Plaintiff).  Every director and officer of a New Jersey corporation owes fiduciary duties to the corporation and its shareholders.  Liu therefore owes AustarPharma and Plaintiff the duty of loyalty.

---

[25] *See supra* ¶ 33.

[26] *See Ono v. Itoyama*, 884 F. Supp. 892, 899 (D.N.J. 1995) (holding that where "the board consist[ed] of the two 50% shareholders," the "Court [could] presume that a 50% shareholder would not agree to initiate litigation against himself" and so futility was demonstrated; as a result, the company was aligned as a defendant in a shareholder derivative suit).

[27] *See* Exhibit B (Operating Agreement) Art. 10.3.

[28] *See Lewis v. Curtis*, 671 F.2d 779, 785 (3d Cir. 1982) (a "demand on the board" is futile where "the directors upon whom demand would be made lack the requisite disinterestedness to determine fairly whether the corporate claim should be pursued").

79.     The duty of loyalty requires directors, among other things, to act for the benefit of the corporation and its shareholders rather than for any personal interest, and to faithfully seek to maximize the returns for the corporation and its shareholders.   Misappropriating corporate business opportunities or engaging in direct or indirect competition with the corporation for personal benefit is a breach of the duty of loyalty.

80.     By virtue of his role within AustarPharma, Liu had access to AustarPharma's Trade Secrets, confidential business plans, research and development, customers, and contract partners, for years.

81.     Liu breached the duty of loyalty he owed to AustarPharma and all of its shareholders and Members by engaging in a steady campaign of self-dealing and diversion of corporate opportunities to himself.

82.     Liu formed the Guangzhou Company, as well as his other entities, with the purpose of usurping corporate opportunities for himself that should have belonged to AustarPharma.  The Guangzhou Company is in the business of developing, manufacturing, and commercializing generic drug products and medical delivery technologies in the U.S. and the PRC.   Thus, Liu has launched a new company that is engaged in direct competition with AustarPharma in the same primary markets.  Moreover, Liu has employed several AustarPharma employees at the Guangzhou Company and has used the AustarPharma brand to advance the reputation of the Guangzhou Company.

83.     Liu's focus on the Guangzhou Company and his other competitive ventures also reflects a lack of prioritization of the growth and development of AustarPharma, further evidencing a breach of his fiduciary duties.

84.     Plaintiff, both on its own behalf and on behalf of AustarPharma, requests that this Court impose a constructive trust upon the illegitimate profits of Liu and Guangzhou Company.

85.     Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert this cause of action as a derivative claim for the reasons set forth at paragraph 76 above, which is incorporated by reference as if fully set forth here.

## COUNT II

**Breach of Operating Agreement**
**(Direct Claim Against Liu)**

86.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 85.

87.     As signatories to the 2008 Operating Agreement, Plaintiff and Liu owed each other several contractual obligations.

88.      Plaintiff has fully performed all of its duties and obligations under the Operating Agreement.

89.     Pursuant to Article 12.1 and 12.2 of the Operating Agreement, Liu was obligated to refrain from "engaging in business similar to the Company's Business" in both the United States and in the PRC.

90.     Article 7.1 directs the CEO to "prepare and deliver to the Members [specified] reports for the next Fiscal Year, which shall be accompanied by corresponding reports for the current year," including the Company's "Investment Plan," "Budget authorization," "Management salary budget," "Authorization for personnel," "Internal personnel movement," and other things.  Under Article 7.3, "[t]he Chief Executive Officer shall provide the Members copies of (a) monthly unaudited financial statements for the Company . . . (b) quarterly unaudited

financial statements for the Company . . . and (c) annual audited consolidated financial statements for the Company . . . accompanied by an annual management report."

91.     Liu breached his obligations under Article 12 through the Guangzhou Company which, like AustarPharma, is in the business of developing, manufacturing, and commercializing generic drug products and medical delivery technologies in the U.S. and the PRC.  Thus, Liu has launched a new company that is engaged in direct competition with AustarPharma in the same primary markets.

92.     Liu breached his obligations under Article 7 by failing to provide the Members of AustarPharma the financial reports referenced in Articles 7.1 and 7.3 for several years.

93.     Liu's breach of his obligations under Article 12 has harmed Plaintiff by usurping business opportunities that should have belonged to AustarPharma, resulting in lost revenue and opportunities to the detriment of its Members.  Liu's breach of his obligations under Article 7 has harmed Plaintiff by depriving it of its contractual right to access certain financial information pertaining to AustarPharma.

94.     Plaintiff requests that this Court award damages for losses Plaintiff has suffered as a direct or indirect result of Liu's breaches of the Operating Agreement. If Liu is not enjoined from competing with AustarPharma in violation of the Operating Agreement, Plaintiff will continue to suffer irreparable harm, with no adequate remedy at law for Liu's breaches.  Plaintiff therefore requests that this Court grant injunctive relief against Liu permanently prohibiting him from engaging in business similar to AustarPharma's business, thus enforcing the terms of the Operating Agreement. Plaintiff also requests that this Court order Liu to produce to Plaintiff each of the reports referenced in Articles 7.1 and 7.3 that Liu has thus far failed to produce.

## COUNT III

**Conversion of Property**
**(Derivative and Direct Claim Against Liu and Guangzhou Company)**

95.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 94.

96.     Defendants Liu and Guangzhou Company took or aided in the diversion of corporate funds belonging to AustarPharma and its Members for his own use, through Guangzhou Company, and exercised or assisted in the exercise of dominion and control over corporate funds in a manner that was inconsistent with AustarPharma and its Members' right to the use, possession, and enjoyment of those funds, thereby depriving AustarPharma and its Members of their property rights.  In addition, Defendants poached AustarPharma personnel to work for the Guangzhou Company.

97.     AustarPharma and Plaintiff have suffered damages that are the reasonable and proximate result of this conversion.  AustarPharma and Plaintiff have expended time and money in pursuit of retrieving the converted property.  Liu and Guangzhou Company have engaged in this wrongful conduct intentionally, willfully, maliciously, and with the intent to injure AustarPharma and Plaintiff.  Plaintiff, on its own behalf and on behalf of AustarPharma, requests that this Court award damages for losses Plaintiff and AustarPharma have suffered as a direct or indirect result of Defendants' conversion.  Plaintiff, on behalf of AustarPharma, also requests that the Court order Liu and Guangzhou Company to return all property that Liu has taken from AustarPharma.

98.     Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert this cause of action as a derivative claim for the reasons set forth at paragraph 76 above, which is incorporated by reference as if fully set forth here.

## COUNT IV

**Violation of Federal Defend Trade Secrets Act – 18 U.S.C. § 1836
(Derivative Claim Against Liu and Guangzhou Company)**

99.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 98.

100.     The confidential and proprietary information that AustarPharma entrusted to Liu, including but not limited to AustarPharma's unique formulas, methodologies, and processes for developing drugs and drug delivery technologies, research and development, short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, and computer software constitute trade secrets because AustarPharma derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are subject of efforts that are reasonable under the circumstances to maintain their secrecy. 18 U.S.C. § 1839(3).

101.     The confidential trade secret information obtained by Liu and Guangzhou Company is related to AustarPharma's services and products which are provided and used in interstate commerce. 18 U.S.C. § 1836(b)(1).

102.     Under the Defend Trade Secrets Act (the "DTSA"), Defendants Liu and Guangzhou Company were prohibited from misappropriating AustarPharma's Trade Secrets.

103.     The DTSA applies to any conduct occurring outside of the U.S. if "the offender is a natural person who is a citizen or permanent resident alien of the United States" or "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837.  Because Liu is a citizen of New Jersey, and Liu committed acts in furtherance of the offense for his own

benefit and for the benefit of Guangzhou Company in the U.S., where he obtained the trade secrets from AustarPharma, the DTSA applies to both Liu and Guangzhou Company.

104.    Misappropriation is defined to include "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B).  Liu's role as CEO, President and a founding partner of AustarPharma, as well as Article 12 of the Operating Agreement, give rise to a duty to maintain the secrecy and limit the use of AustarPharma's Trade Secrets.

105.    Liu violated this duty by using, taking advantage of, and disclosing AustarPharma's Trade Secrets to unjustifiably interfere with AustarPharma's business by, among other things, using or disclosing AustarPharma's Trade Secrets without express or implied consent to gain a competitive advantage for himself and the Guangzhou Company, including by applying for patents in the name of the Guangzhou Company that cover technology nearly identical to what AustarPharma has developed.  Given that Article 12 of the Operating Agreement expressly prohibits Liu from competing with AustarPharma in the U.S. and PRC, any use of AustarPharma's Trade Secrets by Liu or Guangzhou Company for their own benefit was done without the consent of AustarPharma.

106.    As a result of Defendants' violations of the DTSA, AustarPharma has been injured and will continue to be damaged by, among other things, the loss of customers, revenues, valuable proprietary information, and goodwill.

107.    Plaintiff, on behalf of AustarPharma, requests an award of compensatory damages and unjust enrichment under 18 U.S.C. §1836(3)(B), exemplary damages under 18 U.S.C.

§1836(3)(C), because Defendants' misappropriation of AustarPharma's Trade Secrets was willful and malicious upon information and belief, and attorney's fees under 18 U.S.C. §1836(3)(D).

108.    AustarPharma has suffered, and will continue to suffer, irreparable harm for which it has no adequate remedy at law if these trade secret misappropriating activities are not preliminarily and permanently enjoined. Under 18 U.S.C. § 1836(3)(A), this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.  Liu has already launched the Guangzhou Company, through which he intends to sell products developed using misappropriated trade secrets.  Moreover, Liu's Guangzhou Company employs several individuals currently or formerly employed by AustarPharma.  This conduct constitutes the threatened or actual misuse of AustarPharma's Trade Secrets.  Permanent injunctive relief is therefore appropriate.  Accordingly, Plaintiff, on behalf of AustarPharma, requests that this Court enter an order permanently enjoining Liu and Guangzhou Company from directly or indirectly, using or disclosing AustarPharma's Trade Secrets for any purpose.

109.    If given notice, Liu and Guangzhou Company would seek to destroy, move or hide evidence of their unlawful conduct.  Therefore, Plaintiff, on behalf of AustarPharma, requests that this Court order the seizure of Liu and Guangzhou Company's property as it is necessary to prevent the propagation or dissemination of AustarPharma's Trade Secrets. 18 U.S.C. § 1836(b)(2)(A).

110.    Finally, Plaintiff, on behalf of AustarPharma,  requests that this Court enter an order requiring Liu and Guangzhou Company to return any and all of AustarPharma's confidential information, as provided by 18 U.S.C. §1836(3)(A)(ii).

111.    Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert this cause of action as a derivative claim for the reasons set forth at paragraph 76 above, which is incorporated by reference as if fully set forth here.

## COUNT V

**Misappropriation of Trade Secrets**
**(N.J.S.A. § 56:15 et seq.)**
**(Derivative Claim Against Liu and Guangzhou Company)**

112.    Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 111.

113.    The confidential and proprietary information that AustarPharma entrusted to Liu, including but not limited to AustarPharma's unique formulas, methodologies, and processes for developing drugs and drug delivery technologies, research and development, short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, and computer software constitute trade secrets because AustarPharma derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are subject of efforts that are reasonable under the circumstances to maintain their secrecy. N.J.S.A. § 56:15-2.

114.    Under the New Jersey Trade Secrets Act (the "NJTSA"), Defendants Liu and Guangzhou Company were prohibited from misappropriating AustarPharma's Trade Secrets. Misappropriation is defined to include "[d]isclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who. . . used improper means to acquire knowledge of the trade secret." N.J.S.A. § 56:15-2.  "Improper means" is defined to

include "breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, a trade secret." *Id.*  Liu's role as CEO, President and a founding partner of AustarPharma, as well as Article 12 of the Operating Agreement, give rise to a duty to maintain the secrecy and limit the use of trade secrets.

115.    Liu violated this duty by using, taking advantage of, and disclosing AustarPharma's Trade Secrets to unjustifiably interfere with AustarPharma's business by, among other things, using or disclosing AustarPharma's Trade Secrets without express or implied consent to gain a competitive advantage for himself and the Guangzhou Company, including by applying for patents in the name of the Guangzhou Company that cover technology nearly identical to what AustarPharma has developed.   Given that Article 12 of the Operating Agreement expressly prohibits Liu from competing with AustarPharma in the U.S. and PRC, any use of AustarPharma's Trade Secrets by Liu or Guangzhou Company for their own benefit was done without the consent of AustarPharma.

116.    As a result of Defendants' violations of the New Jersey Trade Secrets Act, AustarPharma has been injured and will continue to be damaged by, among other things, the loss of customers, revenues, valuable proprietary information, and goodwill.

117.    Plaintiff, on behalf of AustarPharma, requests an award of compensatory damages and unjust enrichment, as well as punitive damages because, on information and belief, Liu and Guangzhou Company's misappropriation of AustarPharma's Trade Secrets was willful and malicious. N.J.S.A. § 56:15-4.  Plaintiff, on behalf of AustarPharma, also requests an award of attorney's fees under N.J.S.A. § 56:15-6.

118.    AustarPharma has suffered, and will continue to suffer, irreparable harm for which it has no adequate remedy at law if these trade secret misappropriating activities are not

preliminarily and permanently enjoined.  This Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets. N.J.S.A. § 56:15-3.  Liu has already launched the Guangzhou Company, through which he intends to sell products developed using misappropriated trade secrets.  Moreover, Liu's Guangzhou Company employs several individuals currently or formerly employed by AustarPharma.  This conduct constitutes the threatened or actual misuse of AustarPharma's Trade Secrets.  Permanent injunctive relief is therefore appropriate.  Accordingly, Plaintiff, on behalf of AustarPharma,  requests that this Court enter an order permanently enjoining Liu and Guangzhou Company from directly or indirectly, using or disclosing AustarPharma's Trade Secrets for any purpose.

119.    Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert this cause of action as a derivative claim for the reasons set forth at paragraph 76 above, which is incorporated by reference as if fully set forth here.

### COUNT VI

**Tortious Interference with Prospective Economic Advantage**
**(Derivative Claim Against Liu and Guangzhou Company)**

120.    Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 119.

121.    AustarPharma is in direct competition with the Guangzhou Company in the business of developing, manufacturing, and commercializing generic drug products and medical delivery technologies in the U.S. and the PRC.

122.    AustarPharma had a reasonable expectation that it would establish contractual relationships in the PRC, producing revenue for AustarPharma and its shareholders.  Liu, and thus the Guangzhou Company, were aware that a central plank of AustarPharma's business

strategy was to expand into the PRC market and to continue to build co-development partnerships with Chinese pharmaceutical companies.

123.    Without justification, Defendants Liu and Guangzhou Company intentionally interfered with AustarPharma's prospective economic advantage by diverting opportunities that should belong to AustarPharma to Guangzhou Company, and unlawfully using AustarPharma's Trade Secrets in order to do so.  Were it not for this intentional interference, there was a high likelihood that AustarPharma would have secured sales and/or co-development contracts that have instead been diverted to the Guangzhou Company, and thus, Liu and Guangzhou Company's unlawful interference resulted in, and will continue to result in, damages to AustarPharma.

124.    Plaintiff, on behalf of AustarPharma, requests that this Court award damages for losses AustarPharma has suffered as a direct or indirect result of Liu and Guangzhou Company's tortious interference.  Further, AustarPharma will continue to suffer irreparable harm for which it has no adequate remedy at law if this tortious interference is not preliminarily and permanently enjoined.  Thus, Plaintiff, on behalf of AustarPharma, requests that the Court enjoin Defendants Liu and Guangzhou Company from soliciting, or attempting to solicit or influence, or initiating any contact with, directly or indirectly, any of AustarPharma's current or prospective customers.

125.    Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert this cause of action as a derivative claim for the reasons set forth at paragraph 76 above, which is incorporated by reference as if fully set forth here.

## COUNT VII

### Judicial Expulsion of Liu - N.J.S.A. § 42:2C-46e
### (Derivative Claim)

126.    Plaintiff incorporates by reference the allegations in the preceding paragraphs 1 through 125.

127.    Liu has willfully and wrongfully committed material breaches of the Operating Agreements as set forth herein.  Moreover, Liu has engaged and is engaging in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, AustarPharma's activities, as well as conduct relating to AustarPharma's activities which makes it not reasonably practicable to carry on the activities with Liu as a Member.

128.    Accordingly, Liu should be expelled as a Member of AustarPharma pursuant to N.J.S.A. § 42:2C-46(e)(1), (2) and (3).

129.    Pursuant to N.J.S.A. 42:2C-68, Plaintiff may assert this cause of action as a derivative claim for the reasons set forth at paragraph 76 above, which is incorporated by reference as if fully set forth here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment for relief as follows:

1.  Hold and declare that Defendants Liu and Guangzhou Company's actions violate New Jersey law and federal law, and that Liu's actions also violate the Operating Agreement;

2.  Place the illegitimate profits Defendants Liu and Guangzhou Company have earned in a constructive trust;

3.  Seize the property of Defendants Liu and Guangzhou Company as it is necessary to prevent the propagation or dissemination of AustarPharma's confidential, proprietary, or trade secret information;

4. A preliminary and permanent injunction which:

    i.    enjoins Defendants Liu and Guangzhou Company from directly or indirectly, using or disclosing AustarPharma's confidential, proprietary, or trade secret information for any purpose;

    ii.   enjoins Defendants Liu and Guangzhou Company from soliciting, or attempting to solicit or influence, or initiating any contact with, directly or indirectly, any of AustarPharma's current or prospective customers;

    iii.   enjoins Liu from continuing to violate his obligations under Article 9 of the Operating Agreement;

5. Require Defendants Liu and Guangzhou Company to immediately return to AustarPharma all of its confidential, proprietary, or trade secret information;

6. Require Defendants Liu and Guangzhou Company to return any property they have taken from AustarPharma;

7. Require Liu to produce to Plaintiff any reports he is required to produce pursuant to Article 7 of the Operating Agreement that he has not yet produced;

8. Expel Liu as a Member of AustarPharma;

9. Award compensatory and punitive or exemplary damages in an amount to be proven at trial, and hold Defendants Liu and Guangzhou Company jointly and severally liable for the conduct alleged in Counts III, IV, V, and VI;

10. Award reasonable attorney's fees and costs incurred by virtue of this action; and

11. Such other and further relief as the Court may deem appropriate.

**<u>JURY DEMAND</u>**

Plaintiff Austar International Limited hereby demands a trial by jury, by the maximum number of jurors permitted by law, on all issues so triable herein.

March 11, 2019

Respectfully submitted,

*/s/ Stephen A. Loney, Jr.*

Virginia A. Gibson
Stephen A. Loney, Jr.
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4600
Fax: (267) 675-4601
virginia.gibson@hoganlovells.com
stephen.loney@hoganlovells.com

Ryan M. Philp
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Tel: (212) 918-3034
Fax: (212) 918-3100
ryan.philp@hoganlovells.com

*Attorneys for Plaintiff*
*Austar International Limited*

tags CJK



# 奥星国际有限公司
# AUSTAR INTERNATIONAL LTD.

## <u>VERIFICATION</u>

I, Yuki Ji, hereby state that I am authorized to make this verification on behalf of Plaintiff Austar International Limited and that I have reviewed the factual averments set forth in the foregoing Compliant. I, on behalf of Austar International Limited, hereby declare and verify under penalty of perjury under the laws of the United States of America that the factual averments in the foregoing Complaint are true and correct.

Executed on March 10, 2019

_____
Yuki Ji