HOGAN LOVELLS US LLP
Stephen A. Loney, Jr. (N.J. No. 005172006)
stephen.loney@hoganlovells.com
Virginia Gibson (*pro hac vice application to be filed*)
virginia.gibson@hoganlovells.com
Jessica K. Jacobs (N.J. No. 038002011)
jessica.jacobs@hoganlovells.com
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel: (267) 675-4600
Fax: (267) 675-4601

Ryan Philp (N.J. No. 031032003)
ryan.philp@hoganlovells.com
Alan M. Mendelsohn (*pro hac vice application to be filed*)
alan.mendelsohn@hoganlovells.com
390 Madison Avenue
New York, NY 10017
Tel: (212) 918-3000
Fax: (212) 918-3100

*Attorneys for Plaintiff Austar International Limited*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AUSTAR INTERNATIONAL LIMITED, directly against and derivatively on behalf of AustarPharma LLC <br><br> Plaintiff, <br><br> v. <br><br> AUSTARPHARMA LLC <br><br> Defendant/Nominal Defendant, <br><br> RONG LIU and GUANGZHOU BRISTOL DRUG DELIVERY CO., LTD., <br><br> Defendants. | Case No. 2:19-CV-08356-KM-MAH <br><br> *Document Electronically Filed* <br><br> **AUSTAR'S OMNIBUS OPPOSITION TO THE MOTIONS TO DISMISS OF (1) AUSTARPHARMA AND (2) LIU AND BOSTAL** <br><br> Motion Day:  June 17, 2019 <br> <u>Oral Argument Requested</u> |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF FACTS ...................................................................................7

I.   AUSTAR'S INVESTMENT IN AP AND TRUST IN RON LIU .................7

II.  AP SETS ITSELF APART FROM GENERIC DRUG DEVELOPERS WITH ITS PROPRIETARY DRUG DELIVERY TECHNOLOGIES AND UNIQUE BUSINESS STRATEGY. ...........................................................10

III. LIU IS PROHIBITED FROM ENGAGING IN COMPETITIVE BUSINESS. ....................................................................................12

IV.  LIU FORMS COMPETING ENTITIES IN CHINA TO MISAPPROPRIATE AP'S TRADE SECRETS, PERSONNEL, AND BUSINESS OPPORTUNITIES. ...................................................13

V.   THE FILING OF A DERIVATIVE ACTION BECOMES NECESSARY TO PROTECT AP'S INTERESTS. ...................................................17

LEGAL ARGUMENT .........................................................................................18

I.   AUSTAR PROPERLY ASSERTS DERIVATIVE CLAIMS TO PROTECT AP'S INTERESTS ..........................................................................18

   A.  Austar Did Not Make a Formal Demand on AP's Board of Directors and Adequately Pleads Demand Futility Based on Liu's Complete Domination of AP and Its Board. ..........................................................18

   B.  Austar's Assertion That This Is a Collusive Pleading Fundamentally Misunderstands the Law. ..........................................................24

   C.  Austar Is the Only Possible Representative to Protect AP from Liu and Bostal's Misconduct. ..........................................................27

II.  AUSTAR'S ROBUST PLEADING EASILY SATISFIES THE LIBERAL NOTICE PLEADING STANDARD APPLICABLE TO ALL CLAIMS. ....31

   A.  Rule 8(a) Applies to All of Austar's Claims. ..........................................31

i

B.   Austar Adequately Pleads a Claim for Misappropriation of Trade Secrets Under the DTSA and NJTSA. ...................................................33

C.   The Complaint Pleads Detailed Facts Sufficient to Put Liu and Bostal on Notice of the Trade Secrets They Have Misappropriated.................37

D.   Austar Adequately Pleads a Claim for Tortious Interference with Prospective Economic Advantage..........................................................56

E.   Austar Adequately Pleads a Claim for Conversion................................63

F.   Any Perceived Technical Pleading Deficiency Can Be Cured Through Amendment. ...........................................................................................64

III.  THIS COURT HAS PERSONAL JURISDICTION OVER BOSTAL. .......65

A.   The Complaint Pleads a Multitude of New Jersey Contacts Demonstrating that Bostal Expressly Aimed Its Tortious Conduct at New Jersey...............................................................................................66

B.   Precedent in the District of New Jersey Overwhelmingly Favors Exercising Personal Jurisdiction over Bostal........................................70

CONCLUSION ....................................................................................................73

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2815 Grand Realty Corp. v. Goose Creek Energy, Inc.*,
  656 F. Supp. 2d 707 (E.D. Ky. 2009)................................................................28

*Abrams v. Koether*,
  766 F. Supp. 237 (D.N.J. 1991).......................................................................23

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018)..............................................................57

*Amar v. Garnier Enters., Inc.*,
  41 F.R.D. 211 (C.D. Cal. 1966).......................................................................26

*Baron v. Strawbridge & Clothier*,
  646 F. Supp. 690 (E.D. Pa. 1986)....................................................................29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................34

*Bertozzi v. King Louie International, Inc.*,
  420 F. Supp. 1166 (D.R.I. 1976) .....................................................................31

*Big Vision Private Ltd. v. E.I. DLuPont De Nemours & Co.*,
  1 F. Supp. 3d 224 (S.D.N.Y. 2014) ..................................................................43

*Blasband v. Rales*,
  971 F.2d 1034 (3d Cir. 1992) ..........................................................................20

*Bresalier v. Good*,
  246 F. Supp. 3d 1044 (D. Del. 2017)................................................................21

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ...........................................................................34

*Calder v. Jones*,
  465 U.S. 783 (1984)...........................................................................69, 71, 76

*Call v. Czaplicki*,
  No. CIV. 09-6561, 2010 WL 3724275 (D.N.J. Sept. 16, 2010).........................49

iii

*Capanna v. Tribeca Lending Corp.*,
   No. CIV.A.06-5314(JAG), 2009 WL 900156 (D.N.J. Mar. 31,
   2009) ...................................................................................................51

*Chubb Ina Holdings Inc. v. Chang*,
   No. CV 16-2354-BRM-DEA, 2017 WL 499682 (D.N.J. Feb. 7,
   2017) .........................................................................................37, 40, 53

*Church v. Dwight Co., v. SPD Swiss Precision Diagnostics GmBH*,
   Civ. No. 10-453, 2010 WL 5239238 (D.N.J. Dec. 16, 2010) ..........................62

*Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried
   & Forte, P.C.*,
   384 N.J. Super. 251, 894 A.2d 702 (App. Div. 2006)........................................52

*Conley v. Gibson*,
   355 U.S. 41 (1957)................................................................................................34

*Coyer v. Hemmer*,
   901 F. Supp. 872 (D.N.J. 1995) .........................................................................20

*In re D'Amore*,
   472 B.R. 679 (D.N.J. Bankr. 2012) ...................................................................51

*In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545
   (D.N.J. 2011) .....................................................................................................20

*Dardashtian v. Gitman*,
   No. 17 Civ. 4327, 2017 WL 6398718 (S.D.N.Y. Nov. 28, 2017).....................27

*Davis v. Frederick*,
   Civil Action No. 10–cv–2119, 2010 WL 3566833 (E.D. Pa. Sept.
   9, 2010) ..............................................................................................................37

*DeGennaro v. Am. Bankers Ins. Co. of Fla.*,
   No. 3:16-CV-5274-BRM-DEA, 2017 WL 2693881 (D.N.J. June
   22, 2017) ............................................................................................................63

*Drzala v. Horizon Blue Cross Blue Shield*,
   No. CV 15-8392, 2016 WL 2932545 (D.N.J. May 18, 2016)............................50

*Emerald Partners v. Berlin*,
   564 A.2d 670 (Del. Ch. 1989) ...........................................................................31

iv

*Exeltis USA Dermatology, Inc. v. Accella Pharm., LLC,*
   No. 15-7446, 2016 WL 4265716 (D.N.J. Aug. 11, 2016).................................45

*Floorgraphics Inc., v. News America Marketing In–Store Services, Inc.,*
   2006 WL 2846268 (D.N.J. Sept. 29, 2006).......................................................62

*Foman v. Davis,*
   371 U.S. 178 (1962).........................................................................................67

*Frutta Bowls Franchising LLC v. Bitner,*
   No. CV 18-2446 (FLW), 2018 WL 6499760 (D.N.J. Dec. 10,
   2018) ......................................................................................................... 75-76

*In re Gabapentin Patent Litig.,*
   312 F.Supp.2d 653 (D.N.J. 2004) ....................................................................46

*Givaudan Fragrances Corp. v. Krivda,*
   No. CIV.A. 08-4409 PGS, 2013 WL 5781183 (D.N.J. Oct. 25,
   2013) .................................................................................................................42

*Gov't Employees Ins. Co. v. Nealey,*
   262 F. Supp. 3d 153 (E.D. Pa. 2017)................................................................48

*Graco, Inc. v. PMC Glob., Inc.,*
   No. CIV. A. 08-1304FLW, 2009 WL 904010 (D.N.J. Mar. 31,
   2009) .................................................................................................................62

*Grayson v. Mayview State Hosp.,*
   293 F.3d 103 (3rd Cir. 2002)............................................................................67

*Guenther v. Pacific Telecom, Inc.,*
   123 F.R.D. 341 (D. Or. 1987)...........................................................................29

*Hedges v. United States,*
   404 F.3d 744 (3d Cir. 2005) .............................................................................33

*Hill v. Commerce Bancorp, Inc.,*
   No. CV 09-3685 (RBK/JS), 2011 WL 13146435 (D.N.J. Feb. 28,
   2011) .................................................................................................................64

*IMO Indus., Inc. v. Kiekert AG,*
   155 F.3d 254 (3d Cir. 1998) .............................................................................71

v

*Intervet, Inc. v. Mileutis, Ltd.*,
No. CV151371FLWTJB, 2016 WL 740267 (D.N.J. Feb. 24, 2016) ...............63

*Jannett v. Gilmartin*,
No. HNT-L-341-05, 2006 WL 2195819 (N.J. Super. Ct. Law Div.
July 21, 2006)......................................................................................................20

*Markowitz v. Brody*,
90 F.R.D. 542 (S.D.N.Y. 1981) ..........................................................................25

*MaxLite, Inc. v. ATG Elecs., Inc.*,
193 F. Supp. 3d 371 (D.N.J. 2016) .....................................................................76

*Medidata Sols., Inc., v. Veeva Sys. Inc.*,
No. 17 CIV. 589 (LGS), 2018 WL 6173349 (S.D.N.Y. Nov. 26,
2018) ...................................................................................................35, 41, 48

*Meisels v. Fox Rothschild LLP*,
No. A-3519-15T4, 2018 WL 3077960 (N.J. Super. Ct. App. Div.
June 22, 2018)......................................................................................................66

*Miller v. Fisco*,
63 F.R.D. 132 (E.D. Pa. 1974)............................................................................30

*Miller Yacht Sales, Inc. v. Smith*,
384 F.3d 93 (3d Cir. 2004) ..................................................................................70

*Mu Sigma, Inc. v. Affine, Inc.*,
No. CIV.A. 12-1323 FLW, 2013 WL 3772724 (D.N.J. July 17,
2013) ....................................................................................................................63

*Novartis Pharm. Corp. v. Bausch & Lomb, Inc.*,
No. CIV.A. 07-5945JAG, 2008 WL 4911868 (D.N.J. Nov. 13,
2008) ....................................................................................................................64

*Oakwood Laboratories, LLC v. Thanoo*,
No. 17-CV-05090 (PGS), 2017 WL 5762393 (D.N.J. Nov. 28,
2017) ....................................................................................................................45

*In re ORFA Sec. Litig.*,
654 F. Supp. 1449 (D.N.J. 1987).........................................................................25

*Osteotech, Inc. v. Biologic*,
   No. 07-1296 (JAP), 2008 WL 686318 (D.N.J. Mar. 7, 2008)...........................37

*Palkon v. Holmes*,
   No. 2:14-CV-01234, 2014 WL 5341880 (D.N.J. Oct. 20, 2014)......................20

*PrimeSource Building Product, Inc. v. Huttig Building Product, Inc.*,
   No. 16 CV 11390, 2017 WL 10188772 (N.D. Ill. July 6, 2017)...................... 41

*Quintiles IMS Inc. v. Veeva Sys. Inc.*,
   No. CV 17-00177 (CCC), 2017 WL 4842377 (D.N.J. Oct. 26,
   2017) ..................................................................................................................35

*Ravenswood Inv. Co., L.P. v. Bishop Capital Corp.*,
   374 F. Supp. 2d 1055 (D. Wyo. 2005).........................................................29, 32

*Recchion v. Kirby*,
   637 F. Supp. 1309 (W.D. Pa. 1986)..................................................................22

*Reckitt Benckiser Inc. v. Tris Pharma, Inc.*,
   No. CIV.A. 09-3125 (FLW), 2011 WL 773034 (D.N.J. Feb. 28,
   2011) ..................................................................................................................37

*Resnik v. Woertz*,
   774 F. Supp. 2d 614 (D. Del. 2011)..................................................................30

*Ricketti v. Barry*,
   No. 13-6804, 2015 WL 1013547 (D.N.J. Mar. 9, 2015) ...................................65

*Royal Wine Corp. v. Golan Heights Winery Ltd.*,
   448 F. Supp. 2d 613 (D.N.J. 2006)....................................................................50

*Shlensky v. Dorsey*,
   574 F.2d 131 (3d Cir. 1978) .............................................................................23

*Slim CD, Inc. v. Heartland Payment Sys., Inc*,
   No. CIV. A. 06-2256, 2007 WL 2459349 (D.N.J. Aug. 24,
   2007).... ....................................................................................... 33, 58, 61-63

*Smallwood v. Pearl Brewing Co.*,
   489 F.2d 579 (5th Cir. 1974) ............................................................................29

*Startrak Sys., LLC v. Hester*,
    No. CIV. 07-3202DRD, 2007 WL 2705159 (D.N.J. Sept. 14, 2007)
    .............................................................................................69, 70, 74, 76

*Strategic Prod. & Servs., LLC v. Integrated Media Techs., Inc.*,
    No. 18-CV-00694 (KSH) (CLW), 2019 WL 2067551 (D.N.J. May
    10, 2019) .................................................................33, 66, 71, 73, 76

*Strickland v. Flue-Cured Tobacco Cooperative Stabilization Corp.*,
    643 F. Supp. 310 (D.S.C. 1986) ........................................................28

*StrikeForce Techs., Inc. v. WhiteSky, Inc.*,
    No. 13-1895, 2013 WL 3508835 (D.N.J. July 11, 2013) ....................................46

*Stoner v. Walsh*, 772 F. Supp. 790 (S.D.N.Y. 1991) ............................................21

*Sun Dial Corp. v. Rideout*,
    108 A.2d 442 (N.J. 1954) ................................................................52

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
    No. CIV. 04-3623 (WHW), 2005 WL 1076043 (D.N.J. May 6,
    2005) ........................................................................................62

*Teva v. Pharmaceutical Indust. Ltd., v. Apotex, Inc.*,
    Civ. No. 07-5514, 2008 WL 3413862 (D.N.J. Aug. 8, 2008)............................62

*In re Transocean Tender Offer Sec. Litig.*,
    455 F. Supp. 999 (N.D. Ill. 1978).......................................................30

*Vandeveire v. Newmarch*, No. CIV.A. 13-4033 DMC, 2013 WL
    6054804 (D.N.J. Nov. 15, 2013) .......................................................73

*Vargas v. Meehan*,
    No. 2:11-CV-2833-CCC, 2012 WL 1898127 (D.N.J. May 22,
    2012) ........................................................................................67

*Veros Software, Inc. v. First Am. Corp.*,
    No. SACV061130JVSANX, 2008 WL 11338610 (C.D. Cal. June
    13, 2008) ............................................................................... 30-31

*Vizant Techs., LLC v. Whitchurch*,
    97 F. Supp. 3d 618 (E.D. Pa. 2015)..............................................69, 75

*Von Rohr Equip. Corp. v. Modern Fasteners Inc.*,
No. CV 16-6675, 2017 WL 9690975 (D.N.J. May 18, 2017)...............33, 40, 48

*Walden v. Elrod*,
72 F.R.D. 5 (W.D. Okla. 1976) ..........................................................................26

*Weisfeld v. Spartans Indus., Inc.*,
58 F.R.D. 570 (S.D.N.Y. 1972) .........................................................................25

*Wesolek v. Layton*,
914 F. Supp. 2d 853 (S.D. Tex. 2012)................................................................28

*Yamamoto v. Omiya*,
564 F.2d 1319 (9th Cir. 1977) ...........................................................................30

*Yotrio Corp. v. Jonathan Coop, et al. Additional Party Names: 3i*
*Prod., Inc.*,
No. CV1810101JFWFFMX, 2019 WL 1877598 (C.D. Cal. Apr.
12, 2019) ............................................................................................................27

## Statutes

18 U.S.C. § 1836.....................................................................................................27, 35

18 U.S.C. § 1839..........................................................................................................36

N.J.S.A. § 56:15 ..................................................................................................... 35-36

## Rules

Fed. R. Civ. P. 8(a)................................................................................................*passim*

Fed. R. Civ. P. 12 .................................................................................................*passim*

Fed. R. Civ. P. 15 ...........................................................................................................67

Fed. R. Civ. P. 23.1 ..............................................................................................*passim*

## Other Authorities

Comm'n on the Theft of Am. Intellectual Prop., The IP Commission
Report 1 (2013),
http://www.ipcommission.org/report/IP_Commission_Report_052
213.pdf .................................................................................................................4

David S. Levin & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act*, 53 Wake Forest L. Rev. 106 (2018) ......................................5

*Drug Development Technology & Services*, AustarPharma, http://www.austarpharma.com/content/services/88/index.html ........................11

H.R. Rep. No. 114-529 (2016)..................................................................................4

*Mission & Vision*, AustarPharma, http://www.austarpharma.com/content/about/78/index.html ............................12

Patent Law of the People's Republic of China (promulgated by the Standing Comm. Nat'l People's Cong., Mar. 12, 1984, rev'd Dec. 27, 2008, effective Oct. 1, 2009) (P.R.C). .......................................................56

Robert C. Dorr & Christopher H. Munch, Protecting Trade Secrets, Patents, Copyrights and Trademarks § 2.21 (2d ed. 1995) ................................37

Plaintiff Austar International Limited ("Austar"), by and through its undersigned counsel, respectfully submits this Omnibus Opposition to (1) the Motion to Dismiss filed by Defendant AustarPharma LLC ("AP" or the "Company") (the "AP Motion")[1] and (2) the Motion to Dismiss filed by Defendants Rong "Ron" Liu ("Liu") and Guangzhou Bristol Drug Delivery Co., Ltd. (referred to herein as "Bostal")[2] (the "Liu and Bostal Motion") (together, the "Motions").[3]

## PRELIMINARY STATEMENT

Austar placed its trust in Ron Liu to run the parties' joint venture for their mutual benefit per the terms of their agreements. Instead, Liu abused that trust and his position as AP President and CEO, by forming Bostal and related entities in China to usurp AP's business, trade secrets and personnel for his own gain. As the Complaint sets forth in detail, Liu and Bostal misappropriated AP's trade secrets,

---

[1] All citations to the Memorandum of Law in Support of AustarPharma LLC's Motion to Dismiss (ECF No. 16-3) appear herein as AP Mem. at ___.

[2] According to Defendants, the Guangzhou Bristol Drug Delivery Co., Ltd. is now known as Bostal Drug Delivery Co., Ltd. ("Bostal"). Liu & Bostal Mem. at 1. Thus, for purposes of this brief, Austar will refer herein to "Bostal" when referring to Defendant Guangzhou Bristol Drug Delivery Co., Ltd., and all references in the Complaint and herein to the Guangzhou Bristol Drug Delivery Co., Ltd. or the "Guangzhou Company" are to be construed as references to Bostal.

[3] All citations to the Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint on Behalf of Defendant Rong Liu and Bostal (ECF No. 17-1) appear herein as "Liu & Bostal Mem. at ___."

causing substantial harm to AP and its members.  Austar—a founding Member and investor in AP, which is now entirely controlled and dominated by Liu—sought to negotiate with Liu before resorting to litigation and asked that he cease his harmful conduct, but to no avail.

Unable to justify their conduct or dispute Liu's blatant violations of his contractual and fiduciary duties, Defendants instead lodge an orchestrated attack on federal jurisdiction.  In an effort to avoid answering for their conduct in federal court, Defendants resort to bogus challenges to Austar's derivative standing and attempt to reframe Austar's claim under the Defend Trade Secrets Act ("DTSA") as a ploy to obtain federal jurisdiction.  This is a distortion.  Austar asserts proper derivative claims for Liu's theft of *trade secrets owned by the Company*, as well as direct and derivative claims for his breaches of fiduciary duties.  And Liu's theft of Austar's proprietary technologies, research and development processes and findings, and other confidential business information, through Bostal, is at the core of the Complaint and pleaded in detail.  Defendants' alleged conduct represents a paradigmatic example of exactly the type of misconduct for which the DTSA is intended to provide a federal remedy.

Addressing each Defendant's motion in turn, Austar rebuts nominal defendant AP's challenges to its derivative standing in the first part of this Opposition.  In the second part, Austar addresses Liu and Bostal's baseless

2

challenges to the well-pleaded DTSA and tort claims. Ultimately, none of the Defendants offer any legitimate basis for dismissing the well-pleaded claims, all of which squarely belong in this Court.

First, this case properly was commenced derivatively because the trade secrets, business opportunities and property Liu and Bostal have misappropriated belong to AP, not Austar. Contrary to AP's arguments, Austar is uniquely situated to bring precisely this type of action to remedy an injury to the Company. Indeed, if the Court were to accept AP's arguments (clearly asserted by and on behalf of Liu to insulate him from liability), that would mean no party can protect the Company's interests and trade secrets given his complete control. Against this backdrop, it is not surprising that each of AP's attacks on Austar's derivative standing are meritless. While AP seeks to mischaracterize the substance of a pre-litigation communication to Liu (not the AP Board[4]) as a formal demand on the AP Board of Directors, this is a straw man. As a matter of fact and law, Austar made no formal demand on the LLC's Board to take any action against Liu, nor would it have made any sense to do so given Liu's clear control and domination of the Board. Indeed, AP does not actually dispute Austar's allegations that it would have been futile to do so under the circumstances. Austar has met the requirements of Rule 23.1 and clearly is a proper and adequate derivative plaintiff.

---

[4] Capitalized terms not defined herein shall have the meanings set forth in the Complaint (ECF No. 1).

Second, Defendants' next best hope of defeating federal jurisdiction is to take aim at Austar's federal cause of action under the DTSA. Defendants go to great lengths to minimize Austar's substantial DTSA allegations in an effort to generate the misimpression that this claim was concocted to create federal jurisdiction. Not so. That Liu also violated state law does not detract from the fact that he and Bostal misappropriated AP's trade secrets in violation of a federal statute designed to provide a federal forum for plaintiffs whose trade secrets have been misappropriated by foreign individuals or companies.[5]

Liu and Bostal's further attempt to mischaracterize AP as a company that does nothing more than make generic drugs using compounds that have no trade

---

[5] The House Report that accompanied the DTSA notes the theft of intellectual property as a massive problem for U.S. businesses, and states the then-current legal protections, comprised of government enforcement of criminal sanctions and a patchwork of states' laws that provide civil relief, are "not wholly effective in a national and global economy." H.R. Rep. No. 114-529, at 4 (2016). The report concluded that "[i]n a globalized and national economy, Federal courts are better situated to address these concerns." *Id.* The House Report cited a recent report by the Commission on the Theft of American Intellectual Property to support its reasoning. The Commission's report was created, in part, to "[d]ocument and assess the role of China in international intellectual property theft." *See* Comm'n on the Theft of Am. Intellectual Prop., The IP Commission Report 1 (2013), http://www.ipcommission.org/report/IP_Commission_Report_052213.pdf.
Further, the DTSA's proponents "focused heavily on the peril of trade secret misappropriation allegedly committed by foreign actors and entities, especially from China." *See* David S. Levin & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act*, 53 Wake Forest L. Rev. 106, 123 (2018).

secret protection is disingenuous. In so doing, Defendants ignore the well-pleaded allegations about theft of AP's proprietary technologies that AP itself characterizes on its website and in its business plan as "proprietary." And the fact that Liu and Bostal have sought patent protection in PRC for several of the technologies and inventions that originated with AP belies the notion that the underlying technologies are not proprietary trade secrets. Defendants also ignore Austar's allegations that AP's unique formulas, methodologies, and processes for developing drugs, which are incorporated into the finished drug products, and the particular way in which AP leverages its proprietary technologies to enhance its drug products with exclusive features that give AP a competitive advantage in the industry, all constitute trade secrets.

Liu and Bostal also ignore that the trade secrets Austar alleges Liu and Bostal misappropriated extend beyond AP's technology and development process—they also include specific categories of confidential business information, including business plans and strategies, marketing schemes, pricing information, business proposals, sales information, details relating to bids, customer lists, and financial information. Further, Defendants gloss over Austar's allegations of specific acts of misappropriation by Liu and Bostal—the most blatant example being filing for patents in China covering the same proprietary technologies and preparation methods AP has developed. *See* Compl. ¶ 74. Based on the

complaint's well-pleaded facts, federal subject matter jurisdiction exists under the DTSA to remedy Defendants' trade secret misappropriation.

Third, Liu and Bostal's arguments for dismissing Austar's tort claims for interference with prospective economic advantage and conversion also disregard (or improperly seek to contradict) the allegations in the Complaint.  As they attempt with Austar's DTSA claim, Liu and Bostal rely on conclusory assertions that Austar has failed to meet an undefined and inapplicable specificity threshold. In reality, Austar has provided specific examples of business opportunities Liu knew AP would be interested in pursuing, which he instead surreptitiously pursued on behalf of Bostal.  Austar has likewise satisfied its pleading obligations by alleging the conversion of AP's corporate funds and confidential information. Austar easily meets its notice pleading burden.

Finally, Defendants seek to shield Bostal, the entity Liu created to reap the rewards of his misconduct, by asserting that this Court lacks personal jurisdiction over Bostal.  But this case centers around the misconduct of a New Jersey resident (Liu), largely carried out through a company he controls from New Jersey (Bostal), all of which was aimed squarely at a New Jersey company (AP).  Even if Bostal operates primarily in China (which is not even established on this record), its theft of AP's trade secrets, recruitment of its personnel, usurping of its business opportunities and conversion of its corporate funds and confidential information

6

were all clearly aimed at a New Jersey company and New Jersey assets.  This is more than sufficient to create personal jurisdiction over Bostal in New Jersey as a matter of law.

For the reasons forth herein, the Defendants' Motions should be denied in their entirety.

## STATEMENT OF FACTS

## I.   AUSTAR'S INVESTMENT IN AP AND TRUST IN RON LIU

Austar agreed to provide $8 million in start-up capital and to leverage its connections, reputation and goodwill in the Chinese pharmaceutical industry to support the launch of AP.[6]  Compl. ¶ 2.  Austar's partner in forming this new company was Ron Liu, a New Jersey-based scientist whose purported vision, expertise in drug research and development, and personal connections in the U.S. pharmaceutical industry were the primary catalyst for Austar's investment. *Id.* ¶¶ 1–2, 10.  Liu and Austar signed a Joint Venture Agreement in 2004 to establish AP, and both parties expressly committed to take all actions necessary to secure

---

[6] Liu and Bostal's allegation that Austar did not fulfill its financing obligation is both incorrect, as will be established through discovery, and irrelevant.  In any event, such careless and gratuitous allegations raised in response to a Rule 12 motion to dismiss must be disregarded for the reasons set forth below at p. 48-49, *infra*.  Similarly, the 2007 amendment to the Joint Venture Agreement on which this allegation is purportedly based (*see* Liu and Bostal Mem. at 5) must also be disregarded as a matter outside the pleadings improperly submitted in support of a motion to dismiss. *See id.*

the success of the Company.  *Id.* ¶ 2.  AP was subsequently incorporated in New Jersey where it maintains its headquarters.  *Id.* ¶ 3.[7]

As President, CEO and the majority interest holder, Liu controls AP and has taken steps to reduce Austar's influence over and visibility into AP's performance and operations.  *Id.* ¶ 35.  The operative governing charter for AP is the August 8, 2008 Operating Agreement executed by Austar, Liu and another investor DFH, pursuant to which the three parties are "Members" of the LLC.  *Id.* ¶¶ 28-29.   In an effort to secure dominance over AP, Liu acquired DFH, thus becoming the beneficial owner of DFH's membership and LLC interests in AP, and obtaining the capability of voting all of DFH's voting rights.  *Id.* ¶ 35.  Liu only informed Austar of this acquisition after-the-fact.  *Id.*

As a result, the current voting rights arrangement is that Austar holds 43.87% of the Company's voting rights, and Liu effectively controls 55.83% of the Company's voting rights.  *Id.*  This is particularly significant because the Operating Agreement provides that "the approval or consent of Members owning an aggregate of more than 60% of the total LLC Interests shall be required" in order for AP to take a number of significant actions set forth therein, including decisions

---

[7] The Complaint includes an inadvertent misstatement that AP is incorporated in Delaware. Compl. ¶ 11. AP is, in fact, incorporated *and* headquartered in New Jersey, as correctly alleged in the Complaint's opening paragraphs.  *Id.* ¶ 3. While Austar would gladly correct this by amendment in due course, it is irrelevant to the substance of its claims or Defendants' motions to dismiss.

to "cause the Company to participate in any capacity . . . in any business organization or enterprise," to "own, improve, develop, operate, manage and lease real estate," to "borrow money from any Member, bank, lending institution or other lender for any purpose of the Company," and to "enter into, terminate or amend any Related Party Transaction." *Id.* ¶ 31.  Moreover, Liu constitutes 50% of AP's management and controls 50% of AP's four-member Board of Directors.  *Id.* ¶ 76.

In addition to consolidating power for himself through the acquisition of DFH, and thereby diminishing Austar's ability to influence the direction of the Company, Liu has sought to limit Austar's access to information about the Company's performance and operations.  As CEO, Liu was required to prepare and deliver certain financial reports to the Members. Compl. ¶ 42.  Article 7.1 of the Operating Agreement requires that "[n]o later than 60 days prior to the end of each Fiscal Year, the Chief Executive Officer shall prepare and deliver to the Members . . . reports for the next Fiscal Year" including an Investment Plan, Budget authorization, Forecast authorization, Project purchasing budget, Rented property requirements, Authorization for personnel, and more. *Id.*  These reports required approval by the Members owning an aggregate of more than 60% of the total interests in AP within 30 days, and the Company was not permitted to undertake any spending reflected in these reports until the reports were approved by the

Members. *Id.* ¶¶ 43-44.  Liu breached his obligations under Article 7 by failing to provide the Members of AP the financial reports referenced in Articles 7.1 and 7.3 for several years. *Id.* ¶ 92.   In failing to provide these reports, Liu further marginalized Austar.

## II.   AP SETS ITSELF APART FROM GENERIC DRUG DEVELOPERS WITH ITS PROPRIETARY DRUG DELIVERY TECHNOLOGIES AND UNIQUE BUSINESS STRATEGY.

AP provides research and development services to pharmaceutical companies worldwide, and develops and markets finished generic drug products and drug delivery technologies. *Id.* ¶ 17.  In particular, AP touts its two "core competences": its water-insoluble drug delivery technologies and its controlled-release drug delivery technologies.  *Id.* ¶ 19; Compl., Ex. C (June 3, 2010 AP Business Plan) at 3.   AP's website devotes an entire page to its "Drug Development Technology & Services," highlighting AP's "deep scientific expertise and practical know-how in multiple drug delivery technology platforms."[8]   AP has combined controlled-release and water-insoluble drug delivery technologies to complete several platform technologies that allow AP to become a leader in the development of modified-release generic drug products in both U.S. and global markets. Compl. ¶ 20.  These platform technologies include

---

[8] *Drug Development Technology & Services*, AustarPharma, http://www.austarpharma.com/content/services/88/index.html.

an osmotic pump system, a diffusion controlled film system, and a matrix system with both erosion and diffusion mechanisms.  *Id.*  AP has also developed other drug delivery technologies including implantable technologies, parenteral drug delivery technologies, pulmonary and intranasal delivery technologies, and enhanced absorption/transport technologies. *Id.* ¶ 22.  AP itself considers its technologies to be "proprietary," describing them as such in its June 3, 2010 Business Plan. Compl., Ex. C at 28.  Its website refers to AP's "innovative platform technologies and proprietary know-how."[9]

AP uses these proprietary technologies to improve its drug products "to meet underserved market needs."  Compl. ¶ 21.[10]  In this regard, AP is not, as Liu and Bostal now attempt to spin it, simply a generic drug company making drugs using non-exclusive compounds originally developed by other companies.  Rather, AP's initial short term goal was to become "a key player of technology-based generic drugs" and then ultimately become a global leader in patented new drugs, also by leveraging its proprietary drug delivery technologies.  Compl., Ex. C at 4.   To

---

[9] *Mission & Vision*, AustarPharma,
http://www.austarpharma.com/content/about/78/index.html.

[10] AP's water-insoluble drug delivery technologies include:  pharmaceutical salts and pH adjustment, cosolvents, conventional micelles with surfactants, self-emulsifying systems, emulsions and microemulsions, semisolid systems, particle size reduction (e.g. nanocrystals), solid dispersions, process improvement, softgel technology, lipid based systems, complexations, liposomes, polymeric micelles, fast absorption techniques, Bioavailability enhancement techniques, bio-variation reduction techniques, and pain and irritation reduction on injection sites.  *Id.*

achieve these goals, AP has devoted extensive time and resources—on Austar's dime—to the design, development, and testing of certain drugs, delivery technologies, research processes, quality assurance and regulatory compliance processes, manufacturing processes, and other methodologies relating and contributing to the preparation of drugs for launch in the U.S. Compl. ¶ 72.

Further, AP has invested resources in developing a business strategy aimed at expanding AP's footprint in its primary markets, the United States and China. *Id*. ¶¶ 18, 72. AP's cultivation of co-development partnerships with Chinese pharmaceutical companies and formation of a subsidiary in Beijing represent a deliberate effort to seize a competitive advantage for AP within the industry. *Id*. ¶ 25. Liu was entrusted to protect AP's trade secrets, including its confidential information relating to the development of drug formulas and drug delivery technologies, as well as its confidential business plans, and all attendant proprietary information including marketing schemes, pricing and other financial information, business proposals, sales information, bid specifications, and customer lists. *Id.* ¶ 100.

## III. LIU IS PROHIBITED FROM ENGAGING IN COMPETITIVE BUSINESS.

AP's Members agreed to certain restrictive covenants in the Operating Agreement, including restrictions on competitive activities by Liu and the other

Members, so as to protect AP's business and trade secrets. *See* Compl. Ex. B (the Operating Agreement), Art. 12.  Read together, the agreement's restrictions on anti-competitive activities prohibit Liu from "engaging in business similar to the Company's Business" or business that "conflict[s] with the Company's Business" in both the United States and in China during the term of his membership, as well as for any two-year period following separation. Compl. ¶ 47; *see also* Compl. Ex. B, Art. 12.1 ("The Members shall not engage in any business or other activities which directly or indirectly competes with specific generic drug products developed by the Company for the market in the USA"); *id.*, Art. 12.2 ("The restrictions in Section 12.1 shall not be deemed to prohibit Austar or DFH from engaging, directly or indirectly, in any business similar to the Company's Business involving customers in the PRC, provided that the nature of such business does not conflict with the Company's Business").  In addition to obligations arising out of the Operating Agreement, Liu has at all times been bound by a duty of loyalty to AP and Austar as a result of his position within the Company. Compl. ¶ 78.

## IV.   LIU FORMS COMPETING ENTITIES IN CHINA TO MISAPPROPRIATE AP'S TRADE SECRETS, PERSONNEL, AND BUSINESS OPPORTUNITIES.

In July 2013, Liu formed Bostal, a Chinese company based in the city of Guangzhou that holds itself out as a high-tech pharmaceutical company specializing in the research and development of new drug delivery systems, several

of which are direct copies of the products and technologies developed by AP. Compl. ¶¶ 49, 51-55.  The January 16, 2017 Capital Increase Agreement related to Bostal and entered into between Liu, two investors, and another company controlled by Liu describes Bostal's core technology and businesses to include the development of controlled-release pharmaceutical products that involve *osmotic pump technology*, as well as other products, technologies and services identical to AP's. *Id.* ¶ 53.  Bostal has in turn invested in several companies, either as the sole shareholder or in conjunction with Liu or other companies incorporated by Liu, that are also focused on researching and developing similar products to AP. *Id.* ¶ 55.  Austar's complaint identifies a host of specific drug products that AP initially developed and sold, which Liu then prepared for launch by Bostal in PRC, including but not limited to: oxybutynin, paliperidone, nifedipine, celecoxib, valsartan tablets, olmesartan, omeprazole, esomeprazole, simvastatin, metformin, diclofenac sodium and aripiprazole.  *Id.* ¶ 63.  Each of these products was developed on the back of Austar's investment in AP and using AP's proprietary research, data, methodologies, formulations and unique technologies.  Liu just gave them to Bostal.

Bostal has hired for key positions at least thirteen individuals who either currently or used to hold key positions at AP, including key members of AP's Formulation team, AP scientists and the company's President, who promptly filed

to patent AP's inventions in PRC.  *Id.* ¶¶ 59, 74.  And Bostal even boasts that it trains its new employees at AP's facility in New Jersey as part of its recruitment pitch. *Id.* ¶¶ 58-59.  Online profiles of Bostal tout the experience of Liu and his team in developing drug delivery technologies at AP. *Id.* ¶¶ 51-52.  These profiles create the impression that AP is merely a past experience on Liu's resumé when in reality Liu is *currently* the President and CEO of AP and remains obligated to prioritize AP and is prohibited from launching competing ventures like Bostal.

Liu knows that AP's expansion in China was central to its business strategy and has chosen to pursue that strategy through Bostal and affiliated entities rather than on behalf of AP. *Id.* ¶ 67.  Liu and the current or former AP personnel Bostal now employs have applied for patents in the name of Bostal and other entities Liu created that cover the same technologies and preparation methods that AP has researched and developed for years, including water-insoluble drug delivery technologies (*e.g.*, self-emulsifying systems, lipid based systems, liposomes),controlled-release technologies (*e.g.*, osmotic pump systems), and preparation methods for sustained release tablets.  *Id.* ¶ 74.  These applications represent concrete acts of misappropriation of AP's trade secrets.

Liu has also pursued business opportunities on behalf of Bostal and invested resources in AP, when he should have been doing those things on behalf of AP. The Complaint alleges specific examples of these opportunities.  On July 26, 2017,

Liu entered into an agreement with Deyang High Tech Zone Management Committee, purportedly on behalf of AP, pursuant to which AP would invest in Deyang for a newly built BE project and pharmaceutical project ("the Deyang Project"). *Id.* ¶ 71. However, Liu failed to reveal this deal to the other principals and managers of AP and ultimately diverted the benefits of this deal to Bostal. *Id.* Austar also alleges that Bostal announced an investment of 400 million RMB to build a factory that will focus on research and development of new sustained-released drugs, to be sold internationally. *Id.* ¶ 70. Liu never offered this business opportunity to AP. *Id.* Further, Bostal has also publicly purported to have forged a number of co-development partnerships with well-known Chinese pharmaceutical companies, identical in structure to the partnerships that are a critical component of AP's business. *Id.* ¶ 68.

Bostal's business activities are not, as Defendants' motions pretend, confined to China. Liu and Bostal's motion ignores, for example, the allegation that Bostal acquired the right to half of the profits from U.S. sales of an FDA-approved product (valsartan tablets) and a product still in the FDA approval process (valsartan hydrochlorothiazide compound tablets) in 2017 from Qingdao Huaren Pharmaceutical Co., Ltd. ("Huaren"). *Id.* ¶ 65. These two products were developed by AP under two Consignment Agreements entered into between Huaren and AP, pursuant to which Huaren obtained worldwide sales and

manufacturing rights and AP received a development service fee (for helping prepare the products for launch in the U.S.) and half of the profits from products manufactured in the U.S. *Id.* Bostal has also announced a project to build a microsphere sustained release preparation technology platform that would result in Bostal obtaining profits from sales in both the United States and China. *Id.* Online profiles of Bostal state that it is focused on developing and producing drugs for PRC, U.S., Europe and other international markets. *Id.* Bostal has also announced that it passed a FDA site inspection on its Production Workshop and Analytical laboratory, further indicating a focus on the U.S. market. *Id.*

## V.   THE FILING OF A DERIVATIVE ACTION BECOMES NECESSARY TO PROTECT AP'S INTERESTS.

Prior to commencing litigation, Austar sought to negotiate with Liu in good faith to avoid litigation. The February 13, 2018 letter introduced by AP in connection with its motion (the "February 2018 Letter") is one of several communications between Austar and Liu that was part of an ongoing dialogue related to Liu's proposal to acquire Austar's membership interest in AP. *See* ECF No. 16-2 at 2. The February 2018 Letter was not a formal Board demand – indeed, it was neither directed to the Board, nor did it request that the Board take any legal action to address Liu's misconduct. After Liu refused to change course and

stymied efforts to negotiate a resolution, Austar initiated this litigation to protect AP's trade secrets and business opportunities.

## LEGAL ARGUMENT

### I.   AUSTAR PROPERLY ASSERTS DERIVATIVE CLAIMS TO PROTECT AP'S INTERESTS

#### A.   Austar Did Not Make a Formal Demand on AP's Board of Directors and Adequately Pleads Demand Futility Based on Liu's Complete Domination of AP and Its Board.

In an effort to create the misimpression that Austar has failed to comply with the requirements of Federal Rule of Civil Procedure 23.1(b)(3)(A), AP mischaracterizes the February 2018 Letter as a formal demand on AP's Board of Directors.  Contrary to AP's attempted sleight of hand, that letter was part of a then-ongoing dialogue between Austar, Liu (individually) and their respective outside counsel regarding a potential buy-out by Liu of Austar's membership interest.  It plainly was not a formal demand on the Board for it to take action with respect to Liu's misconduct.  On its face, the February 2018 Letter was not directed to AP's four-member Board at all, nor did it request that the Board take any legal action, such as commencing an investigation or lawsuit against Liu and Bostal.  The February 2018 Letter was directed to Liu only, indicating that his overture to acquire Austar's membership interest only would be considered at fair value and reiterating that he should cease-and-desist his self-dealing and

18

misappropriation.  As a matter of fact and law, there is no basis to construe the February 28 Letter as a formal demand on the Board.

Tellingly, AP fails to cite a single case construing correspondence akin to the February 2018 Letter as a formal board demand.  In fact, none of the cases cited by AP relate at all to what constitutes a formal board demand under New Jersey law[11] (or Delaware law, which New Jersey courts frequently look to for guidance in the areas of corporate law and, specifically, demand futility).  *Jannett v. Gilmartin*, No. HNT-L-341-05, 2006 WL 2195819, at *2 (N.J. Super. Ct. Law Div. July 21, 2006).[12]  This is not surprising.  Indeed, Rule 23.1 itself specifies that a shareholder plaintiff must plead either "(A) any effort by the plaintiff to obtain the desired action *from the directors or comparable authority* and, if necessary, from the shareholders or members; and (B) the reason for not obtaining the action

---

[11] The question whether Rule 23.1 has been satisfied is determined in accordance with state law.  *See In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 555 (D.N.J. 2011) ("As a federal court hearing a shareholders' derivative suit involving state law claims, a district court must . . . 'apply state substantive law to determine whether the facts demonstrate demand would have been futile and can be excused.") (citations omitted).  Because AP is a New Jersey LLC, the question whether the February 2018 Letter constitutes a formal board demand is governed by New Jersey law.

[12] None of the cases cited by AP address in any way what constitutes a formal board demand as a matter of law.  *See* AP Mem. at 7-8, citing *Coyer v. Hemmer*, 901 F. Supp. 872, 887-88 (D.N.J. 1995) (finding failure to satisfy demand futility test); *Palkon v. Holmes*, No. 2:14-CV-01234, 2014 WL 5341880, at *4-7 (D.N.J. Oct. 20, 2014) (finding that demand on board was properly refused); *Blasband v. Rales*, 971 F.2d 1034, 1055 (3d Cir. 1992) (affirming lower court's finding of failure to establish demand futility).

or not making the effort." Fed. R. Civ. P. 23.1 (emphasis added).  Also, Delaware

courts have addressed when correspondence qualifies as a formal board demand

under Delaware law.  Under Delaware law,

> Although there is no 'all-inclusive legal formula' or 'magic words'
> that define whether a communication is a formal demand, Delaware
> courts require that a demand (1) identify the alleged wrongdoers; (2)
> identify the alleged wrongdoing and the resulting injury to the
> corporation; and (3) *specify the legal action the shareholder wants the
> board to take*.

*Bresalier v. Good*, 246 F. Supp. 3d 1044, 1057 (D. Del. 2017) (emphasis added).

The test under New York law also is similar.  While "demand to sue need not

assume a particular form or be made in any special language, it must inform *the*

*board* with particularity of the complained of acts and the potential defendants. . . .

A demand must fairly and adequately apprise *the directors* of the potential cause of

action *so that they, in the first instance, can discharge their duty of authorizing*

*actions that 'in their considered opinion' . . . [are] in the best interests of the*

*corporation*.'"  *Stoner v. Walsh*, 772 F. Supp. 790, 796 (S.D.N.Y. 1991) (internal

citations omitted) (emphasis added).

As is evident, a letter may constitute a formal board demand if, at a

minimum, *it is directed to the board of directors* and specifies the legal action that

the plaintiff requests the board of directors to take.  These requirements are

consistent with the very purpose of the demand requirement – to the extent a

demand is made, it is intended to apprise the board of directors of a potential cause of action so that the board of directors can determine how to proceed, whether by commencing an investigation, filing a litigation or otherwise discharging their fiduciary duties to act on behalf of the company.  The February 2018 Letter clearly does not meet, nor was it intended to meet, either of these requirements – it is neither directed to the Board, nor does it specify any legal action that the Board was requested to take.  To the contrary, the letter conveyed, "[w]e understand that you have expressed interest in purchasing Austar's membership interest in AP.  In that regard, as *Austar has previously conveyed to you in prior communications*, Austar would consider such a transaction . . . ."  ECF No. 16-2 at 2. (emphasis added).  This is not the stuff of a formal board demand.

Where, as here, a letter is not directed to the board of directors, or even is only directed to a sub-set of the board of directors, courts have held that such a letter does not constitute a formal board demand under Rule 23.1.  *See, e.g.*, *Recchion v. Kirby*, 637 F. Supp. 1309, 1319 (W.D. Pa. 1986) (concluding that the letter was not a proper demand letter, in part, because only some of the members of the board were notified).  Likewise, courts have declined to construe correspondence as a formal board demand where it failed to specify the legal action requested, *i.e.*, what action the correspondence is requesting the board of directors to take.  *See, e.g.*, *Shlensky v. Dorsey*, 574 F.2d 131, 140 (3d Cir. 1978)

21

(finding that neither of plaintiffs' letters constituted a demand because they were not addressed to the board of directors and that they "called for nothing more than a responsive communication from [the individual], to whom they were addressed"); *Abrams v. Koether*, 766 F. Supp. 237, 244 (D.N.J. 1991) (finding that the letters were "not demands for legal action," but, rather, requests for information).

AP's ulterior motive for introducing the February 2018 Letter is to suggest that Austar somehow is not a proper derivative plaintiff because it purportedly has interests antagonistic to the company. Not only does this assertion improperly reach outside the pleadings, it is unavailing for multiple reasons, as set forth in Section I.C. below. *See Abrams*, 766 F. Supp. at 244-45 (declining to consider demand letter for other purposes). Tellingly, however, what AP does *not* argue is that Austar has failed to plead demand futility. AP concedes this point because, as set forth in detail in the Complaint, any demand on the Board plainly would have been futile given Liu controls two of the four directors on the Board, and because approval or consent of Members owning in excess of 60% of the total LLC membership interests is necessary to authorize the suit. Given that Liu holds directly as the beneficial owner 56% of the LLC interests, he effectively has a blocking right against any litigation against him on behalf of the company. ¶ 76.

Thus, unable to contest Austar's pleading of demand futility, AP instead attempts to contort the February 2018 Letter into a formal board demand as a transparent attempt to seize upon law establishing that, if Austar would have been foolish enough to make a formal board demand, it would have conceded the independence of the clearly tainted Board. *See* AP Mem. at 6-8; *see also Bresalier*, 246 F. Supp. 3d at 1051-52. Of course, Austar did not make a formal demand on AP's board of directors for this very reason – Austar was not prepared to concede the independence of a clearly tainted Board. Moreover, as a practical matter, Austar clearly recognized that any demand plainly would have been refused by a Board intent on protecting Liu; moreover, in any case, Liu had an effective blocking right by virtue of his ownership interest.[13]

Accordingly, AP's argument that Austar has failed to meet the requirements of Rule 23.1 based on the February 2018 Letter should be rejected out of hand. By its terms, the February 2018 Letter plainly does not constitute a formal board demand.

---

[13] To the extent the Court were to construe the February 2018 Letter as a formal litigation demand (which it is not), Austar respectfully requests leave to amend the Complaint to plead wrongful refusal. If needed, it would not be difficult for Austar to plead wrongful refusal given that, not surprisingly, the Board did not do anything in response to the February 2018 Letter (since it was not directed to the Board). Indeed, the subsequent history, which is outside the record for purposes of these Motions, only would serve to reinforce what is apparent from the face of the February 2018 Letter – it is not a formal board demand.

**B.**     **Austar's Assertion That This Is a Collusive Pleading Fundamentally Misunderstands the Law.**

In another misguided argument under Rule 23.1, AP asserts that Austar did not comply with the requirement under Rule 23.1(b)(2) that the complaint "allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack." AP Mem. at 8.   This argument demonstrates a fundamental misunderstanding of the meaning and purpose of Rule 23.1(b)(2).

"Where, as here, federal subject matter jurisdiction rests on a federal question rather than diversity, the policy underlying the requirement that non-collusiveness be alleged is plainly not significantly implicated." *Markowitz v. Brody*, 90 F.R.D. 542, 549 n.2 (S.D.N.Y. 1981).   Accordingly, courts have "disregard[ed] a failure to allege non-collusiveness where the case involves a federal question and the record reveals no hint of collusion." *Id.*; *see also In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1458 (D.N.J. 1987) (noting that, despite the absence of the "required allegation of noncollusion, this court sees no hint of collusion on the record," and refusing to dismiss the derivative claim); *Weisfeld v. Spartans Indus., Inc.*, 58 F.R.D. 570, 578 (S.D.N.Y. 1972) (stating that both the failure to verify the complaint and failure to allege the absence of collusion in accordance with Rule 23.1(b) were not grounds for dismissal, especially given that "the vigor with which defendants have opposed the action belies any inference of

collusion between the parties"); *Walden v. Elrod*, 72 F.R.D. 5, 13 (W.D. Okla. 1976) (noting "[t]he type of collusion that is contemplated by the courts in a consideration of dismissal for collusion is the transfer of a minimal number of shares of stock for the purpose of creating diversity jurisdiction").

Here, not only is federal jurisdiction premised on a federal statute creating original federal subject matter jurisdiction, there also is no basis whatsoever to suggest that Austar's Complaint implicates a concern regarding collusion, which is triggered by perceived attempts to manufacture *diversity* jurisdiction.  *See, e.g.*, *Amar v. Garnier Enters., Inc.*, 41 F.R.D. 211, 215–17 (C.D. Cal. 1966) (finding collusion where the plaintiff was unfamiliar with the facts of the lawsuit, had only purchased the minimum required value of securities to bring the suit, purchased them not long before the action began, and was not controlling the litigation). Indeed, it bears emphasis that, as alleged in the Complaint, Austar is an original member of AP that at all times has continued to hold its interest in AP.  Compl. ¶ 2.  Thus, even if federal jurisdiction were premised on diversity, there simply would be no basis to assert that this action was collusively filed to manufacture federal jurisdiction.

In any case, this action was not brought in federal court based on diversity jurisdiction; rather, federal subject matter jurisdiction arises from Austar's well-pleaded DTSA claim.  To be sure, the DTSA expressly provides for federal

jurisdiction over claims brought under it.  18 U.S.C. § 1836(c) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section.").  And federal courts exercising pendant jurisdiction over state law claims brought along with a DTSA claim is neither unusual nor controversial.  *See, e.g.*, *Dardashtian v. Gitman*, No. 17 Civ. 4327, 2017 WL 6398718, at *5–6 (S.D.N.Y. Nov. 28, 2017) (applying federal question jurisdiction based on the DTSA claim and granting supplemental jurisdiction over the remaining state law claims); *Yotrio Corp. v. Jonathan Coop, et al. Additional Party Names: 3i Prod., Inc.*, No. CV1810101JFWFFMX, 2019 WL 1877598, *2 at n.2 (C.D. Cal. Apr. 12, 2019) ("The parties agree that the sole basis for this Court's subject matter jurisdiction is [the] DTSA claim[,] [and] [t]he language of DTSA expressly confers subject matter jurisdiction on this Court").

For this reason, all of the cases cited by AP in support of dismissal under Rule 23.1(b)(2) are entirely irrelevant.[14]  Austar's argument regarding collusion is

---

[14] Moreover, none of cases cited by AP were dismissed solely because the complaint did not allege the absence of collusion. *See Wesolek v. Layton*, 914 F. Supp. 2d 853, 863-64 (S.D. Tex. 2012) (dismissing in part for failure to plead demand futility and failure to verify complaint); *2815 Grand Realty Corp. v. Goose Creek Energy, Inc.*, 656 F. Supp. 2d 707, 720 (E.D. Ky. 2009) (dismissing in part for failure to verify complaint, allege shareholder status, and allege pre-suit demand or demand futility); *Strickland v. Flue-Cured Tobacco Cooperative Stabilization Corp.*, 643 F. Supp. 310, 316 (D.S.C. 1986) (finding "plaintiffs have failed to comply with Rule 23.1 in at least four respects").

a total red herring.  Simply stated, there is no basis to dismiss Austar's claims under Rule 23.1(b)(2).

### C.   Austar Is the Only Possible Representative to Protect AP from Liu and Bostal's Misconduct.

AP's contention that Austar is not an adequate representative of the interests of AP is without merit, to the point of absurdity.  As AP acknowledges, the very purpose of a derivative action is to protect the interests of a company from misconduct by faithless directors and managers. AP Mem. at 10.  This is precisely why Austar brings this derivative action.  AP's attempt to reduce the lawsuit to a "personal dispute" between Austar and Liu, *id.* at 14, obfuscates the fact that AP in essence *is* Liu and Austar.  The only other relevant stakeholder was DFH, but Liu is now the beneficial owner of DFH's membership and LLC Interests in AP, having acquired the capability of voting DFH's voting rights.  Compl. ¶ 35.  Thus, there is no one to protect AP from the conduct of its faithless President and CEO, enforce the Operating Agreement, or hold Liu accountable for violations of his fiduciary duties other than Austar.

As a matter of law, AP bears the burden "to show that the derivative plaintiff does not fairly and adequately represent the other shareholders."  *See Ravenswood Inv. Co., L.P. v. Bishop Capital Corp.*, 374 F. Supp. 2d 1055, 1062 (D. Wyo. 2005) (citing *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 592 n.15 (5th Cir. 1974); *Guenther v. Pacific Telecom, Inc.,* 123 F.R.D. 341, 344 (D. Or. 1987); *Baron v.*

*Strawbridge & Clothier,* 646 F. Supp. 690, 695 (E.D. Pa. 1986)).  AP's challenge to Austar's status as an adequate representative is premised on the notion that Austar has independent interests that are antagonistic to those of AP.  AP Mem. at 11.  To support its argument, AP points to two sources—the Complaint and the February 2018 Letter.  Neither of these sources provide any basis to conclude, on the pleadings, that Austar has any interests antagonistic to AP, much less a sufficient basis for AP to obtain the extreme remedy of disqualifying AP, which, in effect, would allow Liu to escape liability for his misdeeds.

First, with respect to the Complaint, AP alleges that Austar's assertion of both direct and derivative claims make Austar an inadequate representative. AP Mem. at 12.  Not surprisingly, AP fails to muster a single case establishing a *per se* rule under New Jersey law prohibiting a derivative plaintiff from asserting both direct and derivative claims simultaneously.  In fact, "[c]ourts within the Third Circuit have held that a conflict does not exist 'on the mere basis of simultaneously suing a corporation and bringing a derivative action on its behalf.'"  *Resnik v. Woertz*, 774 F. Supp. 2d 614, 626 (D. Del. 2011) (quoting *Miller v. Fisco,* 63 F.R.D. 132, 133–34 (E.D. Pa. 1974)).  "As a general rule, the mere fact that a plaintiff asserts direct and derivative claims in a single action does not constitute a conflict of interest." *Veros Software, Inc. v. First Am. Corp.*, No.

SACV061130JVSANX, 2008 WL 11338610, at *5 (C.D. Cal. June 13, 2008), citing *Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977).

Underlying AP's argument that Austar is an inadequate representative is its contention that Austar "will be at odds with [AP] as they sort out which entity is entitled to receive any profits held in constructive trust (Compl. ¶ 84) or any damages that may be awarded." AP Mem. at 12.   This is at best a hypothetical concern that federal courts consistently have rejected as a basis to scuttle otherwise valid derivative claims.  "Of course, there is always a theoretical conflict of interest in situations where a plaintiff in a single lawsuit seeks redress not only on behalf of the corporation but also from the corporation." *In re Transocean Tender Offer Sec. Litig.*, 455 F. Supp. 999, 1014 (N.D. Ill. 1978).  However, "in many cases, [such as this case] 'plaintiffs' success as to either action is equally contingent upon the proof of the same nucleus of facts, [so that] they and their counsel can be expected to attack all fronts with equal vigor.'" *Veros Software, Inc.*, 2008 WL 11338610, at *5 (quoting *Bertozzi v. King Louie International, Inc.*, 420 F. Supp. 1166, 1180 (D.R.I. 1976)).  In such circumstances where the direct and derivative claims arise from a common nucleus of facts, the "conflict is . . . nothing more than a 'surface duality.'" *Id.* (quoting *Bertozzi*, 420 F. Supp. at 1180).

Courts consistently have rejected the sort of hypothetical concerns advanced by AP.  "A plaintiff in a stockholder derivative suit will not be disqualified simply

because he may have interests which go beyond the interests of the class . . . . Likewise, purely hypothetical, potential or remote conflicts of interest will not disqualify a derivative plaintiff." *Emerald Partners v. Berlin*, 564 A.2d 670, 674 (Del. Ch. 1989) (internal citations omitted). Where initial interests are aligned, "the potential conflict . . . can arise only at the remedy stage of litigation, and only if the basic question of the defendants' liability is first resolved in the plaintiffs' favor"; courts are reluctant to find the representation inadequate at the outset. *Veros Software, Inc.*, 2008 WL 11338610, at \*6.

Second, in an effort to conjure a basis to disqualify Austar, AP improperly relies on the February 2018 Letter in an effort to introduce matters outside the pleadings. While the Court may consider the February 2018 Letter in order to discard AP's frivolous argument that it constituted a formal demand for Board legal action, AP is not entitled to rely on the February 2018 Letter to argue that it renders AP an inadequate representative. At best, that raises a fact issue not appropriate for resolution on a motion to dismiss. *See infra* pp. 48-49 (citing *Abrams*, 766 F. Supp. at 244-45). In any case, however, nothing in the February 2018 Letter casts any doubt on Austar's status as an adequate representative. AP cites no authority whatsoever to support its contention that Austar's request to be made whole for the damages and lost profits Liu caused, or Austar's efforts to reach a negotiated settlement, somehow undermine Austar's status as an adequate

representative. AP Mem. at 11 –12.   In fact, courts have held to the contrary, recognizing that shareholders who previously approached a corporation with buyout offers are still adequate representatives of the remaining shareholders in a derivative suit.   *See*, *e.g.*, *Ravenswood Investment Co.*, 374 F. Supp. at 1062 (finding the defendant's allegations that the plaintiffs were inadequate representatives due to antagonistic economic interests did not meet their burden).

## II.   AUSTAR'S ROBUST PLEADING EASILY SATISFIES THE LIBERAL NOTICE PLEADING STANDARD APPLICABLE TO ALL CLAIMS.

### A.   Rule 8(a) Applies to All of Austar's Claims.

The Liu and Bostal Motion is largely premised on an improper attempt to elevate the pleading standard to one that requires particularized allegations beyond what is required by Rule 8(a).   While Defendants' motions pay lip service to the appropriate pleading standard, many of their arguments for dismissal could only succeed if trade secret claims were subject to a heightened pleading standard that finds no basis in law.   Liu and Bostal rely on conclusory assertions that Austar's misappropriation, tortious interference, and conversion allegations are insufficiently specific.   Those arguments completely ignore that all of the claims

Liu and Bostal seek to dismiss pursuant to Rule 12(b)(6) are subject to the liberal notice pleading standard of Rule 8(a).[15]

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Rule 8(a)(2) "requires only a short and plain statement of the claim," sufficient facts to demonstrate "the pleader is entitled to relief," and "fair notice of what . . . the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (internal quotation marks omitted)). A complaint should not be dismissed on a Rule 12(b)(6) motion if the claim is adequately stated and if the factual allegations raise a right to relief "above the speculative level." *Twombly*, 550 U.S. at 555. Further, the allegations of a complaint are construed in the light most favorable to the plaintiff and all facts alleged are assumed true. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007). The detailed Complaint in this case goes well beyond what is required to satisfy the Rule 8(a)(2) notice pleading standard.

---

[15] *See Von Rohr Equip. Corp. v. Modern Fasteners Inc.,* No. CV 16-6675, 2017 WL 9690975, at *1 (D.N.J. May 18, 2017) (DTSA claim satisfies Rule 8(a)); *Slim CD, Inc. v. Heartland Payment Sys., Inc*, No. CIV. A. 06-2256, 2007 WL 2459349, at *4 (D.N.J. Aug. 24, 2007) (tortious interference claim satisfies Rule 8(a)); *Strategic Prod. & Servs., LLC v. Integrated Media Techs., Inc.*, No. 18-CV-00694 (KSH) (CLW), 2019 WL 2067551, at *10 (D.N.J. May 10, 2019) (conversion claim satisfies Rule 8(a)).

**B.    Austar Adequately Pleads a Claim for Misappropriation of Trade Secrets Under the DTSA and NJTSA.**

Liu and Bostal argue primarily that Austar's claims under the DTSA and NJTSA[16] lack sufficient detail.  In so doing, they rely on inapposite precedent—including cases decided on motions for summary judgment rather than motions to dismiss[17]—mischaracterizations of the Complaint, and improper references to a purported amendment to the Joint Venture Agreement attached to their motion to dismiss.[18]  Accepting the allegations in the Complaint as true, however, Austar has gone above and beyond its pleading obligations to state plausible claims under the DTSA and NJTSA.

To state a claim under the DTSA, "a plaintiff must plausibly allege that: (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret. 18 U.S.C. § 1836(b)(1)." *Medidata Sols., Inc., v. Veeva Sys. Inc.*, No. 17 CIV. 589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018).[19]  The DTSA defines trade secrets very broadly to include:

---

[16] The New Jersey Trade Secrets Act, § N.J.S.A. 56:15–1, *et seq.*, is referred to herein as "NJTSA."

[17] *See infra* pp. 41-42.

[18] *See infra* pp. 48-49, 53.

[19] The same is true with respect to the NJTSA: "Under New Jersey law, a claim for trade secret misappropriation simply requires pleading the existence of a trade secret and misappropriation of the trade secret. *See* N.J.S.A. § 56:15." *Quintiles*

> **all forms and types** of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if— (A) the owner thereof has taken **reasonable measures to keep such information secret**; and (B) the information derives **independent economic value**, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3) (emphasis added).[20]  Misappropriation, as defined under the statute, includes "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under

---

*IMS Inc. v. Veeva Sys. Inc.*, No. CV 17-00177 (CCC), 2017 WL 4842377, at *6 (D.N.J. Oct. 26, 2017).

[20] The NJTSA provides a nearly identical definition: "'Trade secret' means information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.J.S.A. § 56:15-2.

circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).[21]

Despite Defendants' misguided attempt to impose a heightened pleading standard, Plaintiffs asserting trade secrets claims "need not make out specific allegations as to exactly how Defendants used or disclosed Plaintiff[s'] trade secrets; there is no heightened pleading standard for a misappropriation claim, and Plaintiff[s are] entitled to seek discovery to support [their] allegations setting forth a prima facie claim." *Chubb Ina Holdings Inc. v. Chang*, No. CV 16-2354-BRM-DEA, 2017 WL 499682, at *10 (D.N.J. Feb. 7, 2017) (quoting *Osteotech, Inc. v. Biologic*, No. 07-1296 (JAP), 2008 WL 686318, at *5 (D.N.J. Mar. 7, 2008)) (internal quotations omitted). Moreover, Austar has a significant informational disadvantage as a minority stakeholder in AP. This informational disadvantage is not uncommon in trade secrets cases,[22] and courts have taken this into account in

---

[21] Misappropriation is given a similar definition in the NJTSA. "'Misappropriation' means: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who: (a) used improper means to acquire knowledge of the trade secret; or (b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means; or (c) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means." N.J. Stat. Ann. § 56:15-2.

[22] Robert C. Dorr & Christopher H. Munch, Protecting Trade Secrets, Patents, Copyrights and Trademarks § 2.21, at 89-90 (2d ed. 1995) ("Often, the trade secret

allowing misappropriation claims to proceed to discovery. *See Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. CIV.A. 09-3125 (FLW), 2011 WL 773034, at \*5 (D.N.J. Feb. 28, 2011) ("[T]he Court notes that information concerning Defendants' alleged use of the trade secret may, at this juncture, be solely within the Defendants' knowledge") (citing *Davis v. Frederick,* Civil Action No. 10–cv–2119, 2010 WL 3566833, at \*3 (E.D. Pa. Sept. 9, 2010) ("To the extent that the Complaint does not contain more specific factual allegations concerning the actual policies and procedures . . . this is because Defendant, not Plaintiffs, is in possession of, and knowledgeable about, such policies. Defendant can thus begin to formulate a defense based on the allegations contained in the Complaint; if no details about the specific policies and procedures emerge during discovery, Defendant can move for summary judgment.")).

Here, as set forth below, despite its informational disadvantage, Austar has included a robust pleading of its trade secret claims that easily meets the liberal notice pleading standard of Rule 8(a).

---

owner does not know what was taken, and the actual identification of the trade secret may occur only after full and complete discovery of the wrongdoer's material. . . . When full and complete discovery has occurred, then specific identification of the trade secrets can be made").

**C.    The Complaint Pleads Detailed Facts Sufficient to Put Liu and Bostal on Notice of the Trade Secrets They Have Misappropriated.**

*1.    The Complaint Sufficiently Identifies Trade Secrets.*

Liu and Bostal ignore Austar's detailed allegations regarding the specific categories of proprietary information AP has developed:

> [AP] has devoted extensive time, money, and other resources to the design, development, and testing of certain drugs, delivery technologies, research processes, quality assurance and regulatory compliance processes, manufacturing processes, and other methodologies relating and contributing to the preparation of drugs for launch in the U.S. [AP]'s unique formulas, methodologies, and processes for developing drugs and drug delivery technologies constitute confidential trade secrets.

Compl. ¶ 72.   Austar further alleges that AP entrusted Liu with its "unique formulas, methodologies, and processes for developing drugs and drug delivery technologies, research and development, short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, and computer software." *Id*. ¶ 100.

The Complaint details the platform technologies AP has developed by combining controlled-release and water-insoluble drug delivery technologies, including "an osmotic pump system, a diffusion controlled film system, and a

matrix system with both erosion and diffusion mechanisms." *Id.* ¶ 20.  AP's water-insoluble drug delivery technologies include:

> pharmaceutical salts and pH adjustment, cosolvents, conventional micelles with surfactants, self-emulsifying systems, emulsions and microemulsions, semisolid systems, particle size reduction (e.g. nanocrystals), solid dispersions, process improvement, softgel technology, lipid based systems, complexations, liposomes, polymeric micelles, fast absorption techniques, Bioavailability enhancement techniques, bio-variation reduction techniques, and pain and irritation reduction on injection sites.

*Id.* ¶ 21. The Complaint also describes other technologies AP has developed, including "implantable technologies, parenteral drug delivery technologies, pulmonary and intranasal delivery technologies, [and] enhanced absorption/transport technologies." *Id.* ¶ 22.

There are numerous decisions, in this district and others, finding that misappropriation of trade secrets claims under the DTSA that identify trade secrets with even *less* specificity than Austar has, nevertheless satisfy the notice pleading standard and survive a motion to dismiss.  In *Von Rohr Equipment Corp.*, the court dispensed with any question as to whether the complaint adequately identified the trade secrets in just a few sentences:

> The Complaint plausibly alleges that the case involves trade secrets. It alleges that McClatchy and Reiser took customer lists, that Plaintiffs had its employees sign a Confidentiality Policy to prevent disclosure of the lists, and wrote cease a desist letters to prevent use of the information. Compl. ¶¶ 24-25, 34, 58-62, 66, 73. These allegations satisfy Rule 8(a)'s standards.

2017 WL 9690975, at *1.  Likewise, in *Chubb Ina Holdings Inc.*, the plaintiff alleged that former employees "accessed and removed from Chubb's computer systems confidential business records" and that plaintiff maintains non-public information regarding its clients on its company computers. 2017 WL 499682, at *2.  If these general descriptions of customer lists and business records are sufficient to identify trade secrets under the DTSA at the pleading stage, then surely Austar's description of AP's highly specialized, proprietary drug delivery technologies, as well as the other categories of trade secrets Austar identifies (which include customer lists), should suffice as well. Compl. ¶ 100.

Given that the DTSA is a relatively new statute and there is limited relevant case law in this District, decisions by other federal courts are instructive.   In *Medidata Solutions, Inc.*, the complaint alleged three categories of trade secrets: clinical trial software solutions, sales and marketing activities, and short- and long-term business plans. 2018 WL 6173349, at *1.  Noting that "district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated," the court found that plaintiffs had satisfied that standard by specifying these "categories of information." *Id.* at *3.

Similarly, in *PrimeSource Building Product, Inc. v. Huttig Building Product, Inc.*, No. 16 CV 11390, 2017 WL 10188772 (N.D. Ill. July 6, 2017), the complaint

identified several categories of information: customer information, supplier information, financial, budget and planning data, employee information, and business model. *Id.* at \*2. The court conceded "that PrimeSource's trade secrets description is not as specific as it could be." *Id.* at \*3. But the court found that "the plaintiff is not required to describe its trade secrets in detail in a complaint" and cited numerous decisions where district courts found general categories of information to be sufficient at the pleading stage. *Id.* The decision was based in part on the court's finding that the "existence of a trade secret ordinarily is a question of fact . . . best resolved by a fact finder after full presentation of evidence from each side" and that "[i]n the trade secrets context, [c]ourts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." *Id.* at \*4 (internal quotation and citation omitted).

Unable to argue that Austar's robust allegations fail to meet the notice pleading standard, Liu and Bostal resort to distorting the lines between summary judgment and a motion to dismiss, importing the summary judgment standard without providing any basis for its application at this stage of the litigation. They rely on *Givaudan Fragrances Corp. v. Krivda*, No. CIV.A. 08-4409 PGS, 2013 WL 5781183 (D.N.J. Oct. 25, 2013), to support their contention that Austar must identify "with precision the trade secrets at issue at the outset of the litigation." *Id.* at \*11. But Liu and Bostal omit any discussion of the context of the quote they

rely on, which pertains not to the standard for pleading a misappropriation of trade secrets claim under the DTSA and NJTSA, but rather to the standard for sufficient notice at that point in the litigation—years after the complaint was filed and after extensive discovery. *Id.*, at *7.  Liu and Bostal also cite another decision decided on a motion for summary judgement, without explaining this important context, to support their claim that courts require identification of trade secrets with "reasonable particularity."[23]  Once again, these particularity requirements are not applicable and have no relevance in the context of a motion to dismiss a trade secrets claim.

Liu and Bostal also mischaracterize AP as purely a generic drug company, going as far as to assert that "[AP] has no information that is subject to 'trade secret' protection." Liu & Bostal Mem. at 10.  But even if such a bald factual assertion could carry a Rule 12 motion to dismiss (it cannot), it is belied by AP's own public statements.  For example, AP's website and business plan tout the proprietary nature of its technology platform and make clear that there is much more to AP's business than simply repourposing off-patent drug compounds.  AP's

---

[23] Liu and Bostal Mem. at 8 (citing *Big Vision Private Ltd. v. E.I. DLuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 258 (S.D.N.Y. 2014)).  In that decision, the court stated "[t]he requirement of particularity exists for the simple reason that a defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon that trade secret and **so that the defendant can defend itself at any trial.**" *Big Vision Private Ltd.*, 1 F. Supp. at 258 (emphasis added).  This standard is entirely inapplicable at this stage of the litigation.

June 3, 2010 Business Plan touts AP's two "core competences": its water-insoluble drug delivery technologies and controlled-release drug delivery technologies. Compl. Ex. C at 3.  Liu and Bostal also inaccurately state that AP's website does not list any drug delivery technologies, when in fact the website has an entire page under the "Services" tab entitled "Drug Development Technology & Services" which highlights AP's "deep scientific expertise and practical know-how in multiple drug delivery technology platforms" and lists its controlled-release platform technologies, including the osmotic pump, matrix, film, and pulsatile technologies.[24] Liu & Bostal Mem. at 10.

Austar's trade secret claims are based in large part on AP's highly specialized and proprietary technologies, not on the off-patent chemical compounds of the generic drugs.  Compl. ¶ 100.  In addition to the host of specific drug products developed using AP's proprietary research, data, methodologies, formulations and unique technologies, *id.* ¶ 63, the Complaint repeatedly refers to AP's proprietary drug delivery technologies by name, including its "water-insoluble drug delivery technologies, including liposomes, softgel technology . . . particle size reduction . . . .  matrix systems, diffusion controlled systems, and osmotic pump systems." *See e.g.,* Compl. ¶ 61.  And it lists particular inventions that originated with AP in the United States, which Liu and Bostal improperly

---

[24] *See supra* n.8.

passed off as their own in PRC patent applications. *Id.* ¶ 74. Nevertheless, Liu and Bostal falsely contend that "[t]he Complaint fails to identify any alleged drug delivery technologies by name" and that Austar has not pointed to anything from AP to suggest it has developed any drug delivery technologies. Liu & Bostal Mem. at 10.

Thus, it is unfitting that Liu and Bostal rely on decisions where the alleged trade secrets pertained to the development of generic drugs only, and not to the kinds of proprietary drug delivery technologies that form the primary basis for Austar's trade secret claims. *See* Liu & Bostal Mem. at 8-9. In *Oakwood Laboratories, LLC v. Thanoo*, No. 17-CV-05090 (PGS), 2017 WL 5762393 (D.N.J. Nov. 28, 2017), the court dismissed trade secrets claims by a generic drug maker that defined its trade secrets as processes relating to the development of the "Oakwood Products," which, in turn was defined to include "hard-to-develop generic and quasi-generic, sustained-release, and small molecule injectable drugs." *Id.* at *4; Complaint at ¶¶ 16-18, ECF No. 1. *Oakwood* also is distinguishable because the plaintiff (the trade secret owner) was uncooperative when the defendants requested additional information regarding the trade secrets. *Id.* at *4. Liu has never asked for additional information about the trade secrets, and there would be no need for him to do so given that "[AP]'s information is derived from Dr. Liu" who "is the originator of the technology." Liu & Bostal Mem. at 13.

*Exeltis USA Dermatology, Inc. v. Accella Pharm., LLC*, No. 15-7446, 2016 WL 4265716 (D.N.J. Aug. 11, 2016) is also irrelevant because the plaintiff claimed misappropriation of "certain Proprietary Information" concerning its substitutes for existing branded products. *Id.* at *1. Finally, Liu and Bostal cite *StrikeForce Techs., Inc. v. WhiteSky, Inc.,* No. 13-1895, 2013 WL 3508835 (D.N.J. July 11, 2013), where the dismissal of the trade secrets claim under the NJTSA was not based on the adequacy of the descriptions of the trade secrets but rather on the allegations of acts of misappropriation.

In any event, Liu and Bostal cite no authority suggesting the existence of a bright-line rule prohibiting trade secret protection for proprietary information relating to the development of generic drugs. In fact, courts have recognized that generic drug developers' unique formulas, processes, research, development, technologies and methodologies like those involved here, Compl. ¶ 72, may constitute trade secrets. *See In re Gabapentin Patent Litig.*, 312 F.Supp.2d 653, 657 (D.N.J. 2004) (sealing summary judgment motions that contained protectable trade secrets of secret chemical formulas, analytical testing, chemical composition of the generic drugs, research and development data, previously marked as confidential). Austar has alleged that AP's "unique formulas, methodologies, and processes for developing drugs and drug delivery technologies constitute confidential trade secrets." Compl. ¶ 72. The Complaint explains that

AP leverages its proprietary drug delivery technologies to enhance its drug products in such a way that gives AP a competitive advantage in the industry and allows it to "meet underserved market needs." *Id.* ¶ 21. Thus, AP's exclusive information relating to the development of not only its drug delivery technologies but also its drug products, including the unique formulas, processes, methodologies and research and development findings used to produce them—and the way in which AP uses its proprietary technologies to incorporate unique features into its drug products—constitutes trade secrets.

2.     *AP Took Reasonable Measures to Protect Its Trade Secrets.*

Liu and Bostal falsely assert that Austar has "not identified any particular measures" taken to protect AP's trade secrets, but they provide no authority to support their supposition that the reasonable measures taken must be identified with particularity, nor do they attempt to explain what level of particularity is needed beyond what Austar has alleged. Liu & Bostal Mem. at 11. This ignores the numerous steps Austar alleges that AP took to protect its trade secrets, including:

> requiring its scientists to sign invention and non-disclosure agreements, requiring potential and actual vendors, suppliers, and other business partners to sign confidentiality agreements, advising all employees that such information must be held confidential, protecting electronically stored information with passwords, and reasonably restricting access to [AP]'s facilities and locations within those facilities where particularly confidential information is stored.

Compl. ¶ 73.

Courts routinely have held that allegations that employees were required to sign non-disclosure or confidentiality agreements are sufficient to satisfy a trade secret plaintiff's pleading obligations with respect to the reasonable measures the trade secret owner took to protect its trade secrets. *See e.g.*, *Von Rohr Equip. Corp.*, 2017 WL 9690975, at *1 ("Plaintiffs had its employees sign a Confidentiality Policy to prevent disclosure of the lists . . . . [t]hese allegations satisfy Rule 8(a)'s standards.").  Further, courts have recognized non-compete agreements—like those provisions Liu is bound by under the Operating Agreement—as a reasonable measure to protect trade secrets. *See Medidata Sols., Inc.*, 2018 WL 6173349, at *1 ("To protect these trade secrets . . . Medidata required customers, partners and vendors to sign non-disclosure agreements . . . . Employees also entered into confidentiality and non-compete agreements.").

Liu and Bostal cite only one case dismissing a trade secrets claim under the DTSA for failure to allege reasonable measures to protect the trade secrets, but even in that case, the court acknowledged that "courts often do not resolve this issue at the pleadings stage." *Gov't Employees Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 167 (E.D. Pa. 2017).  Moreover, that case involved particularly egregious carelessness to protect the trade secrets, including filing public documents

containing the purported trade secrets, failing to apply a "confidential" stamp on an affidavit which would have triggered the protections of a protective order, and failing to follow the applicable rules with respect to filing documents under seal. *Id*. at 170.  This case is thus entirely irrelevant here.

Liu and Bostal suggest that Austar has failed to allege that the reasonable measures taken to protect the trade secrets applied to Liu because they only relate to "scientists," "vendors," and "suppliers."  Liu & Bostal Mem. at 11.  This is untrue, as the Complaint states that "all employees" were advised to keep AP's information confidential. Compl. ¶ 73.  Moreover, it alleges that "its scientists" were required to sign invention and non-disclosure agreements, and Liu, in fact, is a scientist.  *Id.* ¶ 1.

Liu and Bostal also take the position that the non-compete provisions in the Operating Agreement that applied to Liu were narrowed by amendment to permit him to compete. Liu & Bostal Mem. at 11.  This argument must be disregarded as it relies on the improper submission of the 2007 Amended Joint Venture Agreement, attached as Exhibit 1 to a declaration submitted by Danielle Rosenthal along with the Liu and Bostal Motion. *See* Liu & Bostal Mem. at 5, ECF No. 17-2 and 17-3; *Call v. Czaplicki*, No. CIV. 09-6561, 2010 WL 3724275, at *14 n.13 (D.N.J. Sept. 16, 2010) (disregarding an affidavit submitted with plaintiff's opposition to motion to dismiss on the basis that "[i]n evaluating a Rule 12(b)(6)

motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents.") (internal citations and quotations omitted).[25]  Austar referenced the Joint Venture Agreement dated July 1, 2004 in its Complaint, and attached it as Exhibit A, solely to provide background on the formation of AP and the origins of Liu's partnership with Austar. *See e.g.*, Compl. ¶ 2.  However, Austar's breach of contract claim is based only on the 2008 Operating Agreement, not the Joint Venture Agreement. *Id.* at ¶¶ 87 –94.  The Complaint does not reference the 2007 Amended Joint Venture Agreement and Austar's claims do not rely on it or the 2004 version.  Thus, the 2007 Amended Joint Venture Agreement and all of Liu and Bostal's arguments that rely on it must be disregarded.[26]

---

[25] *See also Royal Wine Corp. v. Golan Heights Winery Ltd.*, 448 F. Supp. 2d 613, 615 at n.2 (D.N.J. 2006) (disregarding a prior version of a contract defendant attached to its motion on the grounds that plaintiff did not mention that version in its pleadings or base its claims on it).

[26] To the extent Liu and Bostal have introduced the 2007 Amended Joint Venture Agreement to provide extrinsic evidence of the parties' intent with respect to terms in the 2008 Operating Agreement, such use would be impermissible at this stage. *See Drzala v. Horizon Blue Cross Blue Shield*, No. CV 15-8392, 2016 WL 2932545, at *3 (D.N.J. May 18, 2016) ("[I]f the language lends itself to more than one reasonable interpretation, then courts may look to extrinsic evidence to resolve any ambiguities. . . .  Thus, when a term in a contract is sufficiently ambiguous, it creates a triable issue of fact").  Liu and Bostal have not even alleged any ambiguity in the 2008 Operating Agreement.

In any event, Articles 12.1 and 12.2 of the Operating Agreement, taken together, prevent Liu from seeking to develop and to sell in the United States or in the People's Republic of China ("PRC") generic drug products or delivery technologies that are equivalent to those being developed by AP for initial launch in the United States. Compl. ¶ 47.   These non-compete provisions constitute reasonable measures taken to protect AP's trade secrets.[27]

In addition, even if there were no written contractual limitations expressly focused on Liu's use of AP's trade secrets, as President and CEO of AP, Liu is bound by his fiduciary duty of loyalty[28] to avoid "divulging trade secrets or other confidential information for the purposes of competing with" AP. *Capanna v. Tribeca Lending Corp.*, No. CIV.A.06-5314(JAG), 2009 WL 900156, at *11 (D.N.J. Mar. 31, 2009).[29]   Thus, it would not be unreasonable if Liu's use of the

---

[27] Defendants advance a limited reading of Article 12.1, arguing that it only limits activity within the United States.  As written, however, 12.1 prohibits any activity, wherever it occurs, that "directly or indirectly competes with" products that AP "developed . . . for the market in the USA."  Defendants' argument also ignores that Liu was not authorized under Article 12.2 to conduct "business similar to the Company's Business involving customers in the PRC," and none of the members was authorized to do business that "conflict[s] with the Company's Business."

[28] *See In re D'Amore*, 472 B.R. 679, 689-690 (D.N.J. Bankr. 2012) ("[A]bsent a contrary provision in an LLC's operating agreement, managing members of an LLC owe the traditional fiduciary duties of loyalty and care to non-managing members of that LLC.").

[29] *See also Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C.*, 894 A.2d 702, 704 (N.J. Super Ct. App. Div. 2006) (in the context

trade secrets was not constrained by contract, as he was already constrained by virtue of his fiduciary duties.  Taking Austar's allegations as true, it adequately pleads that AP took reasonable measures to protect its trade secrets from misuse by *all* of its personnel, including Liu.

### 3. *The Trade Secrets Derive Independent Economic Value from Not Being Generally Known.*

Aside from the demonstrably false and conclusory assertions that AP does not possess any trade secrets, Liu and Bostal do not directly address Austar's allegation that AP's trade secrets derive independent economic value from not being generally known.  AP itself characterizes its drug delivery technologies as "proprietary," which by definition means that AP and Liu consider these products to derive economic value from not being generally known outside of AP.  AP's June 3, 2010 Business Plan, in which Liu's name appears on the cover page, states that AP's business scope covers two main areas: generic drug development and drug delivery technology based products, including "proprietary drug delivery technologies." Compl. Ex. C at 299.  Further, it states that "[AP] has developed a proprietary osmotic pump technology with accenting release profile." *Id.* at 58. AP's website also refers to its "innovative platform technologies and proprietary

---

of "the disclosure of trade secrets, the power to grant corporate entities injunctive relief to protect their business, custom and profits is firmly established and not dependent on pre-existing express agreements with the individuals against whom the restraints are sought") (citing *Sun Dial Corp. v. Rideout*, 108 A.2d 442, 446 (N.J. 1954)).

know-how."[30]  Liu and Bostal acknowledge that "[t]he premise of information being subject to trade secret protection is that it is information that is confidential or proprietary and not generally known." Liu & Bostal Mem. at 7.  Applying their own standard, information relating to AP's proprietary drug delivery technologies constitutes trade secrets.  Likewise, information relating to the development of AP's unique products, and their incorporation of features that are made possible only by AP's proprietary technologies, gives AP a competitive advantage in the industry and derives independent economic value from not being generally known.[31]

Further, the confidential business information, including customer lists and pricing information, which Austar has alleged were misappropriated also derive independent economic value from not being generally known. Compl. ¶ 100. "New Jersey law has considered customer lists and pricing and marketing techniques to be trade secrets." *Chubb Ina Holdings Inc.*, 2017 WL 499682, at *8, n.9 (quoting *IDT Corp. v. Unlimited Recharge, Inc.*, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012)).

---

[30] *See supra* n.8.

[31] *See supra* p. 45.

### 4.      *The Complaint Alleges Acts of Misappropriation.*

Liu and Bostal apparently take the position that, to the extent AP owned any trade secrets, Liu was under no obligation to protect them.  They brazenly contend that "everyone has a right to market competing products" and suggest that Liu was free to "use his own expertise elsewhere." *Id*. at 9, 12.  In the first instance, these statements ignore the fact that Liu's anticompetitive activities are expressly proscribed by the Operating Agreement.  The Operating Agreement prohibits Liu from "engaging in business similar to the Company's Business" in both the United States and China.  Compl. ¶ 47.   Liu and Bostal's decision not to dispute the merits of Austar's breach of contract claim obviates the need for the parties to provide briefing on whether the terms of the Operating Agreement proscribe Liu's conduct.  To the extent Liu and Bostal purport to provide evidence of the drafters' intent with respect to the non-compete provisions through the improper submission of the 2007 Amended Joint Venture Agreement, such arguments must be disregarded for the reasons set forth above.[32] Liu & Bostal Mem. at 13.

Second, Liu and Bostal's position disregards Liu's fiduciary duty to protect AP's trade secrets and confidential information.[33]  Liu, and thus Bostal, knew or had reason to know that Liu's knowledge of AP's trade secrets "was acquired

---

[32] *See supra* n.26.

[33] *See supra* p. 50.

under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret," but Liu nevertheless set up Bostal to use AP's trade secrets for his own gain without AP's consent.[34] Compl. ¶¶ 104, 115.  This is textbook misappropriation.

Austar has specifically alleged acts of misappropriation by Liu and Bostal, and has supported its allegations with evidence attached as exhibits to the Complaint and references to publicly available information, including online profiles of Bostal.  Liu formed Bostal in July 2013, which in turn invested in several entities in conjunction with Liu or other companies Liu has incorporated. *Id.* ¶¶ 49, 55.  The Complaint demonstrates that AP and Bostal share the same core competencies—including the development of the same drug delivery technologies like the osmotic pump—and nearly identical business models. *Id.* ¶¶ 53-54, 61-62 (comparing Compl. Ex. D, Bostal's Capital Increase Agreement to Compl. Ex. C, AP June 3, 2010 Business Plan).  Further, Austar alleges that Liu poached key AP personnel to work for Bostal. *Id.* ¶ 59.  The Complaint also identifies patent applications that have been filed in Bostal's name, which list as inventors Liu and other scientists employed by AP either at the time of the patent application or at

---

[34] Liu and Bostal contend that Bostal and AP are collaborating to earn revenue, citing paragraph 65(a) of the complaint.  The Complaint does not provide any basis for that contention; on the contrary, it alleges that AP never consented to Bostal's acts of misappropriation.  In any event, such collaboration would have required Austar's approval, which Liu never sought or obtained. *See* Compl. ¶ 31.

some time prior to that date. *Id.* ¶ 74. These patents cover the same technologies and preparation methods AP has developed, including water-insoluble drug delivery technologies (*e.g.*, self-emulsifying systems, lipid based systems, liposomes), controlled-release technologies (*e.g.*, osmotic pump systems), and preparation methods for sustained release tablets. *Id.* Tellingly, under PRC law, Bostal could not obtain patents over these inventions if the underlying technology was public or generally known.[35]

Moreover, the Complaint identifies specific drug products Liu has prepared for launch by Bostal which AP spent significant resources and sold, including but not limited to: oxybutynin, paliperidone, nifedipine, celecoxib, valsartan tablets, olmesartan, omeprazole, esomeprazole, simvastatin, metformin, diclofenac sodium and aripiprazole. *Id.* ¶ 63. AP invested significant resources developing unique formulas, methodologies, and processes in order to bring these drug products to the market, and Liu seeks to bypass this research and development stage by simply stealing AP's intellectual property. *Id.* ¶ 72. And it lists particular inventions using AP's technologies for which Liu and Bostal have sought and obtained patents in PRC. *Id.* ¶ 74.

---

[35] Patent Law of the People's Republic of China (promulgated by the Standing Comm. Nat'l People's Cong., Mar. 12, 1984, rev'd Dec. 27, 2008, effective Oct. 1, 2009), art. 22 (P.R.C).

Without citing any authority, Liu and Bostal allege that the similarity of Bostal's business to AP's "does not lead to a conclusion—or even a suggestion—of appropriation of information by any improper means." Liu & Bostal Mem. at 15. However, courts have held "allegations of similarities to be sufficient when accompanied by allegations of exactly how defendants improperly obtained the alleged trade secrets." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 883 (N.D. Cal. 2018). Austar has alleged that Liu and Bostal obtained the trade secrets by virtue of Liu's role at AP, and that based on Liu's contractual and fiduciary obligations, Liu and thus Bostal knew or had reason to know that Liu's knowledge of AP's trade secrets "was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." *See* Compl. ¶¶ 104-105. Moreover, the court in *Alta Devices, Inc.*, considered the filing of a patent application covering similar technology to be a fact giving rise to the inference of acts of misappropriation. 343 F. Supp. at 883. Thus, Austar's allegations that Liu and Bostal are engaged in a similar business, and are developing similar drug delivery technologies, all with the assistance of AP personnel, are sufficient to raise a right to relief above the speculative level.

**D.  Austar Adequately Pleads a Claim for Tortious Interference with Prospective Economic Advantage.**

Liu and Bostal's primary argument for moving to dismiss Austar's tortious interference with prospective economic advantage claim is that it lacks specificity as to the expectancy of economic benefit. Liu & Bostal Mem. at 22-23.  Once again, they seek to elevate the pleading standard beyond what is required under the applicable notice pleading standard.  Under New Jersey law, "to succeed on a claim for tortious interference with prospective economic advantage, a plaintiff must establish: (1) a claimant has reasonable expectation of an economic benefit; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) in the absence of interference, the reasonable probability that the claimant would have received the anticipated economic benefit; and (5) damages resulting from the defendant's interference." *Slim CD, Inc.*, 2007 WL 2459349, at *3.  Liu and Bostal focus their challenge of Austar's tortious interference claim on the sufficiency of Austar's allegations of a reasonable expectation of economic benefit and wrongful, intentional interference. *See* Liu & Bostal Mem. at 22-23.  As set forth below, Austar has met its pleading burden.

1.    *The Complaint Adequately Alleges a Reasonable Expectation of Economic Benefit.*

Liu and Bostal assert that Austar's tortious interference claim is premised on a "mere hope of securing co-development agreements with unidentified Chinese pharmaceutical companies." *Id.* at 22.   This argument misconstrues the facts Austar has alleged and the applicable legal standard.   Austar alleges specific examples of business opportunities that Liu pursued and invested time, energy and resources in on behalf of Bostal instead of AP.   One particularly egregious example is the Deyang Project, where Liu purported to enter an agreement to obtain the business on behalf of AP, but then never revealed the deal to AP's other principals and managers and diverted the benefits to Bostal. Compl. ¶ 71.   Austar also alleges that Bostal made a significant investment in constructing a factory that would be used to develop products that compete directly with AP's products. *Id.* ¶ 70.   The Deyang Project and the factory represent two business opportunities that are entirely consistent with AP's business goals, but Liu chose to pursue these projects for Bostal instead.

Liu and Bostal ignore these allegations, focusing exclusively on the co-development agreements.   The expectancy of economic benefit Austar has alleged with respect to AP's co-development agreements is not speculative.   On the contrary, it is based on AP's existing co-development partnerships with

pharmaceutical companies in the United States and China, from which AP receives a significant revenue stream, and AP's establishment of a wholly-owned subsidiary in Beijing in 2005 to cultivate and expand AP's co-development partnerships with Chinese pharmaceutical companies. *Id.* ¶¶ 24-25.   Austar alleges that Bostal publicly reports that it has forged a number of similar cooperative partnerships with well-known pharmaceutical companies in China, and abroad, in order to develop and commercialize drugs for sale in the PRC, U.S., European and international markets. *Id.* ¶ 68.

Austar further alleges Liu has pursued business opportunities—including the Deyang Project, the factory, and co-development partnerships—that he knew AP always intended to pursue itself.  *Id.* ¶ 67.  Liu and thus Bostal were aware of AP's expectation of economic benefits from pursuing opportunities like these in China, and that expanding into the Chinese market and continuing to build co-development partnerships with Chinese pharmaceutical companies were central to AP's business strategy.  *Id.* ¶ 122.  Austar alleges that by competing directly with AP in the same primary markets with the same products and services, Liu and Bostal interfered with AP's expectation of economic benefit. *Id.* ¶ 123.  Finally, Austar alleges that if not for Liu's abandonment of his loyalty to AP and prioritization of his new, competing ventures, including Bostal, AP would have

secured sales and/or co-development contracts that instead were diverted to Bostal, thus resulting in damages to AP. *Id.*

Based on recent case law in this district, Austar has adequately pleaded its claim.  In *Slim CD, Inc.*, as well as subsequent decisions relying on it, tortious interference with prospective economic advantage claims survived motions to dismiss where the alleged business opportunities were no more specific than what Austar has alleged.  The plaintiff Slim CD, had entered an agreement with the defendant Heartland, pursuant to which Heartland would pay Slim CD for software.  *Slim CD, Inc.*, 2007 WL 2459349, at *1 –3.  Slim CD, though, alleged that Heartland did not deliver, which interfered with Slim CD's hope of selling part or all of the company to an unspecified prospective acquirer. *Id.*  The court found that although "Plaintiff has not identified the potential purchaser or acquirer of Slim CD with whose purchase Heartland allegedly interfered," Slim CD met the notice pleading standard and the court thus declined to dismiss the claim "in light of the recent case law in this District suggesting that such specificity is not necessary." *Id.* at *4.  In addition, the court observed that "although earlier cases in this district required plaintiffs to plead with sufficient specificity the prospective

economic advantage with which a defendant allegedly interfered, recent cases have not required such specificity." *Id.*[36]

Subsequent decisions have cited *Slim CD, Inc.* and followed suit, including where the prospective economic benefit was the continued sale of the plaintiff's products to the general public. *See Church v. Dwight Co., v. SPD Swiss Precision Diagnostics GmBH*, Civ. No. 10-453, 2010 WL 5239238, at *3-4 (D.N.J. Dec. 16, 2010) (denying motion to dismiss where plaintiff alleged "ongoing and expected sales to the public at large" and noting that "[c]ourts easily find a reasonable expectation of economic benefit even where the sale is to the public at large.").[37]

---

[36] The court cited *Syncsort Inc. v. Innovative Routines Int'l, Inc., No. CIV. 04-3623 (WHW),* 2005 WL 1076043, at *12 (D.N.J. May 6, 2005), holding that a the pleading party is not required "to name a specific prospective customer or contract with which another party interfered," and *Floorgraphics Inc., v. News America Marketing In–Store Services, Inc.,* 2006 WL 2846268, at *6 (D.N.J. Sept. 29, 2006), holding that a plaintiff need not identify specific lost business opportunities in its pleading for tortious interference).

[37] *See also Teva v. Pharmaceutical Indust. Ltd., v. Apotex, Inc.*, Civ. No. 07-5514, 2008 WL 3413862, at *9 (D.N.J. Aug. 8, 2008) (denying motion to dismiss where plaintiff alleged that it had a "continuing, economically advantageous relationship with the supply of carvedilol for use in its carvedilol products" and defendant "knowingly interfered with this relationship by filing lawsuits for the purpose of barring others from beginning or continuing to supply carvedilol") (internal quotations omitted); *Graco, Inc. v. PMC Glob., Inc.*, No. CIV. A. 08-1304FLW, 2009 WL 904010, at *32 (D.N.J. Mar. 31, 2009) (finding plaintiff had sufficiently plead a tortious interference claim by alleging that it had a "reasonable expectation to continue its sales of Garraf products to its existing customers and distributors, and to sell its products to other members of the trade").

In support of their argument that AP's expectation of economic gain from co-development partnerships is speculative, Liu and Bostal falsely state that AP would need to clear a number of regulatory hurdles in order to profit from co-development agreements. Liu & Bostal Mem. at 22 –23.   AP has a reasonable expectation that its *existing* joint venture agreements with pharmaceutical companies in the United States and China, which are already producing millions of dollars in revenue, will continue and expand. Compl. ¶ 24.  Thus, Liu and Bostal's reliance on a case where the reasonable expectation of economic advantage claim was based on potential sales of products that were not yet developed is irrelevant here.[38]   Liu & Bostal Mem. at 23.   Liu and Bostal's remaining cases are distinguishable because the plaintiffs failed to allege any facts as to the business they were in pursuit of or the business was purely hypothetical.[39] *See* Liu & Bostal Mem. at 22 –23.

---

[38] *See Intervet, Inc. v. Mileutis, Ltd.*, No. CV151371FLWTJB, 2016 WL 740267, at *8 (D.N.J. Feb. 24, 2016) ("[I]n *Slim CD*, the subject of the tortious interference claim – sale of the company itself – was clearly more than speculative since the company was able to be sold. Defendant's allegation regarding its reasonable expectation of economic advantage is not the same, since the product Defendant ultimately wished to sell was still allegedly in development.").

[39] *See Mu Sigma, Inc. v. Affine, Inc.*, No. CIV.A. 12-1323 FLW, 2013 WL 3772724, at *4 (D.N.J. July 17, 2013) ("Plaintiff has not alleged any facts indicating what business it was in pursuit of."); *DeGennaro v. Am. Bankers Ins. Co. of Fla.*, No. 3:16-CV-5274-BRM-DEA, 2017 WL 2693881, at *12 (D.N.J. June 22, 2017) (finding that plaintiff's allegation that as a result of defendants' conduct, he did not exercise his right to purchase suitable insurance policies from

2.      *Austar Adequately Alleges Wrongful, Intentional Interference.*

Liu and Bostal's argument that Austar failed to adequately allege malice fails because it misunderstands the meaning of the term "malice" in this context. *Id.* at 23.  With respect to a claim for tortious interference, "[m]alice is not used in the literal sense requiring a showing of ill will toward the plaintiff," but rather "for the purposes of this prong, malice is defined as a harm that was inflicted intentionally and without justification or excuse." *Church*, 2010 WL 5239238, at *6.  "The relevant inquiry is whether the defendant's conduct was sanctioned by the 'rules of the game.'" *Id.*   Contrary to Liu and Bostal's suggestion that specifically alleging "malice" is required, courts have held that allegations of wrongful and intentional interference that set "enough factual matter (taken as true) . . . to raise a reasonable expectation that discovery will reveal evidence of the necessary element" are sufficient, and that "[w]hether or not Defendant did, in fact, act with 'malice,' is an issue of fact, not appropriately decided on a motion to dismiss." *Id.* at *7 (internal citations and quotations omitted).  The Complaint includes allegations that Liu abandoned his loyalty to AP and pursued a course of

_____

"unknown or hypothetical insurance carriers" was insufficient); *Novartis Pharm. Corp. v. Bausch & Lomb, Inc.*, No. CIV.A. 07-5945JAG, 2008 WL 4911868, at *7 (D.N.J. Nov. 13, 2008) ("Novartis must allege an injury that is more concrete than lost business of unknown, unsolicited, or hypothetical customers."); *Hill v. Commerce Bancorp, Inc.*, No. CV 09-3685 (RBK/JS), 2011 WL 13146435, at *3 (D.N.J. Feb. 28, 2011) ("Plaintiff's amendment simply does not include any facts indicating that he was in pursuit of an economic opportunity.").

self-dealing, which included misappropriating AP's trade secrets for his own gain and competing directly with AP in its primary markets. These allegations support a reasonable expectation that discovery will reveal evidence of malice.

### E.   Austar Adequately Pleads a Claim for Conversion.

With respect to Austar's conversion claim, Liu and Bostal argue that Austar has failed to "identify, specify, or even quantify" the corporate funds Austar alleges Liu and Bostal diverted from AP. Liu & Bostal Mem. at 20. Liu and Bostal provide no authority to support their contention that Austar must do any of those things. *Id*. The only additional requirements courts have imposed on plaintiffs asserting the tort of conversion of funds is that they allege the funds belonged to the injured party and "show more than a contractual obligation on the part of a defendant to pay the plaintiff." *Ricketti v. Barry*, No. 13-6804, 2015 WL 1013547, at *8 (D.N.J. Mar. 9, 2015). Austar alleges that Liu and Bostal converted funds belonging to AP. Compl. ¶ 96. Moreover, Austar alleges that Liu's obligation to act in a manner consistent with the interests of AP, and to faithfully seek to maximize the returns for AP and its shareholders, stemmed from Liu's fiduciary duties as President and CEO. *Id*. ¶ 79.

Liu and Bostal are wrong as a matter of law in asserting that Austar was required to demand the return of the converted property. Liu & Bostal Mem. at 21. "Demand is not invariably an essential element of conversion. In particular, it is

not required when the alleged converter has already parted with the chattel or, in this case, identifiable fund of money. Rather, demand is required where the possessor of the chattels lawfully acquired them, and still retains them." *Meisels v. Fox Rothschild LLP*, No. A-3519-15T4, 2018 WL 3077960, at *6 (N.J. Super. Ct. App. Div. June 22, 2018). Liu's acquisition of the converted property was in violation of his fiduciary duties, and was not lawful.

Although Austar's conversion claim focuses on corporate funds, the Complaint also alleges misappropriation of confidential information, which courts have held may form the basis for a conversion claim. *See e.g.*, *Strategic Prod. & Servs., LLC*, 2019 WL 2067551, at *10 (denying motion to dismiss conversion claim based on allegation that defendant converted "confidential information," which plaintiff defined by reference to what defendant characterized as a boilerplate definition as it appeared in plaintiff's employee handbook). Austar requested that the Court order Liu and Bostal to "return all property that Liu has taken from [AP]," which should be construed to encompass both converted corporate funds and misappropriated confidential information. Compl. ¶¶ 96-97.

## F.   **Any Perceived Technical Pleading Deficiency Can Be Cured Through Amendment.**

As set forth above, the Complaint not only meets the pleading standard of Rule 8(a), but its allegations include a level of specificity well beyond what is

required. Nevertheless, to the extent the Court deems any aspect of the Complaint deficient, Austar should be permitted to amend its pleading. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). "The Third Circuit has shown a strong liberality in allowing amendments under Rule 15 in order to ensure that claims will be decided on the merits rather than on technicalities." *Vargas v. Meehan*, No. 2:11-CV-2833-CCC, 2012 WL 1898127, at *2 (D.N.J. May 22, 2012) (citations omitted). In the absence of "undue delay, bad faith, dilatory motive, unfair prejudice, or futility of amendment," leave to amend should be "freely given" as the Rule requires. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3rd Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). There is no indication of such countervailing considerations here. Accordingly, should this Court identify any insufficiency with Austar's initial Complaint—either with respect to any causes of action or the pleading requirements under Rule 23.1—an amendment rather than dismissal would be the appropriate remedy.

## III. THIS COURT HAS PERSONAL JURISDICTION OVER BOSTAL.

Liu and Bostal take the meritless position that Bostal—an entity formed and controlled by a New Jersey resident to steal the personnel and trade secrets and usurp the business of a New Jersey company—may not be haled into a New Jersey court simply because it purportedly does not conduct its business in New Jersey.

This argument is not supported by the law or facts, which overwhelmingly favor this Court's exercise of personal jurisdiction over Bostal.  There is jurisdiction in New Jersey federal court to protect the rights of a New Jersey company and its investor against injuries caused by a New Jersey resident.  The fact that the entity Liu established to reap the rewards of his misdeeds purportedly operates in China cannot be used to shield the entity from an action brought against it in New Jersey. Liu and Bostal's preferred outcome is to limit Austar's recourse to a proceeding against Bostal in China.  However, this dispute clearly belongs in New Jersey as it centers around a New Jersey company and a New Jersey resident's misconduct with respect to that company.

**A.    The Complaint Pleads a Multitude of New Jersey Contacts Demonstrating that Bostal Expressly Aimed Its Tortious Conduct at New Jersey.**

As Liu and Bostal acknowledge, the question of whether a court may exercise specific personal jurisdiction over a nonresident defendant who is alleged to have committed an intentional tort in the forum state is evaluated under the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984).  Liu & Bostal Mem. at 17*;see also Startrak Sys., LLC v. Hester*, No. CIV. 07-3202DRD, 2007 WL 2705159, at *5 (D.N.J. Sept. 14, 2007).  The effects test requires the plaintiff to establish: "(1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal

point of the harm suffered by the plaintiff as a result of that tort; [and] (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *Id.* at *7. "The traditional test for specific jurisdiction and *Calder's* 'effects' test . . . share a common touchstone: in order for a court to exercise personal jurisdiction over a defendant, that defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 629 (E.D. Pa. 2015) (internal quotations and citations omitted). Although the plaintiff bears the burden to establish the court's jurisdiction upon a motion to dismiss for lack of personal jurisdiction, "when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Startrak Sys., LLC,* 2007 WL 2705159, at *7 (quoting *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004)) (internal quotations omitted).

Liu and Bostal concede, as they must, that Austar has satisfied the first two prongs of the effects test given that Austar has alleged a number of intentional torts committed by Bostal and that AP felt the brunt of the harm in New Jersey where it is headquartered. *See* Liu & Bostal Mem. at 17; Compl. ¶ 15. Liu and Bostal's personal jurisdiction challenge rests solely on the "expressly aimed" prong.

Employing an apparent strategy to dramatically downplay the connections between Bostal and New Jersey and ignore Austar's well-pleaded allegations, Defendants submit a declaration alleging that Bostal has not conducted any operations in New Jersey. *See* ECF No. 17-4. But such self-serving assertions are not relevant to the effects test inquiry. The locus of Bostal's operations has no bearing on whether it expressly aimed its tortious conduct at AP in New Jersey. The notion that Bostal could avoid this Court's jurisdiction over conduct aimed at usurping the business of a New Jersey corporation merely on the basis that Bostal does not conduct business in New Jersey is entirely antithetical to the purpose of the *Calder* test which "provides an enhancement to otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *Strategic Prod. & Servs., LLC*, 2019 WL 2067551, at *7 (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998)) (internal quotations omitted).

What *is* relevant to the effects test inquiry is that Bostal was founded by and is controlled by Liu, a New Jersey resident, and that Bostal's misconduct was orchestrated by Liu and aimed squarely at a New Jersey company, AP. Compl. ¶¶ 10, 49. The Complaint clearly alleges that Bostal reached into New Jersey to acquire AP's trade secrets through Liu while he was working in New Jersey at AP's headquarters, and has subsequently misappropriated those trade secrets for its

own gain, at the expense of a New Jersey company. *Id.* ¶ 15.  Whether Bostal's use of those trade secrets has largely occurred in China, and not in New Jersey, is irrelevant to the question of whether its tortious conduct was aimed at New Jersey. Moreover, Austar alleges that Liu recruited at least thirteen AP employees to work for Bostal, including the Vice President of Business and Strategic Development, scientists and core staff members. *Id.* ¶ 59.  Bostal apparently trained or planned to train some of these employees at AP's New Jersey plant. *Id.* ¶ 58.  Austar has named four individuals known to have simultaneously held positions at both AP and Bostal, meaning that they spent at least part of their time working in New Jersey when they were helping Liu and Bostal in furtherance of their tortious conduct. *Id.* ¶ 59.

Austar also alleges that Liu, through Bostal, has pursued business opportunities, sales and scientific partnerships that Liu knew AP intended to pursue itself and that should have been directed to AP, thus tortiously interfering with a New Jersey company's prospective economic advantage.  *Id.* ¶¶ 66-71. That some of these business opportunities were in China is of no relevance given that China is one of AP's primary markets and that Austar has alleged Liu specifically targeted these opportunities to compete directly with AP. *Id.* ¶ 48. Moreover, at least some of the business opportunities Liu has pursued on behalf of Bostal have a nexus to the United States—for example, Bostal acquired the right to

half of the profits from the sale of valsartan tablets and valsartan hydrochlorothiazide compound tablets sold in the United States from the Chinese pharmaceutical company, Huaren. Compl. ¶ 65.   Thus, Liu and Bostal's characterization of Bostal's business as being confined to China is misleading and inaccurate.

In sum, the Complaint pleads numerous facts establishing a clear New Jersey nexus sufficient for the Court to exercise personal jurisdiction over Bostal. To the extent the Court were to deem additional facts necessary, however, the appropriate course is to grant Austar jurisdictional discovery to further explore Bostal's New Jersey contacts. *See Vandeveire v. Newmarch*, No. CIV.A. 13-4033 DMC, 2013 WL 6054804, at *1 (D.N.J. Nov. 15, 2013) ("Courts should grant leave to conduct jurisdictional discovery where the plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [the party] and the forum state.") (internal quotations omitted).

### B.    Precedent in the District of New Jersey Overwhelmingly Favors Exercising Personal Jurisdiction over Bostal.

Faced with a very similar set of facts, the court in *Strategic Product & Services, LLC* found just a few weeks ago that the "expressly aimed" prong of the effects test was satisfied because "the heart of the complaint" was that the

defendant "targeted [the plaintiff's] profit center" in New Jersey by reaching into New Jersey to improperly acquire plaintiff's confidential information and poach its employees, thus targeting "New Jersey assets." 2019 WL 2067551, at *7. In denying the motion to dismiss for lack of personal jurisdiction, the court did not even address whether the foreign defendant's operations or sales had any nexus to the forum. Instead, the court focused on the defendant's targeting of plaintiff's profit center, as well as the fact that the defendant was acting through the plaintiff's former employee, who (like Liu) was subject to restrictive covenants with the plaintiff, making it entirely foreseeable that the defendant would be haled into court in New Jersey. *Id.* at *8.

This recent decision is consistent with prior decisions focusing the effects test inquiry on whether the defendants intended to cause harm to the plaintiff in the forum. In *Startrak System, LLC*, 2007 WL 2705159, StarTrak alleged that its former vice president of sales and senior engineer disclosed its trade secrets to another company, Satamatics (composed of two corporations, one British and one Delaware), which they joined after leaving StarTrak, and claimed that the former employees and Semantics misappropriated trade secrets. *Id.* at *1 –4. Applying the effects test, the court found sufficient contacts with New Jersey to establish personal jurisdiction over one of the former employees residing in Texas (Shahzad) and the Satamatics entities, based merely on the following allegations:

> (1) throughout his employment, Shahzad resided in N.J. and worked
> out of its N.J. office; (2) while working in N.J., Shahzad acquired
> knowledge of trade secrets that he later disclosed to Satamatics; (3)
> Satamatics has been directly involved in the improper use of
> StarTrak's confidential and proprietary information; and (4)
> Defendants' misappropriation of trade secrets caused harm to
> StarTrak in N.J.

*Id.* at *7; *see also Vizant Techs., LLC*, 97 F. Supp. 3d at 632 ("[T]o the extent that defendants misappropriated the trade secrets of Vizant in violation of DUTSA, this conduct was 'expressly aimed' at causing harm to an entity which defendants knew was headquartered in Pennsylvania. . . .  In other words, both defendants 'knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in' Pennsylvania.") (internal citations omitted).  The same result is dictated by the effects test here.

Liu and Bostal rely principally on *Frutta Bowls Franchising LLC v. Bitner*, No. CV 18-2446 (FLW), 2018 WL 6499760 (D.N.J. Dec. 10, 2018), which is factually inapposite.  In that case, the court noted that the plaintiff had failed to address the effects test altogether, and "because the burden of demonstrating jurisdiction falls on Plaintiff, the failure to respond is a basis to find that the Court lacks jurisdiction."  *Id.* at *5.  Nevertheless, the court applied the effects test and found "no allegation, let alone evidence, to suggest that the Florida LLCs intended to direct their alleged tortious conduct into New Jersey."  *Id.*  The same cannot be said here, as Austar alleges that Bostal is controlled by a New Jersey resident who

founded Bostal with the purpose of usurping AP's business for his own gain, and that Bostal has poached numerous key employees from AP, some of whom may have worked for both entities simultaneously and may have worked on behalf of Bostal from AP's New Jersey headquarters.[40]

Bostal's misappropriation of AP's trade secrets, tortious interference with AP's prospective economic advantage, and conversion of AP's corporate funds and confidential information were orchestrated by a New Jersey resident for the sole purposes of stealing from and causing harm to New Jersey company.  The effects test is satisfied with respect to each of Austar's intentional tort claims against Bostal.[41]

## **CONCLUSION**

For all the foregoing reasons, Austar respectfully requests that this Court deny AP's and Liu and Bostal's motions to dismiss the Complaint.

---

[40] To the extent *Frutta* focuses on where defendants conducted operations and sales, as opposed to whether the defendants deliberately targeted plaintiff's profit center and assets, it is plainly inconsistent with *Calder* itself, as well as this Court's application of that precedent in cases like *Strategic Products & Services, LLC* and *Startrak System, LLC*.

[41] Once this Court finds personal jurisdiction over Bostal on one count, it may exercise pendant jurisdiction over the remaining counts arising from the same nucleus of material facts, which is construed liberally in the Third Circuit. *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 (D.N.J. 2016).  All of the counts against Bostal arise from the same core set of facts.

Date:  June 3, 2019                    Respectfully submitted,

                                        /s/Stephen A. Loney, Jr.
                                       HOGAN LOVELLS US LLP
                                       Stephen A. Loney, Jr. (N.J. No. 005172006)
                                       stephen.loney@hoganlovells.com
                                       Virginia Gibson (*pro hac vice application to
                                       be filed*)
                                       virginia.gibson@hoganlovells.com
                                       Jessica K. Jacobs (N.J. No. 038002011)
                                       jessica.jacobs@hoganlovells.com
                                       1735 Market Street, 23rd Floor
                                       Philadelphia, PA 19103
                                       Tel: (267) 675-4600
                                       Fax: (267) 675-4601

                                       Ryan Philp (N.J. No. 031032003)
                                       ryan.philp@hoganlovells.com
                                       Alan M. Mendelsohn (*pro hac vice
                                       application to be filed*)
                                       alan.mendelsohn@hoganlovells.com
                                       390 Madison Avenue
                                       New York, NY 10017
                                       Tel: (212) 918-3000
                                       Fax: (212) 918-3100

                                       *Attorneys for Plaintiff Austar International
                                       Limited*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below, the foregoing Plaintiff Austar International Limited's Opposition to AP's and Liu and Bostal's Motions to Dismiss, was electronically filed, together with all supporting documents, and that such documents are available for viewing and download on the Court's ECF system.

Date: June 3, 2019          /s/ Stephen A. Loney, Jr.
                                            Stephen A. Loney, Jr.