| | |
|---|---|
| AUSTAR INTERNATIONAL LIMITED, DIRECTLY AGAINST AND DERIVATELY ON BEHALF OF AUSTARPHARMA LLC, | Civ. No. 19-8356 (KM) (MAH) |
| Plaintiff, | OPINION |
| v. | |
| AUSTARPHARMA LLC, | |
| Defendant/Nominal Defendant, | |
| v. | |
| RONG LIU AND GUANGZHOU BRISTOL DRUG DELIVERY CO., LTD., | |
| Defendants. | |

**KEVIN MCNULTY, U.S.D.J.:**

The complaint of plaintiff Austar International Limited ("Austar International") asserts direct and derivative claims against AustarPharma LLC ("AustarPharma"), Rong Liu, and Guangzhou Bristol Drug Delivery Co., LTD. (now known as Bostal Drug Delivery Co., Ltd. ("Bostal"). AustarPharma moves to dismiss the complaint for failure to satisfy the threshold demand requirements of Federal Rule of Civil Procedure 23.1. (DE 16). Dr. Liu and Bostal move to dismiss the complaint for failure to state a claim under Rule 12(b)(6). (DE 17). Bostal separately moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2). (*Id.*). Recently, defendants also filed letter briefs seeking to dismiss or stay this action in favor of a newly filed similar action in China. (DE 59, 61).

1

For the reasons stated herein, the motion of Dr. Liu and Bostal to dismiss (DE 17) is granted with respect to plaintiff's conversion claim (Count 3). Defendants' motions to dismiss (DE 16, 17) are in all other respects denied. Defendants' letter motions for a stay or dismissal based on international comity (DE 59, 61) are also denied without prejudice to renewal in light of later developments.

## I.    Summary[1]

This action arises from a 15-year business relationship between plaintiff Austar International and defendant Dr. Rong Liu that has now soured.

### a. Formation of AustarPharma

In 2004, Austar International and Dr. Liu created AustarPharma, a joint venture "pharmaceutical drug technology company" which is "focused on the research, development, manufacture, and commercialization of finished generic drug products and drug-delivery technology products, as well as providing research and development services to pharmaceutical companies worldwide." (Compl. ¶¶ 1, 17).

The parties formalized their relationship in a July 14, 2004 joint venture agreement. (DE 1-1). Among the purposes of the joint venture was "the establishment and management of the business of pharmaceutical research and development, manufacturing and distribution of finished drug products worldwide through a joint venture to be formed between Austar and Dr. Liu." (*Id.* at 4).

The parties warranted to one another that they would undertake "to use their respective best efforts to give full force and effect to the provisions of this Agreement." (*Id.* at 7). Austar International and Dr. Liu were each deemed to be

---

[1]    For ease of reference, certain key items from the record will be abbreviated as follows:

"DE"        =        Docket entry number in this case; and

"Compl."    =        The complaint filed by plaintiff [DE 1].

a "Shareholder"[2] and they agreed that "The Shareholders acknowledge that during the subsistence of this Agreement, the Members shall use all reasonable endeavors to co-operate, promote and develop the Business to the benefit of the Company." (*Id.* at 12). Austar International agreed to act as financer, pledging $8 million "to finance the Company's drug development programs and projects, focusing on drug delivery products as well as strategic generic drug products." (*Id.* at 9). Austar International also agreed to "avail its well-established social connections, reputation and goodwill in the Chinese pharmaceutical industry to bring in business opportunities into the Company." (*Id.* at 12).

Dr. Liu, for his part, agreed "to take all actions necessary for the proper establishment of the Company." (*Id.* at 7). Section 9.4[3] of the joint venture agreement further states, in part, that Dr. Liu shall:

   i.    contribute his experiences, know-how and general knowledge in pharmaceutical research and development, drug delivery technologies, strong connection and excellent reputation in the pharmaceutical industry in the USA to set up and operate the Company; and

   ii.   inject Special Projects into the Company.

A "Special Project[]" is defined as "any project under the Company's development, which idea(s) is originally provided by Dr. Liu and has been approved by the Board as special project under this Agreement before its implementation by the Company." (*Id.* at 5–6). The contract also outlines several restrictive covenants, including that under Section 13.1:

   Dr. Liu (and all subsidiary, associate or affiliate thereof) shall not be engaged, directly or indirectly, in any business similar to the Business in the USA and the PRC other than through the business of the Company so long as Austar and Dr. Liu are Members and for a period of 2 years thereafter which shall include, without limitation, the following:

---

2    Defined as "Austar and Mr[.] Liu or such other members of the Company from time to time." (DE 1-1 at 5).

3    Exhibit A (DE 1-1) contains two sections labeled "9.4." I refer here to the second of these sections.

a) employ directly or indirectly, any person who has, at any time, within the one year period preceding the date such Member ceased to be a Member ("Transfer Date"), been a director, officer, employee or consultant to the Company and also, by reason of such employment or office is or may be likely to be in possession of any confidential information regarding the Company; and

b) take any action to interfere, directly or indirectly, with the goodwill of the Company or tamper with or induce or attempt to tamper with or induce any person who is, or who had at any time within the 2 year period preceding the Transfer Date an employee, agent, sales person, contractor, supplier, manufacturer, distributor or dealer of the Company to stop selling to the Company or otherwise to abandon the Company.

However, Clause 13.1 is limited in that it "shall not be deemed to prohibit [Austar International] from engaging, directly or indirectly, in any business similar to the Business in the PRC provided that the nature of such business is in support of the Business and shall not be conflict with the Business. Such business customer should be within in [sic] PRC." (*Id.*).

AustarPharma initially had two directors. (*Id.* at 13). One was to be selected by Austar International and the other by Dr. Liu. (*Id.*). The initial directors were Mars Ho Kwok Keung, selected by Austar International, and Dr. Liu, selected by himself. (*Id.*).

### b. Amended joint venture agreement

Subsequently, the parties have executed amendments to the governing agreements of AustarPharma. (DE 1-2 at 25). One, dated March 16, 2007, was in effect only briefly and seems to have no bearing on this action. On August 8, 2008, the parties again amended and restated the operating agreement. (DE 1-2 at 2). That 2008 agreement is the one that is operative today.

Pursuant to Article 6.6 of the 2008 agreement, the parties, now referred to as "Members," agreed to use "best efforts to give full force and effect to the provisions of this Agreement." (*Id.* at 11). Liu agreed under Sections 7.1, 7.2, and 7.3, as part of his job as CEO, to "no later than 60 days prior to the end of

4

each Fiscal Year . . . prepare and deliver" financial and personal planning reports, litigation reports, and financial statements to all members. (*Id.* at 11–13). Dr. Liu still agreed to contribute "his experience, know-how and general knowledge" to the development and operation of the company and to "introduce and develop special projects" for the company. (*Id.* at 14).

As part of the 2008 agreement, De Fortune Holding Limited ("DFH") agreed to infuse $2 million into AustarPharma in exchange for a minority stake. (Compl. ¶ 4). As a result, Austar International held a 43.87% interest in AustarPharma, Dr. Liu held a 35.89% interest, and DFH held a 19.94% interest. (*Id.* ¶ 33).

The board of directors was expanded to four members. Austar International was entitled to designate two directors; Dr. Liu and DFH were each entitled to elect one. (*Id.*). Dr. Liu remained on the board of directors for AustarPharma.

Under the 2008 amended agreement, board approval was required for the following actions:

    (a) Appointment or replacement or the auditors of the Company;

    (b) Selection of the bankers of the Company;

    (c) The location of the registered office of the Company; and

    (d) Other issues authorized by the Members or required by this Agreement or by law.

(*Id.* at 15).

Section 11 of the agreement restricted transfers of "LLC Interests" and provided that "no Member shall have the right to transfer any or all of its, his or her LLC Interest, and any purported transfer or assignment thereof shall be void" if all members other than the member proposing a transfer do not agree.

Section 12 further amends the restrictive covenants:

> The Members shall not engage in any business or other activities which directly or indirectly competes with specific generic drug products developed by the Company for the market in the USA so long as Austar and DFH are Members and Dr. Liu is an Employee

and a Member and in each case for a period of two years after any of them ceases to be a Member, which activities shall include . . .

a) employment of any Person who has, at any time within the one year period preceding the date. . . been a Director, officer, employee or consultant to the Company and also, by reason thereof is or may be likely to be in possession of confidential information of the Company; and

b) any action to interfere directly with the goodwill of the Company . . . .

"Business" is defined in the agreement to mean "pharmaceutical research and development, manufacturing and distribution of finished drug products in the PRC and the United States of America and in other activities reasonably incidental thereto." (*Id.* at 22). Section 12.2 then outlines the restrictions applicable to China in particular:

The restrictions in Section 12.1 shall not be deemed to prohibit Austar or DFH from engaging, directly or indirectly, in any business similar to the Company's Business involving customers in the PRC, provided that the nature of such business does not conflict with the Company's Business.

### c. AustarPharma

AustarPharma is incorporated in New Jersey and located in Edison, New Jersey, where it has two facilities. (DE 1-3 at 9). AustarPharma operates in the United States, China (through a wholly-owned subsidiary), and worldwide. (Compl. ¶ 18, 25). It has two primary business segments: (1) generic drug research and development, and (2) development and distribution of drug delivery technology-based products, "including proprietary drug delivery technologies and conventional drug delivery technologies." (*Id.* ¶¶ 19–20). AustarPharma has developed a number of drug delivery technologies, but specializes in the development of water-soluble drug delivery technologies. It "has combined controlled-release and water-insoluble drug delivery technologies to complete several platform technologies that allow AustarPharma to become a leader in the development of modified-release generic drug products in both U.S. and global markets." (*Id.* ¶¶ 20, 22). "These

6

platform technologies include an osmotic pump system, a diffusion controlled film system, and a matrix system with both erosion and diffusion mechanisms." (*Id.* ¶ 20). Notably, AustarPharma has had two Abbreviated New Drug Applications approved by the FDA for generic drug tablets: (1) methocarbamol tablets and (2) sertraline hydrochloride tablets. (*Id.* ¶ 23).

AustarPharma has also used its water-insoluble drug delivery technologies to improve and reformulate a variety of water-insoluble drugs in underserved markets so that they have "better pharmacokinetic profiles such as more bioavailable, faster absorbed, longer lasting, and probably fewer adverse effects than the formulations without improvement." (DE 1-3 at 21; Compl. ¶ 21).

AustarPharma has a number of co-development contracts whereby it has partnered with pharmaceutical companies in the US and China. (Compl. ¶ 24). AustarPharma relies on its wholly owned Chinese subsidiary to support and expand its China co-development partnerships. (*Id.* ¶ 25). Under these contracts, AustarPharma's partners market the products AustarPharma has developed, paying AustarPharma a portion of the revenue in exchange. (*Id.* ¶ 24).

### d. This dispute

The complaint alleges that Dr. Liu, individually and by founding and operating a business in China (*i.e.,* defendant Bostal), has injured AustarPharma and Austar International. Dr. Liu has allegedly violated the agreements he signed with Austar International. He has allegedly used AustarPharma's intellectual property, personnel, and trade name to raise capital and grow his business in China, all to the detriment of AustarPharma. (Compl. ¶ 6).

Specifically, in July 2013, Dr. Liu is alleged to have formed Bostal, "which engages in the same business, and covers the same markets, as AustarPharma." (*Id.* ¶ 49). At Bostal, Dr. Liu apparently occupies the roles of board chair, manager, and legal representative, and he is alleged to publicly

trade on his experiences at AustarPharma to promote Bostal and its
subsidiaries. (*Id.* ¶¶ 50–52).

Austar International asserts that there is an undeniable overlap between
AustarPharma and the businesses Dr. Liu has created, or invested in, in
China. Austar International asserts that Dr. Liu's Chinese businesses have
developed technologies similar to those of AustarPharma, for example, (1)
controlled-release pharmaceutical products that involve osmotic pump
technology; and (2) "pharmaceutical products that involve nano-solubilization
technology, pellets-sustained released technology, heat melt extrusion, and
liposome formulation technology." They also allegedly (3) use "American FDA
and ANDA product development system to conduct domestic consistency
evaluation" on drugs that are already on the market. (*Id.* ¶¶ 53, 55). In order to
create these similar or identical products, Dr. Liu and Bostal have allegedly
stolen trade secrets from AustarPharma. (*Id.* ¶¶ 74–75). Using proprietary and
confidential technologies and processes that AustarPharma spent years
developing, Bostal has rapidly developed competing products and applied for
patents on those products, which include "oxybutynin, paliperidone, nifedipine,
celecoxib, valsartan tablets, olmesartan, omeprazole, esomeprazole,
simvastatin, metformin, diclofenac sodium and aripiprazole." (*Id.*; *see also id.* ¶
63).

Dr. Liu, through Bostal, has either purchased the rights to or is
preparing drug products that significantly overlap with those of AustarPharma.
He is preparing to launch these products in both the US and China,
purportedly in violation of the restrictive covenants in the 2008 operating
agreement. (*Id.* ¶¶ 60–65). For instance, in 2017 Bostal announced that it was
building a microsphere sustained release preparation technology platform that
would be registered and sold in China and the US. (*Id.* ¶ 65).

Dr. Liu allegedly pursued corporate opportunities which, as CEO, he well
understood AustarPharma intended to pursue. (*Id.* ¶¶ 66–71). On July 26,
2017, Dr. Liu allegedly entered into an agreement whereby AustarPharma was

to invest in the "Deyang Project." (*Id.* ¶ 71). Dr. Liu, says Austar International, diverted the benefits of that deal to Bostal. (*Id.*). Dr. Liu has also raised capital and invested in a new factory to develop drugs, another opportunity he is alleged to have pursued without offering it to AustarPharma. (*Id.* ¶¶ 69–70).

Moreover, Bostal is alleged to have recruited and hired a total of at least a dozen AustarPharma employees, simultaneously employing as many as four. Bostal is allegedly recruiting others by stating that they will be trained at a "U.S. headquarter," presumably a reference to AustarPharma. (*Id.* ¶¶ 57–59).

Finally, Austar International complains that on December 14, 2017, Dr. Liu unilaterally acquired DFH, making him the beneficial owner of DFH's shares in AustarPharma. (Compl. ¶ 35). Dr. Liu is alleged to now possess majority control of AustarPharma. At present there are three shareholders of AustarPharma: Dr. Liu, who has a 55.83% interest; Austar International, which has a 43.87% interest; and a consultant named "Landmark." (*Id.*). Landmark was purportedly introduced to the company by Dr. Liu and was given a 0.30% interest in exchange for assistance in locating investors. (*Id.*).

### e. The complaint

On March 11, 2019, Austar International filed the complaint, which asserts seven causes of action, six under state law and one (Count IV) under federal law:

- **Count I** – Breach of Fiduciary Duty (derivative and direct claim against Dr. Liu);
- **Count II** – Breach of Operating Agreement (direct claim against Dr. Liu);
- **Count III** – Conversion of Property (derivative and direct claim against Dr. Liu and Bostal);
- **Count IV** – Violation of Federal Defend Trade Secrets Act – 18 U.S.C. § 1836 ("DTSA")(derivative claim against Dr. Liu and Bostal);
- **Count V** – Misappropriation of Trade Secrets (N.J. Stat. Ann. § 56:15 et seq.) ("NJTSA")(derivative claim against Dr. Liu and Bostal);
- **Count VI** – Tortious Interference with Prospective Economic Advantage (derivative claim against Dr. Liu and Bostal); and

9

- **Count VII** – Judicial expulsion of Dr. Liu – N.J. Stat. Ann. § 42:2C-46e (derivative claim).

On May 6, 2019, AustarPharma, Dr. Liu, and Bostal moved to dismiss the complaint. (DE 16, 17). Austar International opposes those motions. (DE 22).

In November 2019, by way of letter briefing, Dr. Liu, Bostal, and AustarPharma also informed the Court that Austar International has filed a similar proceeding seeking injunctive and monetary relief in The People's Republic of China. (DE 59, 61).

On November 22, 2019, I heard arguments of counsel on the motions to dismiss. The parties also updated the Court on the status of the action pending in China.

## II. Discussion

### a. Rule 23.1 Derivative action requirements

Count IV (Violation of Federal Defend Trade Secrets Act) is the sole federal-law count in the complaint. Austar International asserts it as a derivative claim on behalf of Austar International, against Dr. Liu and Bostal. Thus as a threshold matter, I must decide whether Austar International is appropriately pursuing such a derivative claim.

A derivative suit "redress[es] an injury sustained by, or enforce[s] a duty owed to, a corporation." *In re Sharkey*, 272 B.R. 574, 582 (D.N.J. 2001). "A direct action," in contrast, "may be brought in the name and right of a [share]holder to redress an injury sustained by, or enforce a duty owed to, the [share]holder." *Id.*

Federal Rule of Civil Procedure 23.1 provides that a complaint in a derivative action must allege that the plaintiff has satisfied certain prerequisites. "The purpose of the rule is to ensure that a derivative action has a basis in fact, and is not a strike suit." *Yarosh v. Salkind*, No. CIV.A. 04-1816(JWB), 2005 WL 1459719, at *3 (D.N.J. June 21, 2005)(citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–71 (1966)). Rule 23.1 applies when "one or more shareholders or members of a corporation or an unincorporated

association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. Rule 23.1(a). The Rule imposes a requirement that the plaintiff be a fair and adequate representative:

> The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

*Id.* The burden of demonstrating the plaintiff's inadequacy as a representative rests with the defendant. *See, e.g., Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982).

Unlike Rule 23.1(a), Rule 23.1(b) imposes a burden on the plaintiff to plead the existence of certain prerequisites. The complaint, which must be verified, needs to

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

(B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. Rule 23.1(b).

### i. Rule 23.1(a) requirements

Pursuant to Fed. R. Civ. P. 23.1(a), a shareholder may bring a derivative action to enforce a right that a corporation possesses but has failed to enforce. However, "if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated

in enforcing the right of the corporation or association," the derivative action may not be maintained. Fed. R. Civ. P. 23.1(a).

"To determine adequate representation: (1) the plaintiff's attorney must be qualified, experienced and generally able to conduct the litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." *Joseph Oats Holdings, Inc. v. RCM Digesters, Inc.*, No. CV 06-4449 (NLH), 2008 WL 11381898, at *4 (D.N.J. Mar. 27, 2008)(citing *Vanderbilt v. Geo–Energy Ltd.*, 725 F.2d 204, 207 (3d Cir. 1983)). Here, AustarPharma does not challenge the "competency of Austar International's counsel." (DE 16-3 at 15). I therefore focus on whether Austar International has interests "antagonistic" to those of the class.

AustarPharma asserts that Austar International is not an adequate representative because it has a conflict of interest. (DE 16-3 at 14–18). Austar International is alleged to be acting out of self-interest, and not in the interests of AustarPharma. (*Id.* at 12,14–16). The complaint, says AustarPharma, blends individual and derivative claims, thereby compromising Austar International's undivided loyalty to AustarPharma's interests. (*Id.* at 16–17).

Austar International responds that it is an appropriate representative because AustarPharma's shareholders consist solely of Dr. Liu and Austar International. (DE 22 at 27). If Austar International does not act to prevent Dr. Liu from violating his fiduciary and contractual duties to AustarPharma, no one else can or will. As president, CEO, and majority shareholder of AustarPharma, Dr. Liu will remain in a position to harm AustarPharma in order to benefit his newly formed businesses. (*Id.*).

Under Rule 23.1(a), the relevant inquiry is whether Austar International can appropriately represent "similarly situated" shareholders. *Vanderbilt*, 725 F.2d at 207 ("In order to dismiss a derivative plaintiff for this reason, a court must find that the class representative has interests antagonistic to those of the class."); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949). ("[A] stockholder who brings suit on a cause of action derived from the

corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated.").

At the motion dismiss stage, district courts are not called upon to make affirmative factual findings that a named plaintiff will fairly and adequately represent the interests of other shareholders. The Rule is more modest; it provides only that a derivative suit "may not be maintained if it appears that the named shareholder does not fairly and adequately represent the other shareholders." *See* Fed. R. Civ. P. 23.1(a). The burden of demonstrating inadequacy ultimately rests on the defendant. *Lewis*, 671 F.2d at 788 (citation omitted)("The burden is on the defendant to demonstrate that the representation will be inadequate.").

In considering whether a plaintiff's interests are antagonistic to those of the relevant shareholder class, courts consider a number of factors:

> economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Vanderbilt*, 725 F.2d at 207 (citing *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir. 1980)).

The purpose of the Rule is to head off "the question of adequacy of representation [that] may arise when the plaintiff is one of a group of shareholders or members." Fed. R. Civ. P. 23.1, Advisory Committee Note (1966). Here, there is no such "group." Rather, there are, effectively, just two shareholders here: the complainant, Austar International, and Dr. Liu, who is alleged to be the wrongdoer. In such a case, the issue of adequacy of representation barely arises at all; Austar International does not purport to speak for Dr. Liu.

"Although the issue has not been squarely addressed by the Third Circuit, other courts have held that a single shareholder such as [plaintiff] may pursue a derivative claim." *Joseph Oats Holdings, Inc. v. RCM Digesters, Inc.*, No. CV 06-4449 (NLH), 2008 WL 11381898, at *5 (D.N.J. Mar. 27, 2008)(citing *Larson v. Dumke*, 900 F.2d 1363, 1368 (9th Cir. 1990)("Although the cases are not uniform, we are persuaded that a single shareholder may bring a derivative suit."); *Jordon v. Bowman Apple Products Co. Inc.*, 728 F. Supp. 409, 413 (W.D. Va. 1990)("the court concludes that the plaintiff constitutes a legitimate class of one and adequately and fairly represents those shareholders similarly situated"); *Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177 (N.D. Ill. 1987); *Nagy v. Riblet Products Corp., et al.*, No. S90–202 (RLM), 1991 WL 332633 (N.D. Ind. Oct. 16, 1991)).

Equitable considerations militate in favor of finding that there can be a class of one for if "this were not the case, then a minority shareholder such as [plaintiff] would be left without a remedy for the alleged misconduct of all other shareholders." *Joseph Oats*, 2008 WL 11381898, at *5 (citing *Halsted Video*, 115 F.R.D. at 180). That Austar International represents only itself thus does not automatically disqualify it from bringing derivative claims.

Accepting the allegations of the complaint as true, I cannot find that Austar International appears to be an inadequate representative. It would be inappropriate to bar this action on Rule 23.1(a) grounds at this, the motion to dismiss stage.

### ii. Rule 23.1(b) requirements

I must next determine whether the three pleading requirements under Rule 23.1(b) have been satisfied. I find that they have been.

The complaint, as AustarPharma concedes, alleges that Austar International was at all relevant times a shareholder, thereby satisfying Rule 23.1(b)(1). I turn my attention to Rule 23.1(b)(2) and (b)(3). AustarPharma's briefing primarily focuses on (b)(3); I will begin my inquiry there.

## 1. Rule 23.1(b)(3) requirements

As stated in Section II.a, *supra*, the complaint must allege with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort. Fed. R. Civ. P. Rule 23.1(b)(3). "Rule 23.1 mandates a heightened pleading standard and requires that a shareholder plead with particularity both the demand and the corporation's refusal because a derivative action 'is a remedy of last resort.'" *Bravetti v. Liu*, No. CIV.A. 12-7492 MAS, 2015 WL 1954466, at *4 (D.N.J. Apr. 29, 2015)(citation omitted). "[W]here inaction is the heart of the allegation, the plaintiff bears the burden of demonstrating a reasonable doubt as to the validity of the business judgment presumption" that the directors acted properly in the company's interest. *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007).

Defendants make a counterintuitive ju-jitsu-like argument that the plaintiff *did* make a demand, thereby forcing the plaintiff to establish that it *didn't*. AustarPharma asserts that Austar International has not met its burden under Rule 23.1(b)(3) because the complaint (a) fails to plead the details of any demand made by Austar International or (b) state why Dr. Liu's refusal to act was wrongful. (DE 16-3 at 10–12). According to AustarPharma, Austar International impermissibly omits the fact that it did make a demand in the form of a February 13, 2018 letter to Dr. Liu. (*Id.*). The complaint, because it contains no allegations as to this letter, is therefore said to be insufficient. (*Id.*). Moreover, says AustarPharma, the court should ignore plaintiff's arguments concerning demand futility because "[o]nly '[i]f a demand has not been made' is it appropriate for a derivative plaintiff to explain 'the reasons a demand under subsection a. of section 68 of this act would be futile.' N.J.S.A. 42:2C-70(b)." (*Id.* at 11).

Austar International chooses to rest on the ground of futility. It concedes that this February letter exists, but argues that it was not a formal demand: it

was not directed to the board, did not ask the board to take any action, and related instead to negotiations between the parties to acquire Austar International's interest in AustarPharma. (DE 22 at 29–33). An actual demand, it says, would have been futile, and the complaint adequately alleges this. The complaint alleges futility because Dr. Liu "controls two of the four directors and because approval or consent of members owning in excess of 60% of the total LLC membership interests is necessary to authorize suit." (*Id.* at 33). Because Dr. Liu is the beneficial owner of 56% of the LLC, he can block any litigation. (*Id.*).

All of this is too clever by half. Defendants argue in the same breath that the letter was a demand, and that it was not a demand, because it asserted only the parochial interests of Austar International. Both sides concede that Dr. Liu—the very person accused of wrongdoing—is the beneficial owner of 56% of the shares, and has a blocking position such that a demand would have been futile. (DE 23 at 5–7).[4]

Accordingly, the complaint satisfies the requirements of Rule 23.1(b)(3) because it sufficiently pleads demand futility.

### 2. Rule 23.1(b)(2) requirements

I further find that Austar International has satisfied the pleading requirements of Rule 23.1(b)(2). Rule 23.1(b)(2) requires a plaintiff to "allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack." Fed. R. Civ. P. 23.1(b)(2).

---

[4]    Plaintiff suggests that a formal demand would have been futile for the separate reason that the board could not, without the support of 60% of the shareholders, seek or obtain the relief sought here. Pursuant to Article 6.1 of the Operating Agreement, "the approval or consent of Members owning an aggregate of more than 60% of the total LLC Interests shall be required" in order for AustarPharma to take certain actions set forth therein. These include decisions to "cause the Company to participate in any capacity . . . in any business organization or enterprise," to "own, improve, develop, operate, manage and lease real estate," to "borrow money from any Member, bank, lending institution or other lender for any purpose of the Company," and to "enter into, terminate or amend any Related Party Transaction."

AustarPharma contends that the complaint is devoid of any such allegations. (DE 16-3 at 12–13). Austar International responds that where federal-question subject matter jurisdiction is alleged, *see* 28 U.S.C. § 1331, the non-collusive pleading requirement of Rule 23.1(b)(2) is not implicated. (Pl. Br. 24, DE 22 at 35 (citing *Markowitz v. Brody*, 90 F.R.D. 542, 549 n.2 (S.D.N.Y. 1981); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1458 (D.N.J. 1987)). I agree. As outlined infra, *see* Section II.c.ii, Austar International has asserted a viable claim under the DTSA. Because that federal-law claim has substance and creates federal-question jurisdiction by its own force, it cannot be said to be a "collusive" jurisdiction-creating device. Moreover, there is no appearance of collusion between this minority shareholder and the majority-controlled corporation.

### b. New Jersey demand requirements

Because the complaint seeks to derivatively assert state law claims against Dr. Liu and Bostal, satisfaction of Rule 23.1 is not the end of my threshold inquiry. I must now determine whether New Jersey state-law requirements concerning plaintiff's pre-suit demand have been satisfied.

"Federal Rule of Civil Procedure 23.1 provides the procedural vehicle for addressing the adequacy of a derivative plaintiff's pleadings, [t]he substantive requirements of demand are a matter of state law." *Freedman v. Redstone*, 753 F.3d 416, 424 (3d Cir. 2014) (internal quotations and citations omitted). This is because "[c]orporations . . . are creatures of state law, . . . and it is state law which is the font of corporate directors' powers." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991) (citations omitted). Thus, federal courts hearing shareholders' derivative actions involving state-law claims, as is the case here, must not only apply federal procedural requirement of particularized pleading, but also apply state substantive law. *Id.* at 98–99.

The pre-suit demand requirements of a member of a limited liability company are outlined in N.J. Stat. Ann. 42:2C–68:

> A member may maintain a derivative action to enforce a right of a limited liability company if:

a. the member first makes a demand on the other members in a member-managed limited liability company, or the managers of a manager-managed limited liability company, requesting that they cause the company to bring an action to enforce the right, and the managers or other members do not bring the action within a reasonable time; or

b. A demand under subsection a. of this section would be futile.

New Jersey limited liability company law therefore expressly preserves a member's ability to plead demand futility to satisfy the pleading requirements of N.J. Stat. Ann. 42:2C–68. This is to be distinguished from the pre-suit demand requirements that apply to corporations. In 2013, the NJBCA was amended and now categorically requires shareholders to make a pre-suit demand on a corporation prior to filing a derivative suit. That new statutory language purposely omitted any "demand-futility" language. *See* N.J. Stat. Ann. 14A:3-6.3.[5] Moreover, "In January 2018, the NJBCA was amended so as to apply the shareholder derivative provisions automatically, making the provisions applicable unless the corporation indicated otherwise in its certificate of incorporation." *Hirschfeld v. Beckerle*, No. CV1814796FLWDEA, 2019 WL 4727819, at *3–*4 (D.N.J. Sept. 27, 2019).

As I say, however, the limited liability company statute has not been amended in the same manner; Austar International's ability to plead demand futility to satisfy the pre-suit demand requirement for its state law claims remains. As noted *supra*, Section II.a.ii.1, Austar International has sufficiently alleged that demand on AustarPharma would be futile under Rule 23.1. The

---

[5]    N.J. Stat. Ann. 14A:3-6.3 provides that:

No shareholder may commence a derivative proceeding until:

(1) a written demand has been made upon the corporation to take suitable action; and

(2) 90 days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

same analysis applies to plaintiff's pre-suit demand under N.J. Stat. Ann 42:2C-68, which I find is likewise satisfied.

### c. Pleading requirements under Rule 12(b)(6)
#### i. Legal standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

Dr. Liu and Bostal move to dismiss four of the seven counts for failure to state a claim: Count 3 (Conversion), Count 4 (DTSA), Count 5 (NJTSA), and Count 6 (Tortious interference).

### ii. Count 4 (DTSA) and Count 5 (NJTSA)

The DTSA provides a civil cause of action to "[a]n owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA is applicable to conduct outside the U.S. if "(1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837. Under the DTSA:

> (3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). The term "misappropriation" is defined as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who--
>
> > (i) used improper means to acquire knowledge of the trade secret;
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
> >
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; . . . .

18 U.S.C. § 1839(5). Improper means includes "theft, bribery, misrepresentation, breach or inducement of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6).

To prevail on a claim for misappropriation of trade secrets under New Jersey law (NJTSA), a party must establish: "(1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Merckle GmbH v. Johnson & Johnson*, 961 F.Supp. 721, 730 (D.N.J. 1997); *Rycoline Prods., Inc. v. Walsh*, 756 A.2d 1047, 1052 (N.J. Super. Ct. App. Div. 2000). The NJTSA contains virtually identical definitions of trade secret, misappropriation, and improper means. N.J. Stat. Ann. 56:15-2.

Thus, "[f]or courts in this district, the analysis under DTSA folds into that of NJTSA. The essential inquiry for a trade secret is whether the information derives economic value, the information is not readily ascertainable by other means, and the holder endeavors for it to remain confidential." *Scherer Design Grp., LLC v. Schwartz*, No. CV 18-3540, 2018 WL 3613421, at *4 (D.N.J. July 26, 2018), *aff'd sub nom. Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147 (3d Cir. 2019) (citing *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 423 (D.N.J. 2016) (quoting N.J. Stat. Ann. 56:15-2)). A plaintiff must have taken "precautions to maintain the secrecy of the trade secret." *Mu Sigma, Inc. v. Affine, Inc.*, 2013 WL 3772724, at * 8 (D.N.J. July 17, 2013).

Defendants allege that Austar International has not complied with Rule 12(b)(6)'s pleading standards because (1) the complaint does not specifically identify any trade secrets, but makes only vague and conclusory statements (DE 17-1 at 12-15); (2) the complaint does not allege any specific steps taken to keep AustarPharma's trade information secret (*Id.* at 16); and (3) the complaint does not identify any act of misappropriation, because to the extent there were trade secrets, Dr. Liu was contractually permitted to establish separate companies and use this technology. (*Id.* at 17–20).

Austar International counters that the complaint sufficiently meets the liberal pleading standards of Rule 8. Although it is at an informational disadvantage, says Austar International, it nevertheless succeeded in alleging factually what trade secrets are at issue, that the trade secrets were misappropriated, and the reasonable efforts to protect those trade secrets. (DE 22 at 48–49 (citing Compl. ¶¶ 72, 100, 21, 22)). First, says Austar International, the complaint outlines that Austar International's trade secret claims are based on the highly specialized and proprietary technologies, such as the water-insoluble drug delivery technologies and osmotic pump systems that AustarPharma developed, which are listed. (DE 22 at 54–55). Second, Austar International points to paragraph 73 of the complaint which outlines the steps AustarPharma took to protect its trade secrets, which included using non-disclosure agreements, requiring third parties to sign confidentiality agreements, and instructing employees to keep all information confidential. (Compl. ¶ 73). Third, Austar International argues that the complaint sufficiently alleges misappropriation because it alleges that Dr. Liu had reason to know that, under the terms of his agreements with AustarPharma, he was not permitted to use its trade secrets, develop a nearly identical business using AustarPharma's products and systems, and poach AustarPharma employees. (DE 22 at 64–66).

Considering all of these allegations in the light most favorable to plaintiff, I find that Austar International has alleged "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Indeed, a plaintiff "need not make out

specific allegations as to exactly how Defendants used or disclosed Plaintiff's trade secrets; there is no heightened pleading standard for a misappropriation claim, and Plaintiff is entitled to seek discovery to support [its] allegations setting forth a prima facie claim." *Osteotech, Inc. v. Biologic*, 2008 WL 686318, at *5 (D.N.J. Mar. 7, 2008) (denying motion for judgment on the pleadings as to plaintiff's claim for misappropriation of trade secrets under New Jersey law). I consider also that the necessary information is largely in the hands of Dr. Liu, not the plaintiff. In any event, the complaint sufficiently asserts that AustarPharma's trade secrets consisted of the listed proprietary drug delivery technologies that AustarPharma had developed; the allegation is that Dr. Liu lifted them wholesale and transferred them to Bostal. That may or may not turn out to be correct, but it has been alleged.

The complaint also sufficiently alleges that AustarPharma endeavored to keep information about these technologies confidential. Finally, the complaint alleges other facts giving rise to an inference of misappropriation. AustarPharma had been developing this technology for years. Borstal was quickly able to develop, market, and even patent the same technology. It is inferable that this was not a coincidence, given that the same individual is at the helm of these two similar businesses.

All in all, I find that the DTSA and the NJTSA claims include sufficient "factual allegations to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Accordingly, defendants' motion to dismiss these claims is denied.

Having determined that Austar International has validly stated a claim under the DTSA, there is no basis for this Court to decline supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a)("in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). "District courts will exercise supplemental jurisdiction if the

federal and state claims 'are merely alternative theories of recovery based on the same acts.'" *Lyon v. Whisman*, 45 F.3d 758, 761 (3d Cir. 1995)(citing *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474, 479 (3d Cir. 1979)). *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)(holding a district court may exercise supplemental jurisdiction where state-law claims share a "common nucleus of operative fact" with the claims that supported the district court's original jurisdiction). "For example, when the same acts violate parallel federal and state laws, the common nucleus of operative facts is obvious and federal courts routinely exercise supplemental jurisdiction over the state law claims." *Lyon*, 45 F.3d at 761.

Here, plaintiff's federal and state law claims arise from the same facts and the same allegations of wrongful conduct by Dr. Liu. I will therefore exercise supplemental jurisdiction over Austar International's state law claims (Counts 1 to 3 and 5 to 7) under § 1367(a).

Defendants have moved to dismiss two of the state law claims, Count 3 and Count 6, for failure to state a claim. I turn to those next.

### iii. Count 3 (Conversion)

"In New Jersey, conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Capital Health Sys. v. Veznedaroglu*, 2017 WL 751855, at *10, 2017 U.S. Dist. LEXIS 28390, at *32-33 (D.N.J. Feb. 27, 2017) (quoting *Ricketti v. Barry*, 2015 WL 1013547, at *8 (D.N.J. Mar. 9, 2015)); *see Chi. Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456, 978 A.2d 281 (App. Div. 2009); *Scholes Elec. & Communs. v. Fraser*, 2006 WL 1644920, at *4, 2006 U.S. Dist. LEXIS 39287, at *11 (D.N.J. June 14, 2006). Common law conversion consists of the following elements: "(1) the existence of property, (2) the right to immediate possession thereof belonging to [the] plaintiff, and (3) the wrongful interference with that

right by [the] defendant." *Capital Health Sys.*, 2017 WL 751855, at *10, 2017 U.S. Dist. LEXIS 28390, at *33.

The tort of conversion developed historically with respect to chattels, but it has also been applied to money. *See, e.g., Hirsch v. Phily*, 4 N.J. 408, 416, 73 A.2d 173 (1950); *Glenfed Fin. Corp. v. Penick Corp.*, 276 N.J.Super. 163, 181, 647 A.2d 852 (App. Div. 1994), *certif. denied*, 139 N.J. 442, 655 A.2d 444 (1995). Still, it does not extend to these intangibles. Allegations that a defendant "misappropriated [plaintiff's] intangible trade secrets and applied them to [defendant's] business operation" is insufficient to state a claim for conversion "because [plaintiff did] not allege that Defendants are in possession of any of [plaintiff's] tangible property." *Premio Foods, Inc. v. Purdue Farms, Inc.*, No. 11-CV-4968 DMC-JAD, 2012 WL 3133791, at *6 (D.N.J. July 30, 2012).

Austar International vaguely asserts that defendants are in possession of its corporate "funds" and personnel who were poached from AustarPharma. (Compl. ¶ 96). These allegations do not sufficiently establish element 1, the existence of converted property. Persons are not chattel and therefore cannot be the basis of a conversion claim. Nor does Austar International's vague reference to "funds" satisfy Rule 8. To the extent Austar International claims that Dr. Liu used Austar International's corporate funds to benefit himself or Bostal, these allegations are not well-pled. To the extent Austar International's claim of conversion seeks to recover the misappropriated trade secrets or lost profits (as opposed to, say, identifiable funds that were taken), it does not state a claim of conversion of tangible property. *See Premio Foods*, 2012 WL 3133791, at *6 (finding plaintiff's claim that defendant misappropriated [plaintiff's] intangible trade secrets did not amount to a conversion of tangible property); *Foley Mach. Co. v. Amland Contractors, Inc.*, 209 N.J. Super. 70, 78, 506 A.2d 1263, 1268 (App. Div. 1986)(stating that a plaintiff can recover the value of converted property and interest but cannot recover lost profits). Accordingly, the complaint fails to sufficiently plead element (1), the existence

of tangible property. The Rule 12(b)(6) motion of Dr. Liu and Bostal to dismiss Count 3 (DE 17) is granted.

### iv. Count 6 (Tortious interference)

The elements of tortious interference with economic advantage are (1) a "reasonable expectation of economic advantage"; (2) interference done intentionally and with malice; (3) injury, in the sense of the loss of prospective gain; and (4) damages. *MacDougall v. Weichert*, 677 A.2d 162, 174 (1996). The protectable right need not be a contract, but "there must be allegations of fact giving rise to some reasonable expectation of economic advantage." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989) (citation and internal quotation marks omitted).

A plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference, but it must identify one. *See Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787, 790 (3d Cir. 2009) (indicating that to state a claim for tortious interference under New Jersey law a plaintiff must identify at least a "single, specific customer" that it lost or could have acquired). "[A] plaintiff must do more than assert that it lost business. Rather it 'must allege facts that show an existing or prospective economic or contractual relationship' for a 'mere allegation of lost business does not suffice.' " *Advanced Oral Techs., L.L.C. v. Nutrex Research, Inc.*, No. 10-5303, 2011 WL 1080204, at *4 (D.N.J. Mar. 21, 2011) (quoting *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 494 (D.N.J. 1998)). Accordingly, "the claimed loss of ... unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations." *Harmon v. Borough of Belmar*, No. 17-2437, 2018 WL 6068216, at *8 (D.N.J. Nov. 20, 2018) (alteration in original) (citation and internal quotation marks omitted).

Defendants contend that Austar International has not adequately pled the first three elements. (DE 17-1 at 27). First, defendants contend that Austar International bases this claim on the mere "hope of securing co-development

deals" in the future, and hence does not satisfy elements 1 and 3. (*Id.*) Second, the complaint's conclusory allegations do not, says defendants, adequately plead element 2, malice. (*Id.* at 28–29).

Austar International disagrees, stating that the complaint adequately alleges a number of business opportunities that Dr. Liu diverted to Bostal at the expense of AustarPharma. (DE 22 at 69–70). For example, the complaint cites to the Deyang Project, where Dr. Liu purported to invest in a pharmaceutical project on behalf of AustarPharma and the press release for the deal touted AustarPharma's investment. (Compl. ¶ 71). The complaint goes on to allege that Dr. Liu never revealed the project to AustarPharma's principals and managers, and that he diverted the benefits of the project to Bostal. (*Id.*).

These allegations are sufficient at the motion to dismiss stage to establish elements 1, a reasonable expectation of economic advantage, and 3, loss of prospective gain.

I turn to element 2: whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse.'" *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); *see also Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing—an evil-minded act....").

Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (*See, e.g.*, Compl. ¶¶ 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice.

Accordingly, defendants' motion to dismiss Count 6 is denied.

### d. Personal jurisdiction over Bostal

#### i. Standard

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing sufficient facts to show that jurisdiction exists. *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2007). Initially, a court must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff. *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Where factual allegations are disputed, however, the court must examine any evidence presented. *See, e.g., Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990) ("'A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.'" (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

If the district court does not hold an evidentiary hearing, "the plaintiff[s] need only establish a prima facie case of personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see also Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

To assess whether it has personal jurisdiction over a defendant, a district court must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 258-59 (3d Cir. 1998). First, the court is required to use the relevant state's long-arm statute to see whether it permits the exercise of personal jurisdiction. *Id.*; Fed. R. Civ. P. 4(k). "Second, the court must apply the principles of due process" under the federal Constitution. *WorldScape, Inc. v. Sails Capital Mgmt.*, No. 10-cv-4207, 2011 WL 3444218, at *3 (D.N.J. Aug. 5, 2011) (citing *IMO Indus.*, 155 F.3d at 259).

In New Jersey, the first step collapses into the second because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales*, 384 F.3d at 96 (citing N.J. Ct. R. 4:4-4(c)). Accordingly, personal jurisdiction over a non-resident defendant is proper in this Court if the defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

There are two kinds of personal jurisdiction that allow a district court to hear a case involving a non-resident defendant: general and specific. A court may exercise general jurisdiction over a foreign corporation where "the defendant's contacts with the forum are so 'continuous and systematic' as to render them essentially 'at home' in the forum state." *Senju Pharm. Co., Ltd. v. Metrics, Inc.*, 96 F. Supp. 3d 428, 435 (D.N.J. 2015) (citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

In contrast to general jurisdiction, specific jurisdiction relies on the defendant's forum-related activities that give rise to the plaintiffs' claims. To determine whether this court may exercise personal jurisdiction, this court must engage in a fact-intensive analysis. S*trategic Prod. & Servs., LLC v. Integrated Media Techs., Inc.*, No. CV1800694KSHCLW, 2019 WL 2067551, at *7 (D.N.J. May 10, 2019)

Here, all claims against Bostal are for intentional torts: Counts 3 (Conversion), 4 (DTSA), 5 (NJTSA), and 6 (Tortious Interference with Prospective Economic Advantage). Therefore, under the *Calder* effects test "an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the

forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *IMO Indus.*, 155 F.3d at 260, (*citing Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984); *Calder v. Jones*, 465 U.S. 783 (1984).

Under the *Calder* effects test, a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort outside the forum that has a particular type of effect upon the plaintiff within the forum if facts are alleged that meet the following conditions:

(A) the defendant committed an intentional tort;

(B) plaintiff must have felt the brunt of the harm caused by that tort in the forum such that the forum was the focal point of the harm suffered by the plaintiff as a result of that tort; and

(C) defendant "expressly aimed" his tortious conduct at the forum.

*See Calder*, 465 U.S at 789–90; *IMO Indus.*, 155 F.3d at 266.

### ii. Discussion

Austar International seemingly concedes that this court cannot exercise general jurisdiction over Bostal. Bostal is not incorporated in New Jersey and does not have its principal place of business in New Jersey. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). I therefore address whether this court can exercise specific jurisdiction over Bostal.

As stated above, establishing specific jurisdiction requires a three-part inquiry as to whether: **(A)** defendant committed an intentional tort; **(B)** plaintiff was primarily harmed in the forum; and **(C)** defendants aimed their tortious conduct at the forum. Elements A and B are sufficiently alleged.[6] The crux of

---

6       During oral argument, defendants averred that element (A)—defendant committed an intentional tort—has not been sufficiently pled either. I have already held, however, that the pleading of these counts is sufficient to withstand a Rule 12(b)(6) motion to dismiss. Plaintiff asserts in its complaint that Bostal committed several intentional torts including misappropriation of AustarPharma's trade secret information and tortious interference with prospective economic advantages. The complaint also asserts that AustarPharma is incorporated in New Jersey, has its principal place of business in New Jersey, and has its primary operating factories in New Jersey. Thus, the focal point of the harm is felt by AustarPharma in New Jersey. *See Frutta Bowls Franchising LLC v. Bitner*, No. CV 18-2446 (FLW), 2018 WL 6499760, at *5 (D.N.J. Dec. 10, 2018).

Bostal's briefing is that the complaint does not satisfy the requirement of element C that Bostal aimed its tortious conduct at the forum.

On that score, Bostal asserts that "Plaintiff does not allege that Bostal acted with the specific intent to use any alleged misappropriated trade secrets to compete with AustarPharma or to interfere with its prospective business relations in New Jersey." (DE 17-1 at 23). Bostal also asserts that it could not have expressly aimed its conduct at New Jersey because it is not qualified or registered to do business in New Jersey. (*Id.*; *see also* DE 17-4 (Declaration of Xiang Wu) at ¶¶ 2–15).

Austar International responds that the location of Bostal's incorporation or operations is irrelevant to the *Calder* effects test. (DE 22 at 79). The complaint and the documents attached to it establish that Bostal targeted New Jersey because its chairman of the board, manager, and founder, Dr. Liu, resides in New Jersey. It is allegedly through Dr. Liu that Bostal targeted a New Jersey corporation to acquire its trade secrets. Bostal is also alleged to have recruited and hired at least thirteen AustarPharma employees, trained Bostal employees in New Jersey, and interfered with economic opportunities that would have benefited AustarPharma in New Jersey. (*Id.*). Thus, regardless of where Bostal ultimately operates, it still intentionally targeted AustarPharma in New Jersey to gain these advantages. (*Id.* at 79-81).

Austar International relies on *Strategic Prod. & Servs., LLC v. Integrated Media Techs., Inc.*, No. CV1800694KSHCLW, 2019 WL 2067551, at *7 (D.N.J. May 10, 2019). I agree that *Strategic,* if not entirely on point, is instructive here. The complaint in *Strategic* alleged that the defendant raided a New Jersey company's video conferencing business such that its "profit center" was lost. The complaint also asserted that the plaintiff's "employees reported to its New Jersey headquarters" and that "relevant to the jurisdictional inquiry: the employees who made up the videoconferencing unit that migrated to [defendant] were assets fully tied to New Jersey by the indices of their employment. By targeting them, [defendant] targeted New Jersey assets."

Here, Bostal allegedly raided two kinds of assets, both of them tied to New Jersey: (1) the technological products that were researched and developed in New Jersey, and (2) the New Jersey AustaPharma who allegedly became employees of Bostal. Most notably, Dr. Liu—the CEO of AustarPharma, who is alleged to be the key driver behind AustarPharma's business—is simultaneously alleged to be using his position as CEO to gut a New Jersey business for the benefit of his other business, Bostal.

The complaint alleges that AustarPharma is incorporated and headquartered in New Jersey, and that it researches and develops its products here. (*See, e.g.,* DE 1-3 at 4, 9). Moreover, the complaint states that Dr. Liu still resides in New Jersey and has been operating both AustarPharma, Bostal, and its affiliated entities from New Jersey. (*See* DE 1-4 at 4 (noting that Liu Rong is located at Warren, NJ) DE 1-5 at 11). Moreover, Bostal's 2017 Capital Increase Agreement suggests a nexus with AustarPharma in New Jersey; as affiliated Bostal entities, it lists AustarPharma, LLC and AustarPharma (BJ). It also lists as "core team" members several individuals who are alleged to be current or former AustarPharma employees, including Qiang ("Dillon") Gao, Junjie Peng, Yan Liu, Yuehan Hou, and Xiaoling Zhang. (DE 1-4 at 36). The complaint further alleges a number of ways in which Bostal has targeted AustarPharma in New Jersey by "developing 'solubilization techniques for poorly soluble drugs' – nearly identical to AustarPharma's water-insoluble drug delivery technology. And among its core products and technologies, the Guangzhou Company's [*i.e.,* Bostal's] Capital Increase Agreement – like AustarPharma's 'core competences' – also lists osmotic pump controlled-release technology, nano-solubilization technology, and liposomal formulation technology." (Compl. ¶ 62 (citing DE 1-4)).

As pleaded in the complaint, then, I find that the ways in which Bostal is alleged to have intentionally targeted AustarPharma in New Jersey to be sufficient to meet the third-prong of the *Calder* effects test. Bostal's motion to dismiss on jurisdictional grounds is therefore denied.

### e. Simultaneous proceedings

After defendants filed their motions to dismiss in this action, on July 11, 2019 plaintiff filed a similar complaint in The People's Republic of China seeking injunctive and monetary relief against Dr. Liu, Bostal, and AustarPharma (the "Chinese Action"). (DE 59). In November 2019, defendants submitted letter briefs to this Court seeking as an alternative remedy that the Court dismiss or stay this action in favor of the action pending in China, based on international comity and fairness. (DE 59, 61). Austar International opposes this relief (DE 62).

### i. Standard

A federal court may, in its discretion, dismiss a case based on comity. *Int'l Bus. Software Sols., Inc. v. Sail Labs Tech., AG*, 440 F. Supp. 2d 357, 364 (D.N.J. 2006)(citing *Lexington Ins. Co. v. Forrest*, 263 F.Supp.2d 986, 1002 (E.D. Pa. 2003)). The Third Circuit outlined in *Somportex Ltd. v. Philadelphia Chewing Gum Corp* the principles of comity that guide my decision here:

> Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect. *See* Orfield and Re, International Law, Note, "Recognition and Enforcement of Foreign Judgments and Awards," pp. 736-737.

453 F.2d 435, 440–41 (3d Cir. 1971). "To determine whether international comity warrants a stay or dismissal, a court should consider whether **[1]** the foreign country has jurisdiction over the actions, *Philadelphia Gear Corp. v. Philadelphia Gear, S.A.*, 44 F.3d 187, 194 (3d Cir.1994); **[2]** whether the actions are parallel, *Hay Acquisition*, No. CIV.A. 2:04-CV-1236, 2005 WL 1017804, at *11 (E.D. Pa. Apr. 27, 2005); **[3]** whether there exist "extraordinary

circumstances" justifying the stay or dismissal, *Id.* at *12; **[4]** and whether the United States' public policy militates against a stay or dismissal, *Philadelphia Gear*, 44 F.3d at 191." *Canada Life Assur. Co. v. Converium Ruckversicherung (DEUTSCHLAND) AG*, No. CIV. 06-3800 GEB, 2007 WL 1726565, at *7 (D.N.J. June 13, 2007). "Parallel" (or "duplicative") means there is a "'substantial likelihood that the [foreign] litigation will dispose of all claims presented in the federal case.'" *Lexington Ins. Co.*, 263 F.Supp.2d at 1,003 (quoting *Lumen Constr. Inc. v. Brant Const. Co.*, 780 F.2d 691, 695 (7th Cir. 1985)).

Still, for a federal court to withhold its jurisdiction over a duplicative action is the exception, not the norm: "Once a district court has found that litigation is parallel to that taking place in the courts of a foreign sovereign, it must look for "extraordinary circumstances" that necessitate dismissal, which include (1) the desirability of avoiding duplicative litigation, (2) the inconvenience of the domestic forum, (3) the governing law, (4) the order in which jurisdiction was obtained in each forum, (5) the relative progress of each proceeding, and (6) the contrived nature of the domestic claim. In the absence of such extraordinary circumstances, the district court should retain jurisdiction over the action." *Hay*, 2005 WL 1017804, at *12 (internal citation omitted).

### ii. Discussion

With respect to **(1)**, the parties do not deny that China has the necessary subject matter and personal jurisdiction to hear the claim filed there. (*See* DE 59 at 3–4). Although personal jurisdiction over Bostal is challenged in this action, I have denied that challenge. *See* Section II.d.ii, *supra*. To the extent Bostal may nevertheless be vulnerable to an ongoing jurisdictional challenge in light of developing facts, this factor may weigh slightly in favor of a stay.

I turn to factor **(2)**, whether the two actions are "parallel." Defendants argue that the two proceedings are parallel because they involve the same parties, the same issues, and the same facts. (DE 59 at 4–5). Austar International disagrees, stating that because it is asserting different claims and

is seeking different relief in the U.S. action. (DE 62 at 2–5). This New Jersey action differs from the Chinese action, says Austar International, because it is seeking protection under different laws, including the federal DTSA claim, which it cannot assert in China. (*Id.* at 3). Conversely, the Chinese Action affords remedies not available here, such as a pretrial order to freeze certain Chinese assets. (*Id.*). Austar International argues in addition that U.S. courts routinely continue to exercise jurisdiction despite a similar proceeding pending elsewhere when neither court has entered a decision on the merits. (*Id.* at 6).

I find that the Chinese Action would not dispose of all of the claims in this action. In particular, the Chinese Action would not protect Austar International's rights to seek redress for violations of the DTSA. Therefore, I find that the two proceedings are not, or at least not entirely, parallel. *See Lexington Ins. Co.*, 263 F. Supp. 2d at 1,003.

Even setting aside the distinctions between the two actions, I would find dismissal or a stay premature at this early stage, where neither is close to a decision on the merits. "[P]arallel proceedings are ordinarily permitted to proceed simultaneously, at least until one has reached the stage where its ruling becomes res judicata." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 157 (3d Cir. 2001). *See also Univ. of Maryland at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265, 275–76 (3d Cir. 1991)("The general rule regarding simultaneous litigation of similar issues in both state and federal courts is that both actions may proceed until one has come to judgment, at which point that judgment may create a res judicata or collateral estoppel effect on the other action.").[7]

Another factor weighs against a too-early stay or dismissal. Defendants have moved to dismiss or stay *both* the New Jersey and the Chinese action. In each one, they argue that the court should defer to the other forum. (*See* DE 59 at 5; DE 62 at 1). For both motions to be granted—leaving no forum at all—

---

[7]    On November 22, 2019, the parties updated the Court on the status of the Chinese Action. They agreed that a decision on the merits was not imminent. (DE 63).

would obviously be an absurd result. The more prudent course is to wait and see which emerges as the more desirable and efficacious forum.

Accordingly, factor **(2)** weighs against enforcing a stay or dismissal of this action based on principles of comity.

With respect to factor **(3)**, the majority of the "extraordinary circumstances" factors militate against a stay or dismissal:

1. Duplicative litigation – Defendants argue that the actions are similar and seek similar remedies; therefore to allow both actions to proceed would waste this Court's time and resources. (DE 59 at 6). Austar International reiterates that the action here seeks different remedies and claims that are unavailable in China. (DE 62 at 7). As noted above, I find that the litigation is not wholly duplicative. This factor weighs against a stay or dismissal.

2. Inconvenience of the domestic forum – Defendants assert that China is no less convenient a forum than New Jersey because Bostal is located in China, its witnesses and documents are in China, and it would be time consuming for it to litigate here. (DE 59 at 6). Austar International counters that this action concerns a New Jersey LLC and is centered around the acts of an individual, Dr. Liu, who is located in New Jersey and whose actions in New Jersey are essential to the dispute. (DE 62 at 7).

   Because Dr. Liu resides in New Jersey, conducted his affairs from New Jersey, and will likely be a key witness, I find that this factor also weighs against dismissal or a stay. No undue burden is imposed by forcing the parties to litigate this dispute in New Jersey.

3. Governing law – Defendants claim that there does not "appear to be any substantive difference between U.S. and Chinese law that justifies permitting the New Jersey Action to proceed." (DE 59 at 7). Austar International contends that Chinese courts are not well suited to adjudicate trade secret misappropriation claims. (DE 62 at 7). I agree. I find no compelling reason to support staying or dismissing this action in favor of allowing a Chinese court to decide issues concerning a U.S. contract, U.S. contract law, and U.S. trade secrets laws. This factor weighs against a stay or dismissal.

4. Order in which jurisdiction was obtained in each forum – The New Jersey action was filed first. The "first-filed" rule, however, applies as between courts within the United States. *See Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877, 887 (3d Cir. 1981), *aff'd*, 456 U.S. 694 (1982) ("The rule has never been applied, and in fact it was never meant to apply where the two courts involved are not

courts of the same sovereignty."). Defendants note that Bostal has moved (unsuccessfully, as of now) to dismiss this action for lack of personal jurisdiction in New Jersey, but no defendant has done so in China. (DE 59 at 7). This factor does not tip the balance either way.

5. <u>Progress of each proceeding</u> – Defendants contend that the Chinese action will likely progress more quickly. (DE 59 at 8; DE 61 at 2). Austar International contends that this action has progressed more quickly as defendants have not even been served in the Chinese Action. (DE 62 at 8). Still, both proceedings are in their infancy. This factor is neutral.

6. <u>Contrived nature of the domestic claim</u> – Defendants suggest that the only reason Austar International filed this action in New Jersey was to get access to purportedly broad discovery as opposed to the Chinese Action, which defendants believe will involve more narrow discovery. (DE 59 at 8). I find this argument unavailing. The complaint as pled makes clear that a New Jersey entity has been harmed and has pled a series of viable claims. I therefore find that this factor weighs against a stay or dismissal.

Finally, factor **(4)** regarding public policy, also weighs in favor of denying a stay or dismissal. Defendants' argument is essentially that dismissal or a stay in favor of the Chinese Action would not compromise any interest or public policy of the U.S. (DE 59 at 9). But, it serves the public interest to ensure that a United States owner of intellectual property has a forum to seek redress for alleged misuse of that intellectual property by another United States citizen living here and by a foreign corporation. The same policy favors allowing a U.S. court to interpret and enforce the provisions of a U.S. contract entered into by a U.S. citizen and which concerns a U.S. corporation. And the very rationale and purpose of the DTSA is, of course, the protection of trade secrets from foreign encroachment.

Accordingly, defendants' letter motions (DE 59, 61) for a stay or dismissal based on international comity are denied without prejudice to refiling based on further developments in this or the Chinese Action.

### III. Conclusion

For the reasons set forth above, the motion of AustarPharma to dismiss the complaint (DE 16) is **denied.**

The motion of Dr. Liu and Bostal to dismiss the complaint (DE 17) is **granted in part and denied in part**. The motion to dismiss Count 3 (Conversion) is granted without prejudice to the filing of a motion to amend the complaint within 30 days. The motion is in all other respects denied.

Defendants' letter motions for a stay or dismissal based on international comity (DE 59, 61) are **denied** without prejudice.

An appropriate order follows.

Dated: November 27, 2019

Kevin McNulty
United States District Judge